UNITED STATES DISTRICT COURT
FOR THE SOUTHER DISTRICT OF FLORIDA

CIVIL ACTION NO.:02-22032-CIV-HUCK/TURNOFF

LUCRECIA ESTEVEZ,

Plaintiff,

v.

EDUCATIONAL COMMISSION FOR
FOREIGN MEDICAL GRADUATES,

Defendant.

_____/

## SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF AMENDED COMPLAINT

ECFMG is a committee whose purpose in relevant part is to oversee foreign medical students.  It is empowered in large part due to the Mutual Educational and Cultural Exchange Act (See attached Code of Federal Regulations 22 CFR § 62.27) and is overseen directly by the Bureau of Educational and Cultural Affairs, which is a division of the United States Department of State.  The name of the Defendant-agency, the Educational Commission for Foreign Medical Graduates, belies its purpose and existence. It was licensed or contracted by the federal government, specifically the Department of State, to oversee foreign physician and exchange status matters.  (See attached Code of Federal Regulation 45 CFR § 51.2)  ECFMG's role as government agency is detailed in the Federal Code, including 22 CFR § 62.27 already attached hereto.  Further entanglement with the Federal Government is evidenced in (6) with the Secretary of Health and Human Services.  (See 22 CFR § 62.27).  We were unable to get more detail regarding the nature of ECFMG because the federal government, incredibly,  has not yet given the public information requested in July 2002



(FOIA request) of the agreement between the U.S. Department of State and ECFMG; undoubtedly, this agreement the Department of State is a document that would be requested and produced by the Defendant herein. In any event, discovery under the facts this case would clearly allow Estevez to further prove the government character and due process violations of ECFMG through discovery and at trial.

There is no law that prevents finding of an organization's actions to be governmental in character where the organization at issue, like ECFMG, is incorporated . Instead, the opposite is true, as enunciated by the United States Supreme Court: "actions of private entities can sometimes be regarded as governmental actions for constitutional purposes." see Lebron v. National Railroad Passenger Corporation, 513 U.S. 374, 115 S. Ct. 961, p.965. Although ECFMG is not a statutorily created entity like Amtrak in *Lebron*, it does derive its powers from an agreement or charter from the U.S. government. We argue that ECFMG is itself an agency, not just its actions, and that Estevez has a legitimate claim to due process, which was arguably not followed in even a minimal way herein. A private corporation may be a state or government actor "if the private entity has exercised powers that are traditionally the exclusive prerogative of the State." See Perpetual Securities, Inc. v. Tang, 290 F.3d 132 at 139, quoting Blum v.Yaretsky, 475 U,S, 991 (1982). Certainly, immigration matters, including those related to foreign physicians, have traditionally been under the exclusive prerogative of the federal government. The Pennsylvania seal of incorporation of ECFMG should not allow the federal government, through ECFMG, to avoid its constitutional obligations (see *Lebron).*

A government or quasi-government agency decision should be sufficiently detailed and informative in order to comport with minimum due process requirements. See Moore v. Ross, 502 F.Supp.543. We argue that the original decision and the appellate decision of ECFMG, an agency,

did not comport with minimum due process.  Estevez had very little time to present her case, but what she did present was substantial.  This evidence included letters, diplomas, and truthful live witnesses.  This is in great variance with a Board of Registration of Medicine decision involving the ECFMG, where the decision to suspend the foreign graduate was affirmed.  (See Benmosche v. Board of Registration in Medicine, 412 Mass. 82, 588 N.E.2d 621) In that case, the same school (UCE) was at issue, and *Benmosche* did not present a diploma, unlike Estevez.  Furthermore, Estevez has submitted an affidavit swearing that she attended UCE for four (4) credit years as well as other evidence, unlike *Benmosche*, who could only name two classmates and did not even attend the graduation.  The reviewing court in *Benmosche* arguably examined the procedure and evidence with due process considerations in mind, despite the fact that the government was not overtly, or nominally, involved.

Finally, the only case cited by Defendant, Davis v. Prudential Securities, Inc., 59 F. 3f 1186 (11th Cir., 1995) is not applicable to the facts of this case, as addressed in Plaintiff's Reply Motion, and is outweighed by the cases cited herein as well as Brentwood Academy v. Tennessee Secondary School Athletic Association, 531 U.S. 288 (2001).  Incorporated herein by reference is Plaintiff's Reply Memorandum to Defendant's Motion to Dismiss.

Respectfully Submitted,

Jerome H. Shevin

**I HEREBY CERTIFY** that a true and correct copy of the foregoing Amended Complaint was furnished via U.S. Mail this 13th day of January, 2003 to: Dale L. Friedman, Esquire, Conroy, Simberg, Ganon, Krevans & Abel, P.A., 3440 Hollywood Boulevard, 2nd Floor, Hollywood, Florida 33021.

Jerome H. Shevin, P.A.
Levey, Airan, Brownstein, Shevin, et al.

Attorneys for the Plaintiff
Gables One Tower, Penthouse
1320 S. Dixie Highway
Miami, Florida 33146
Telephone: (305) 661-6664

By: _____
    Jerome H. Shevin

45 CFR § 51.2
45 C.F.R. § 51.2

Page 1

**CODE OF FEDERAL REGULATIONS**
**TITLE 45--PUBLIC WELFARE**
**SUBTITLE A--DEPARTMENT OF HEALTH**
**AND HUMAN SERVICES**
**SUBCHAPTER A--GENERAL**
**ADMINISTRATION**
**PART 51--CRITERIA FOR EVALUATING**
**COMPREHENSIVE PLAN TO REDUCE**
**RELIANCE ON**
**ALIEN PHYSICIANS**
Current through December 19, 2002; 67 FR 77697

END OF DOCUMENT

§ 51.2 Application.

Materials covering procedures for applying for
substantial disruption waivers (including the
comprehensive plan) may be obtained from the
Educational Commission for Foreign Medical
Graduates, 3624 Market Street, Philadelphia,
Pennsylvania 19104.

EXPLANATORY NOTE: The Department of
State entered into an agreement with the
Educational Commission for Foreign Medical
Graduates in 1971 whereby the latter was
designated the authority to administer the issuance
of the Form IAP-66 in all cases involving the
admission, certification, transfer or extension of
stay for foreign physicians in exchange visitor status
who are receiving graduate medical education or
training. The Commission was further designated
the authority (FEDERAL REGISTER, Volume 44,
No. 59, March 26, 1979), to process waiver
requests under the "substantial disruption"
provision of Pub.L. 94- 484, as amended, within
criteria to be provided by the United States
Information Agency on advice from the Department
of Health and Human Services (formerly
Department of Health, Education, and Welfare).

<General Materials (GM) - References,
Annotations, or Tables>

45 C. F. R. § 51.2

45 CFR § 51.2

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

22 CFR § 62.27
22 C.F.R. § 62.27

**CODE OF FEDERAL REGULATIONS**
**TITLE 22--FOREIGN RELATIONS**
**CHAPTER I--DEPARTMENT OF STATE**
**SUBCHAPTER G--PUBLIC DIPLOMACY**
**AND EXCHANGES**
**PART 62--EXCHANGE VISITOR PROGRAM**
**SUBPART B--SPECIFIC PROGRAM**
**PROVISIONS**
Current through December 19, 2002; 67 FR 77697

§ 62.27 Alien physicians.

(a) Purpose. Pursuant to the Mutual Educational and Cultural Exchange Act, as amended by the Health Care Professions Act, Public Law 94-484, the Department of State facilitates exchanges for foreign medical graduates seeking to pursue graduate medical education or training at accredited schools of medicine or scientific institutions. The Department of State also facilitates exchanges of foreign medical graduates seeking to pursue programs involving observation, consultation, teaching, or research activities.

(b) Clinical exchange programs. The Educational Commission for Foreign Medical Graduates must sponsor alien physicians who wish to pursue programs of graduate medical education or training conducted by accredited U.S. schools of medicine or scientific institutions. Such Foreign Medical Graduates shall:

(1) Have adequate prior education and training to participate satisfactorily in the program for which they are coming to the United States;

(2) Be able to adapt to the educational and cultural environment in which they will be receiving their education or training;

(3) Have the background, needs, and experiences suitable to the program as required in § 62.10(a)(1);

(4) Have competency in oral and written English;

(5) Have passed either Parts I and II of the National Board of Medical Examiners Examination, the Foreign Medical Graduate Examination in the Medical Sciences, the United States Medical Licensing Examination, Step I and Step II, or the Visa Qualifying Examination (VQE) prepared by the National Board of Medical Examiners, administered by the Educational Commission for Foreign Medical Graduates. (NB--Graduates of a school of medicine accredited by the Liaison Committee on Medical Education are exempted by law from the requirement of passing either Parts I and II of the National Board of Medical Examiners Examination or the Visa Qualifying Examination (VQE)); and

(6) Provide a statement of need from the government of the country of their nationality or last legal permanent residence. Such statement must provide written assurance, satisfactory to the Secretary of Health and Human Services, that there is a need in that country for persons with the skills the alien physician seeks to acquire and shall be submitted to the Educational Commission for Foreign Medical Graduates by the participant's government. The statement of need must bear the seal of the concerned government and be signed by a duly designated official of the government. The text of such statement of need shall read as follows:

Name of applicant for Visa: ___. There currently exists in (Country) a need for qualified medical practitioners in the speciality of ___. (Name of applicant for Visa) has filed a written assurance with the government of this country that he/she will return to this country upon completion of training in the United States and intends to enter the practice of medicine in the specialty for which training is being sought. Stamp (or Seal and signature) of issuing official of named country.

Dated: _____

_____

_____

_____

Official of Named Country.

(7) Submit an agreement or contract from a U.S. accredited medical school, an affiliated hospital, or a scientific institution to provide the accredited graduate medical education. The agreement or contract must be signed by both the alien physician

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

and the official responsible for the training.

(c) Non-clinical exchange programs.

(1) A United States university or academic medical center which has been designated an exchange visitor program by the Secretary of State is authorized to issue Form DS-2019 to alien physicians to enable them to come to the United States for the purposes of observation, consultation, teaching, or research if:

(i) The responsible officer or duly designated alternate of the exchange visitor program involved signs and appends to the Form DS-2019 a certification which states "this certifies that the program in which (name of physician) is to be engaged is solely for the purpose of observation, consultation, teaching, or research and that no element of patient care is involved" or

(ii) The dean of the involved accredited United States medical school or his or her designee certifies to the following five points and such certification is appended to the Form DS-2019 issued to the perspective exchange visitor alien physician:

(A) The program in which (name of physician) will participate is predominantly involved with observation, consultation, teaching, or research.

(B) Any incidental patient contact involving the alien physician will be under the direct supervision of a physician who is a U.S. citizen or resident alien and who is licensed to practice medicine in the State of ___.

(C) The alien physician will not be given final responsibility for the diagnosis and treatment of patients.

(D) Any activities of the alien physician will conform fully with the State licensing requirements and regulations for medical and health care professionals in the State in which the alien physician is pursuing the program.

(E) Any experience gained in this program will not be creditable towards any clinical requirements for medical specialty board certification.

(2) The Educational Commission for Foreign

Medical Graduates may also issue Form DS-2019 to alien physicians who are coming to the United States to participate in a program of observation, consultation, teaching, or research provided the required letter of certification as outlined in this paragraph is appended to the Form DS-2019.

(d) Public health and preventive medicine programs. A United States university, academic medical center, school of public health, or other public health institution which has been designated as an exchange visitor program sponsor by the Secretary of State is authorized to issue Forms DS-2019 to alien physicians to enable them to come to the United States for the purpose of entering into those programs which do not include any clinical activities involving direct patient care. Under these circumstances, the special eligibility requirements listed in paragraphs (b) and (c) of this section need not be met. The responsible officer or alternate responsible officer of the exchange visitor program involved shall append a certification to the Form DS-2019 which states.

This certifies that the program in which (name of physician) is to be engaged does not include any clinical activities involving direct patient care.

(e) Duration of participation.

(1) The duration of an alien physician's participation in a program of graduate medical education or training as described in paragraph (b) of this section is limited to the time typically required to complete such program. Duration shall be determined by the Secretary of State at the time of the alien physician's entry into the United States. Such determination shall be based on criteria established in coordination with the Secretary of Health and Human Services and which take into consideration the requirements of the various medical specialty boards as evidenced in the Director of Medical Specialties published by Marquis Who's Who for the American Board of Medical Specialties.

(2) Duration of participation is limited to seven years unless the alien physician has demonstrated to the satisfaction of the Secretary of State that the country to which the alien physician will return at the end of additional specialty education or training has an exceptional need for an individual with such additional qualification.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

22 CFR § 62.27                                                                                    Page 3
22 C.F.R. § 62.27

(3) Subject to the limitations set forth above, duration of participation may, for good cause shown, be extended beyond the period of actual training or education to include the time necessary to take an examination required for certification by a specialty board.

(4) The Secretary of State may include within the duration of participation a period of supervised medical practice in the United States if such practice is an eligibility requirement for certification by a specialty board.

(i) Alien physicians shall be permitted to undertake graduate medical education or training in a specialty or subspecialty program whose board requirements are not published in the Director of Medical Specialists if the Division requirements are certified to the Secretary of State and to the Educational Commission for Foreign Medical Graduates by the Executive Secretary of the cognizant component board of the American Board of Medical Specialties.

(ii) The Secretary of State may, for good cause shown, grant an extension of the program to permit an alien physician to repeat one year of clinical medical training.

(5) The alien physician must furnish the Attorney General each year with an affidavit (Form I-644) that attests the alien physician:

(i) Is in good standing in the program of graduate medical education or training in which the alien physician is participating; and

(ii) Will return to the country of his nationality or last legal permanent resident upon completion of the education or training for which he came to the United States.

(f) Change of program. The alien physician may, once and not later than two years after the date the alien physician enters the United States as an exchange visitor or acquires exchange visitor status, change his designated program of graduate medical education or training if the Secretary of State approves the change and if the requirements of paragraphs (b) and (e) of this section are met for the newly designated specialty.

(g) Applicability of section 212(e) of the Immigration and Nationality Act.

(1) Any exchange visitor physician coming to the United States on or after January 10, 1977 for the purpose of receiving graduate medical education or training is automatically subject to the two-year home-country physical presence requirement of section 212(e) of the Immigration and Nationality Act, as amended. Such physicians are not eligible to be considered for section 212(e) waivers on the basis of "No Objection" statements issued by their governments.

(2) Alien physicians coming to the United States for the purpose of observation, consultation, teaching, or research are not automatically subject to the two-year home-country physical presence requirement of section 212(e) of the Immigration and Nationality Act, as amended, but may be subject to this requirement if they are governmentally financed or pursuing a field of study set forth on their countries' Exchange Visitor Skills List. Such alien physicians are eligible for consideration of waivers under section 212(e) of the Immigration and Nationality Act, as amended, on the basis of "No Objection" statements submitted by their governments in their behalf through diplomatic channels to the Secretary of State.

[58 FR 48448, Sept. 16, 1993; 67 FR 17612, 17613, April 11, 2002]

<General Materials (GM) - References, Annotations, or Tables>

22 C. F. R. § 62.27

22 CFR § 62.27

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

115 S.Ct. 961
130 L.Ed.2d 902, 63 USLW 4109
(Cite as: 513 U.S. 374, 115 S.Ct. 961)

▷     Supreme Court of the United States

Michael A. LEBRON, Petitioner

v.

NATIONAL RAILROAD PASSENGER
CORPORATION.

No. 93-1525.

Argued Nov. 7, 1994.
Decided Feb. 21, 1995.

Artist sued National Railroad Passenger Corporation (Amtrak) based on allegation that Amtrak's rejection of artist's lease of billboard space on ground that display was "political" violated the First Amendment. The United States District Court for the Southern District of New York, Pierre N. Leval, J., 811 F.Supp. 993, entered judgment for artist, and Amtrak appealed. The Court of Appeals for the Second Circuit, 12 F.3d 388, reversed and remanded with instructions. Certiorari was granted. The Supreme Court, Justice Scalia, held that: (1) court could consider argument that Amtrak was part of government, even though artist had disavowed that argument in lower courts, where both lower courts considered argument and it was fairly embraced both within questions presented and argument set forth in petition; (2) statute under which Amtrak was created, while dispositive of governmental status for purposes of matters within Congress' control, was not dispositive for determining constitutional rights of affected citizens; and (3) Amtrak was agency or instrumentality of United States for purpose of individual constitutional rights.

Reversed and remanded.

Justice O'Connor filed dissenting opinion.

West Headnotes

**[1] Federal Courts** ⊂⇒**461**
170Bk461 Most Cited Cases

Once federal claim is properly presented, party can make any argument in support of that claim and is not limited to precise arguments made below.

**[2] Federal Courts** ⊂⇒**461**
170Bk461 Most Cited Cases

Supreme Court could consider argument that National Railroad Passenger Corporation (Amtrak) was part of government, even though artist who claimed that Amtrak violated his First Amendment rights had disavowed that argument in lower courts and did not explicitly raise it until his brief on merits in Supreme Court, where both lower courts considered argument and it was fairly embraced both within questions presented and argument set forth in petition. U.S.C.A. Const.Amend. 1; U.S.Sup.Ct.Rule 14.1(a), 28 U.S.C.A.

**[3] Railroads** ⊂⇒**5.51**
320k5.51 Most Cited Cases

Rail Passenger Service Act of 1970 created National Railroad Passenger Corporation (Amtrak) for purpose of averting threatened extinction of passenger trains in the interest of public convenience and necessity. Rail Passenger Service Act, § 101 et seq., as amended, 45 U.S.C.(1988 Ed.) § 501 et seq.; 49 U.S.C.A. §§ 10901, 10903, 10922.

**[4] Railroads** ⊂⇒**5.51**
320k5.51 Most Cited Cases

Under its authorizing statute, National Railroad Passenger Corporation (Amtrak) is not agency or establishment of United States Government. Rail Passenger Service Act, § 301, as amended, 45 U.S.C.(1988 Ed.) § 541.

**[5] Railroads** ⊂⇒**5.51**
320k5.51 Most Cited Cases

Congress does not have authority to make final determination of National Railroad Passenger Corporation's (Amtrak) status as government entity for purposes of constitutional rights of citizens affected by its actions, even though statute under which Amtrak was created disclaims agency status. Rail Passenger Service Act, § 101 et seq., as amended, 45 U.S.C.(1988 Ed.) § 501 et seq.

**[6] Railroads** ⊂⇒**5.51**
320k5.51 Most Cited Cases

Although statute under which National Railroad

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

115 S.Ct. 961
130 L.Ed.2d 902, 63 USLW 4109
**(Cite as: 513 U.S. 374, 115 S.Ct. 961)**

Page 2

Passenger Corporation (Amtrak) was created is dispositive of Amtrak's governmental status for purposes of matters within Congress' control, it is not dispositive for purposes of status as government entity in determining constitutional rights of citizens affected by its actions. Rail Passenger Service Act, § 101 et seq., as amended, 45 U.S.C.(1988 Ed.) § 501 et seq.

[7] **Constitutional Law** ⟨⟩82(1)
92k82(1) Most Cited Cases

[7] **Railroads** ⟨⟩5.51
320k5.51 Most Cited Cases

National Railroad Passenger Corporation (Amtrak) is agency or instrumentality of United States for purpose of individual rights guaranteed against Government by the Constitution. Rail Passenger Service Act, § 101 et seq., as amended, 45 U.S.C.(1988 Ed.) § 501 et seq.

[8] **Constitutional Law** ⟨⟩82(1)
92k82(1) Most Cited Cases

Government, whether state or federal, may not evade constitutional requirements simply by calling government-created and controlled corporation an independent entity.

[9] **Constitutional Law** ⟨⟩82(1)
92k82(1) Most Cited Cases

[9] **Administrative Law and Procedure** ⟨⟩5
15Ak5 Most Cited Cases

[9] **United States** ⟨⟩53(4)
393k53(4) Most Cited Cases

Corporation is "agency of government", for purposes of constitutional obligations of government rather than privileges of government, when state has specifically created that corporation for furtherance of governmental objective and does not merely hold some shares but rather controls operation of corporation through its appointees.

[10] **Constitutional Law** ⟨⟩82(3)
92k82(3) Most Cited Cases

[10] **United States** ⟨⟩53(4)
393k53(4) Most Cited Cases

Where government creates corporation by special law, for furtherance of governmental objectives, and retains for itself permanent authority to appoint majority of directors of that corporation, corporation is part of government for purposes of First Amendment. U.S.C.A. Const.Amend. 1.

**\*\*962** *Syllabus* [FN\*]

FN\* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

Petitioner Lebron, who creates billboard displays that comment on public issues, filed suit claiming, *inter alia,* that respondent National Railroad Passenger Corporation (Amtrak) had violated his First Amendment rights by rejecting a display for an Amtrak billboard because of its political nature. The District Court ruled that Amtrak, because of its close ties to the Federal Government, was a Government actor for First Amendment purposes, and that its rejection of the display was unconstitutional. The Court of Appeals reversed, noting that Amtrak was, by the terms of the legislation that created it, not a Government entity, and concluding that the Government was not so involved with Amtrak that the latter's decisions could be considered federal action.

*Held:* Where, as here, the Government creates a corporation by special law, for the furtherance of governmental objectives, and retains for itself permanent authority to appoint a majority of that corporation's directors, the corporation is part of the Government for purposes of the First Amendment. Pp. 964-975.

(a) It is proper for this Court to consider the argument that Amtrak is part of the Government, even though Lebron disavowed it in both lower courts and did not explicitly raise it until his brief on the merits here. It is not a new claim, but a new argument to support his First Amendment claim, see, *e.g., Yee v. Escondido,* 503 U.S. 519, 534-535, 112 S.Ct. 1522, 1532-1533, 118 L.Ed.2d 153; it was passed upon below, see, *e.g., United States v. Williams,* 504 U.S. 36, 41, 112 S.Ct. 1735, 1738, 118 L.Ed.2d 352; and it was fairly embraced within

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

115 S.Ct. 961
130 L.Ed.2d 902, 63 USLW 4109
(Cite as: 513 U.S. 374, 115 S.Ct. 961)

both the question presented and the argument set forth in the petition. Pp. 964-966.

(b) Amtrak was created by the Rail Passenger Service Act of 1970 (RPSA) to avert the threatened extinction of passenger trains in the interest of "the public convenience and necessity." The legislation establishes detailed goals for Amtrak, sets forth its structure and powers, and assigns the appointment of a majority of its board of directors to the President. Pp. 967-968.

(c) There is a long history of corporations created and participated in by the United States for the achievement of governmental objectives. Like some other Government corporations, Amtrak's authorizing statute *375 provides that it "will not be an agency or establishment of the United States Government," 84 Stat. 1330; see also 45 U.S.C. § 541. Pp. 968-971.

(d) Although § 541 is assuredly dispositive of Amtrak's governmental status for purposes of matters within Congress's control--e.g., whether it is subject to statutes like the **963 Administrative Procedure Act--and can even suffice to deprive it of all those inherent governmental powers and immunities that Congress has the power to eliminate--e.g., sovereign immunity from suit--it is not for Congress to make the final determination of Amtrak's status as a government entity for purposes of determining the constitutional rights of citizens affected by its actions. The Constitution constrains governmental action by whatever instruments or in whatever modes that action may be taken, Ex parte Virginia, 100 U.S. 339, 346-347, 25 L.Ed. 676, and under whatever congressional label, Cherry Cotton Mills, Inc. v. United States, 327 U.S. 536, 539, 66 S.Ct. 729, 730, 90 L.Ed. 835; National Railroad Passenger Corporation v. Boston & Maine Corp., 503 U.S. 407, 410, 112 S.Ct. 1394, 1397- 1398, 118 L.Ed.2d 52, and National Railroad Passenger Corporation v. Atchison, T. & S.F.R. Co., 470 U.S. 451, 470, 105 S.Ct. 1441, 1453, 84 L.Ed.2d 432, distinguished. Pp. 971-972.

(e) Amtrak is an agency or instrumentality of the United States for the purpose of individual rights guaranteed against the Government by the Constitution. This conclusion accords with the public, judicial, and congressional understanding over the years that Government-created and -

controlled corporations are part of the Government itself. See, e.g., Reconstruction Finance Corporation v. J.G. Menihan Corp., 312 U.S. 81, 83, 61 S.Ct. 485, 486, 85 L.Ed. 595; Government Corporation Control Act, § 304(a), 59 Stat. 602. A contrary holding would allow government to evade its most solemn constitutional obligations by simply resorting to the corporate form, cf. Pennsylvania v. Board of Directors of City Trusts of Philadelphia, 353 U.S. 230, 231, 77 S.Ct. 806, 806, 1 L.Ed.2d 792. Bank of United States v. Planters' Bank of Georgia, 9 Wheat. 904, 907, 908, 6 L.Ed. 244, and Regional Rail Reorganization Act Cases, 419 U.S. 102, 152, 95 S.Ct. 335, 363, 42 L.Ed.2d 320, distinguished. Pp. 972-974.

12 F.3d 388 (CA 2 1993), reversed and remanded.

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C.J., and STEVENS, KENNEDY, SOUTER, THOMAS, GINSBURG, and BREYER, JJ., joined. O'CONNOR, J., filed a dissenting opinion, post, p. 975.

David Cole, for petitioner.

*376 Kevin T. Baine, for respondent.

For U.S. Supreme Court Briefs See:

1994 WL 388059 (Pet.Brief)

1994 WL 488299 (Resp.Brief)

1994 WL 558138 (Reply.Brief)

For Transcript of Oral Argument See:

1994 WL 759068 (U.S.Oral.Arg.)

Justice SCALIA delivered the opinion of the Court.

In this case we consider whether actions of the National Railroad Passenger Corporation, commonly known as Amtrak, are subject to the constraints of the Constitution.

I

Petitioner, Michael A. Lebron, creates billboard

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

115 S.Ct. 961
130 L.Ed.2d 902, 63 USLW 4109
(Cite as: 513 U.S. 374, 115 S.Ct. 961)

Page 4

displays that involve commentary on public issues, and that seemingly propel him into litigation. See, *e.g.*, *Lebron v. Washington Metropolitan Area Transit Authority,* 749 F.2d 893 (CADC 1984). In August 1991, he contacted Transportation Displays, Incorporated (TDI), which manages the leasing of the billboards in Amtrak's Pennsylvania Station in New York City, seeking to display an advertisement on a billboard of colossal proportions, known to New Yorkers (or at least to the more Damon Runyonesque among them) as "the Spectacular." The Spectacular is a curved, illuminated billboard, approximately 103 feet long and 10 feet high, which dominates the main entrance to Penn Station's waiting room and ticket area.

On November 30, 1992, Lebron signed a contract with TDI to display an advertisement on the Spectacular for two months beginning in January 1993. The contract provided that "[a]ll advertising copy is subject to approval of TDI and [Amtrak] as to character, text, illustration, design and operation." App. 671. Lebron declined to disclose the specific content of his advertisement throughout his negotiations **377 with TDI, although he did explain to TDI that it was generally political. On December 2, he submitted to TDI (and TDI later **964 forwarded to Amtrak) an advertisement described by the District Court as follows:

"The work is a photomontage, accompanied by considerable text. Taking off on a widely circulated Coors beer advertisement which proclaims Coors to be the 'Right Beer,' Lebron's piece is captioned 'Is it the Right's Beer Now?' It includes photographic images of convivial drinkers of Coors beer, juxtaposed with a Nicaraguan village scene in which peasants are menaced by a can of Coors that hurtles towards them, leaving behind a trail of fire, as if it were a missile. The accompanying text, appearing on either end of the montage, criticizes the Coors family for its support of right-wing causes, particularly the contras in Nicaragua. Again taking off on Coors' advertising which uses the slogan of 'Silver Bullet' for its beer cans, the text proclaims that Coors is 'The Silver Bullet that aims The Far Right's political agenda at the heart of America.' " 811 F.Supp. 993, 995 (SDNY 1993).

Amtrak's vice president disapproved the advertisement, invoking Amtrak's policy, inherited from its predecessor as landlord of Penn Station, the

Pennsylvania Railroad Company, "that it will not allow political advertising on the [S]pectacular advertising sign." App. 285.

Lebron then filed suit against Amtrak and TDI, claiming, *inter alia,* that the refusal to place his advertisement on the Spectacular had violated his First and Fifth Amendment rights. After expedited discovery, the District Court ruled that Amtrak, because of its close ties to the Federal Government, was a Government actor, at least for First Amendment purposes, and that its rejection of Lebron's proposed advertisement as unsuitable for display in Penn Station had violated the First Amendment. The court granted Lebron an *378 injunction and ordered Amtrak and TDI to display Lebron's advertisement on the Spectacular.

The United States Court of Appeals for the Second Circuit reversed. 12 F.3d 388 (1993). The panel's opinion first noted that Amtrak was, by the terms of the legislation that created it, not a Government entity, *id.,* at 390; and then concluded that the Federal Government was not so involved with Amtrak that the latter's decisions could be considered federal action, *id.,* at 391-392. Chief Judge Newman dissented. We granted certiorari. 511 U.S. 1105, 114 S.Ct. 2098, 128 L.Ed.2d 661 (1994).

II

We have held once, *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), and said many times, that actions of private entities can sometimes be regarded as governmental action for constitutional purposes. See, *e.g., San Francisco Arts & Athletics, Inc. v. United States Olympic Comm.,* 483 U.S. 522, 546, 107 S.Ct. 2971, 2986, 97 L.Ed.2d 427 (1987); *Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 2785, 73 L.Ed.2d 534 (1982); *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 172, 92 S.Ct. 1965, 1971, 32 L.Ed.2d 627 (1972). It is fair to say that "our cases deciding when private action might be deemed that of the state have not been a model of consistency." *Edmonson v. Leesville Concrete Co.,* 500 U.S. 614, 632, 111 S.Ct. 2077, 2089, 114 L.Ed.2d 660 (1991) (O'CONNOR, J., dissenting). It may be unnecessary to traverse that difficult terrain in the present case, since Lebron's first argument is that Amtrak is not a private entity but Government itself. Before turning to the merits of this

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

argument, however, it is necessary to discuss the propriety of reaching it. Lebron did not raise this point below; indeed, he expressly disavowed it in both the District Court and the Court of Appeals. See Plaintiff's Pre-Trial Proposed Conclusions of Law in No. 92-CIV-9411 (SDNY), p. 12, n. 1, reprinted in App. in No. 93-7127 (CA2), p. 1297; Brief for Appellee in No. 93-7127 (CA2), p. 30, n. 39. In those courts Lebron argued that Amtrak's actions were subject to constitutional requirements because Amtrak, *although *379 a private entity*, was closely connected with federal entities. It was not until after we granted certiorari that Lebron first explicitly presented--in his brief on the merits--the alternative argument that Amtrak was itself a federal entity.

**965 [1][2] Our traditional rule is that "[o]nce a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below." *Yee v. Escondido,* 503 U.S. 519, 534, 112 S.Ct. 1522, 1532, 118 L.Ed.2d 153 (1992); see also *Dewey v. Des Moines,* 173 U.S. 193, 198, 19 S.Ct. 379, 380, 43 L.Ed. 665 (1899). Lebron's contention that Amtrak is part of the Government is in our view not a new claim within the meaning of that rule, but a new argument to support what has been his consistent claim: that Amtrak did not accord him the rights it was obliged to provide by the First Amendment. Cf. *Yee, supra,* 503 U.S., at 534-535, 112 S.Ct., at 1532. In fact, even if this *were* a claim not raised by petitioner below, we would ordinarily feel free to address it, since it was addressed by the court below. Our practice "permit[s] review of an issue not pressed so long as it has been passed upon...." *United States v. Williams,* 504 U.S. 36, 41, 112 S.Ct. 1735, 1738-1739, 118 L.Ed.2d 352 (1992). See *Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083, 1099, n. 8, 111 S.Ct. 2749, 2761, n. 8, 115 L.Ed.2d 929 (1991); *Stevens v. Department of Treasury,* 500 U.S. 1, 8, 111 S.Ct. 1562, 1567, 114 L.Ed.2d 1 (1991).

Respondent asserts that, in addition to not having been raised below, the issue of whether Amtrak is a Government entity was not presented in the petition for certiorari. As this Court's Rule 14.1(a) and simple prudence dictate, we will not reach questions not fairly included in the petition. "The Court decides which questions to consider through

well-established procedures; allowing the able counsel who argue before us to alter these questions or to devise additional questions at the last minute would thwart this system." *Taylor v. Freeland & Kronz,* 503 U.S. 638, 646, 112 S.Ct. 1644, 1649, 118 L.Ed.2d 280 (1992). Here, however, we are satisfied that the argument that Amtrak is a Government entity is fairly embraced within the question *380 set forth in the petition for certiorari [FN1]--which explicitly presents *neither* the "Government entity" theory *nor* the "closely connected to Government" theory of First Amendment application, but rather the facts that would support both. The argument in the petition, moreover, though couched in terms of a different but closely related theory, fairly embraced the argument that Lebron now advances. See Pet. for Cert. 16-18.

> FN1. Certiorari was sought and granted in this case on the following question:
> "Whether the court of appeals erred in holding that Amtrak's asserted policy barring the display of political advertising messages in Pennsylvania Station, New York, was not state action, where:
> "(a) the United States created Amtrak, endowed it with governmental powers, owns all its voting stock, and appoints all members of its Board;
> "(b) the United States-appointed Board approved the advertising policy challenged here;
> "(c) the United States keeps Amtrak afloat every year by subsidizing its losses; and
> "(d) Pennsylvania Station was purchased for Amtrak by the United States and is shared with several other governmental entities."

The dissent contends that the "Government entity" question in the present case occupies the same status, insofar as Rule 14.1(a) is concerned, as the "physical taking" question which we deemed excluded in *Yee v. Escondido, supra.* It gives two reasons for that equivalence: First, the fact that Lebron prefaced his question presented by the phrase, "Whether the court of appeals erred in holding." App. to Pet. for Cert. i. The dissent asserts that this is similar to the preface in *Yee,*

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

which had the effect of limiting the question to the precise ground relied upon by the Court of Appeal. *Post,* at 975-976. But the preface in *Yee* was not at all similar. What we said caused the question presented to be limited to the physical-taking issue was *not* the fact that that was the only ground addressed by the lower-court-said- to-be-in-error; but rather the fact that that was the only ground of decision in two previous Court of Appeals cases, *departure \*381 from which was said by the question presented to be the issue in the appeal.* [FN2] 503 U.S., at 536-537, 112 S.Ct., at 1533.

> FN2. The question presented in *Yee* read as follows:
> " 'Two federal courts of appeal have held that the transfer of a premium value to a departing mobilehome tenant, representing the value of the right to occupy at a reduced rate under local mobilehome rent control ordinances, constitute[s] an impermissible taking. Was it error for the state appellate court to disregard the rulings and hold that there was no taking under the fifth and fourteenth amendments?' " 503 U.S., at 536-537, 112 S.Ct., at 1533.

**966 The dissent's second reason for believing that *Yee* governs the Rule 14.1(a) issue here is that the structural relationship between the clearly presented question and the assertedly included question in the two cases is the same. As the dissent correctly analyzes *Yee,* it involved one "umbrella claim" (government taking of property without just compensation) and "two distinct questions" that were "[s]ubsidiary to that claim" (whether a physical taking had occurred, and whether a regulatory taking had occurred). *Post,* at 975. But the questions in *Yee* were "distinct" in two important ways that the claims here are not. First of all, it was possible to consider the existence of a physical taking without *assuming* (as one of the premises of the inquiry) the *nonexistence* of a regulatory taking; whereas here it is quite impossible to consider whether the Government connections are sufficient to convert private-entity Amtrak into a Government actor without first assuming that Amtrak is a private entity. The opinion in *Yee* did not have to begin: "Assuming

that no regulatory taking has occurred,...." But the portion of today's dissent addressing the merits of this case must begin: "Accepting Lebron's concession that Amtrak is a private entity, ...." *Post,* at 979. The question of private-entity status is, in other words, a *prior* question. The second respect in which the issues here are less "distinct" than in *Yee* is that the factors relevant to their resolution overlap. In *Yee,* what would go to show a regulatory taking and \*382 what would go to show a physical taking were quite different. Here, however, those very elements that we would be considering in determining whether Amtrak-the-private-entity is so closely connected with the Government as to be a Government actor (for example, the constitution of its board) also bear upon whether it is *in fact* a private entity at all. When a question is, like this one, both prior to the clearly presented question and dependent upon many of the same factual inquiries, refusing to regard it as embraced within the petition may force us to assume what the facts will show to be ridiculous, a risk that ought to be avoided.

The recent decision of ours that invites comparison with the dissent's insistence that the "Government entity" question is "precluded," *post,* at 975, is not *Yee,* but *United States Nat. Bank of Ore. v. Independent Agents of America, Inc.,* 508 U.S. 439, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993). There, in a case raising the question of the proper interpretation of 12 U.S.C. § 92 (1926 ed.), we upheld the propriety of the Court of Appeals' considering the prior question whether 12 U.S.C. § 92 had been inadvertently repealed--even though the parties themselves had failed to raise that question, not only (as here) in the court below, but even in the initial briefs and oral arguments before the Court of Appeals itself. That is to say, the situation there, at the court of appeals level, was what the situation *would be* before us here, if (1) the dissent were correct that Rule 14.1(a) was not complied with, and (2) *in addition,* even the petitioner's *principal brief and oral argument* had failed to raise the "Government entity" issue. Even so, we held in *Independent Insurance Agents* that it was proper for the Court of Appeals to request supplemental briefing upon, and to decide, the statutory repeal question, and we then went on to inquire into that question ourselves. Our opinion was unanimous, not a single Justice protesting that the judges of the Court of Appeals, or of this Court,

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

had constituted *383 themselves " 'as [a] self-directed boar[d] of legal inquiry' " or had "exhibit[ed] little patience," *post*, at 978. [FN3]

FN3. The dissent sees no more in *Independent Ins. Agents* than a narrow holding that the Court of Appeals' decision to reach the statutory repeal issue was not *so* imprudent as to be reversible for abuse of discretion. Even that is a damaging concession, given the dissent's apparent position that allowing a litigant "to resuscitate [a] claim that he himself put to rest" always violates "prudential" rules. *Post*, at 977. But in fact the language of the *Independent Ins. Agents* opinion is much more approving of the Court of Appeals' action than that. It declines even to brush aside the Court of Appeals' (questionable) contention that there was "a 'duty' to address the status of section 92," saying only that "[w]e need not decide" that question. 508 U.S., at 448, 113 S.Ct., at 2179. And it goes on to state that the Court of Appeals acted "without *any* impropriety," and that its decision to consider the issue was "*certainly* no abuse of its discretion." *Ibid.* (emphasis added). If we had not thought that the Court of Appeals' entertainment of the statutory repeal question was, not merely unreversible, but appropriate, we would not have rendered ourselves complicit in the enterprise by exercising our own discretion to grant certiorari on that question. (There was no particular need to intervene, since the Court of Appeals had upheld the law.)

The dissent also seeks to characterize *Independent Ins. Agents* as no more than an application of "the traditional principle that there can be no estoppel in the way of ascertaining the existence of a law." *Post*, at 977 (internal quotation marks omitted). It was indeed an application of that principle insofar as concerned the claim that the appellants' right to assert repeal of the statute had been forfeited. But forfeit was not the only point decided in the case: not every nonforfeited claim merits consideration on appeal.

**967 III

Before proceeding to consider Lebron's contention that Amtrak, though nominally a private corporation, must be regarded as a Government entity for First Amendment purposes, we examine the nature and history of Amtrak and of Government-created corporations in general.

A

[3] Congress established Amtrak in order to avert the threatened extinction of passenger trains in the United States. *384 The statute that created it begins with the congressional finding, redolent of provisions of the Interstate Commerce Act, see, *e.g.*, 49 U.S.C. §§ 10901, 10903, 10922 (1988 ed. and Supp. V), that "the *public convenience and necessity* require the continuance and improvement" of railroad passenger service. Rail Passenger Service Act of 1970 (RPSA), § 101, 84 Stat. 1328 (emphasis added). In the current version of the RPSA, 45 U.S.C. § 501 *et seq.* (1988 ed. and Supp. V), the congressional findings are followed by a section entitled "Goals," which begins, "The Congress hereby establishes the following goals for Amtrak," and includes items of such detail as the following:

"(3) Improvement of the number of passenger miles generated systemwide per dollar of Federal funding by at least 30 percent within the two-year period beginning on October 1, 1981.

"(4) Elimination of the deficit associated with food and beverage services by September 30, 1982.

. . . . .

"(6) Operation of Amtrak trains, to the maximum extent feasible, to all station stops within 15 minutes of the time established in public timetables for such operation.

. . . . .

"(8) Implementation of schedules which provide a systemwide average speed of at least 60 miles per hour...." § 501a.

Later sections of the statute authorize Amtrak's incorporation, §§ 541-542, set forth its structure and powers, §§ 543-545, and outline procedures under which Amtrak will relieve private railroads of their passenger-service obligations and provide intercity and commuter rail passenger service itself,

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

§§ 561-566. See generally *National Railroad Passenger Corporation v. Atchison, T. & S.F.R. Co.,* 470 U.S. 451, 453-456, 105 S.Ct. 1441, 1445-1447, 84 L.Ed.2d 432 (1985). As initially conceived, Amtrak was to be **\*385** "a for profit corporation," 84 Stat. 1330, but Congress later modified this language to provide, less optimistically perhaps, that Amtrak "shall be operated and managed as a for profit corporation," § 541.

Amtrak is incorporated under the District of Columbia Business Corporation Act, D.C.Code Ann. § 29-301 *et seq.* (1981 and Supp.1994), but is subject to the provisions of that Act only insofar as the RPSA does not provide to the contrary, see § 541. It does provide to the contrary with respect to many matters of structure and power, including the manner of selecting the company's board of directors. The RPSA provides for a board of nine members, six of whom are appointed directly by the President of the United States. The Secretary of Transportation, or his designee, sits ex officio. § 543(a)(1)(A). The President appoints three more directors with the advice and consent of the Senate, § 543(a)(1)(C), selecting one from a list of individuals recommended by the Railway Labor **\*\*968** Executives Association, § 543(a)(1)(C)(i), one "from among the Governors of States with an interest in rail transportation," § 543(a)(1)(C)(ii), and one as a "representative of business with an interest in rail transportation," § 543(a)(1)(C)(iii). These directors serve 4-year terms. § 543(a)(2)(A). The President appoints two additional directors without the involvement of the Senate, choosing them from a list of names submitted by various commuter rail authorities. § 543(a)(1)(D). These directors serve 2-year terms. § 543(a)(2)(B). The holders of Amtrak's preferred stock select two more directors, who serve 1-year terms. § 543(a)(1)(E). Since the United States presently holds all of Amtrak's preferred stock, which it received (and still receives) in exchange for its subsidization of Amtrak's perennial losses, see § 544(c), the Secretary of Transportation selects these two directors. The ninth member of the board is Amtrak's president, § 543(a)(1)(B), who serves as the chairman of the board, § 543(a)(4), is selected by the other eight directors, and serves at their pleasure, § 543(d). **\*386** Amtrak's four private shareholders have not been entitled to vote in selecting the board of directors since 1981. [FN4]

FN4. Originally, Amtrak's board comprised 15 directors: 7 selected by the shareholders and 8 (one of whom had to be the Secretary of Transportation) appointed by the President of the United States. See RPSA §§ 303(a) and (c), 84 Stat. 1330-1331. In 1973, Congress increased the number of directors to 17, the number of Presidential appointees to 9, and made the Secretary of Transportation a director ex officio. See Amtrak Improvement Act of 1973, § 3(a), 87 Stat. 548. In 1976, the number of presidential appointees (apart from the Secretary of Transportation) was reduced to eight and Amtrak's President made a director ex officio. See Rail Transportation Improvement Act, § 103, 90 Stat. 2615. Amtrak's board was given its current size and membership in 1981. See Omnibus Budget Reconciliation Act of 1981, § 1174, 95 Stat. 689.

By § 548 of the RPSA, Amtrak is required to submit three different annual reports to the President and Congress. One of these, a "report on the effectiveness of this chapter in meeting the requirements for a balanced national transportation system, together with any legislative recommendations," is made part of the Department of Transportation's annual report to Congress. § 548(c).

B

Amtrak is not a unique, or indeed even a particularly unusual, phenomenon. In considering the question before us, it is useful to place Amtrak within its proper context in the long history of corporations created and participated in by the United States for the achievement of governmental objectives.

The first was the Bank of the United States, created by the Act of Feb. 25, 1791, ch. 10, 1 Stat. 191, which authorized the United States to subscribe 20 percent of the corporation's stock, *id.,* at 196. That Bank expired pursuant to the terms of its authorizing Act 20 years later. A second Bank of the United States, the bank of *McCulloch v. Maryland,* 4 Wheat. 316, 4 L.Ed. 579 (1819), and *Osborn v. Bank of United States,* 9 Wheat. 738, 6

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

L.Ed. 204 (1824), was incorporated by the Act of April 10, 1816, 3 *387 Stat. 266, which provided that the United States would subscribe 20 percent of the Bank's capital stock, *ibid.,* and in addition that the President would appoint, by and with the advice and consent of the Senate, 5 of the Bank's 25 directors, the rest to be elected annually by shareholders other than the United States, *id.,* at 269.

The second Bank's charter expired of its own force, despite fierce efforts by the Bank's supporters to renew it, in 1836. See generally R. Remini, Andrew Jackson and the Bank War 155-175 (1967). During the remainder of the 19th century, the Federal Government continued to charter private corporations, see, *e.g.,* Act of July 2, 1864, 13 Stat. 365 (Northern Pacific Railroad Company), but only once participated in such a venture itself: the Union Pacific Railroad, chartered in 1862 with the specification that two of its directors would be appointed by the President of the United States. Act of July 1, 1862, § 1, 12 Stat. 491. See F. Leazes, Jr., Accountability and the Business State 117, n. 8 (1987) (hereinafter Leazes).

The Federal Government's first participation in a corporate enterprise in which (as with Amtrak) it appointed a majority of the directors did not occur until the present century. **969 In 1902, to facilitate construction of the Panama Canal, Congress authorized the President to purchase the assets of the New Panama Canal Company of France, including that company's stock holdings in the Panama Railroad Company, a private corporation chartered in 1849 by the State of New York. See Act of June 28, 1902, 32 Stat. 481; see also General Accounting Office, Reference Manual of Government Corporations, S. Doc. No. 86, 79th Cong., 1st Sess., 176 (1945) (hereinafter GAO Corporation Manual). The United States became the sole shareholder of the Panama Railroad, and continued to operate it under its original charter, with the Secretary of War, as the holder of the stock, electing the Railroad's 13 directors. *Id.,* at 177; Joint Committee on Reduction of Nonessential Federal Expenditures, Reduction of Nonessential Federal Expenditures, S.Doc. No. 227, *388 78th Cong., 2d Sess., 20 (1944) (hereinafter Reduction of Expenditures).

The first large-scale use of Government-controlled corporations came with the First World War. In

1917 and 1918, Congress created, among others, the United States Grain Corporation, the United States Emergency Fleet Corporation, the United States Spruce Production Corporation, and the War Finance Corporation. See Leazes 20. These entities were dissolved after the war ended. See Reduction of Expenditures 1.

The Great Depression brought the next major group of Government corporations, which proved to be more enduring. These were primarily directed to stabilizing the economy and to making distress loans to farms, homeowners, banks, and other enterprises. See R. Moe, CRS Report for Congress, Administering Public Functions at the Margins of Government: The Case of Federal Corporations 6-7 (1983). The Reconstruction Finance Corporation (RFC), to take the premier example, was initially authorized to make loans to banks, insurance companies, railroads, land banks, and agricultural credit organizations, including loans secured by the assets of failed banks. See Act of Jan. 22, 1932, § 5, 47 Stat. 6-7. The Federal Deposit Insurance Corporation (FDIC), was established to hold and liquidate the assets of failed banks, and to insure bank deposits. See Act of June 16, 1933, ch. 89, § 8, 48 Stat. 168, as amended, 12 U.S.C. § 1811 *et seq.* (1988 ed. and Supp. V). And a few corporations, such as the Tennessee Valley Authority (TVA), brought the Government into the commercial sale of goods and services. See Act of May 18, 1933, ch. 32, 48 Stat. 58, as amended, 16 U.S.C. § 831 *et seq.* (1988 ed. and Supp. V).

The growth of federal corporations during the Depression and the World War II era was not limited to the numerous entities specifically approved by Congress. In 1940, Congress empowered the RFC to create corporations without specific congressional authorization. See Act of June 25, *389 1940, § 5, 54 Stat. 573-574. The RFC proceeded to do so with gusto, incorporating on its own the Defense Plant Corporation, the Defense Supplies Corporation, the Metals Reserve Company (which itself created several subsidiaries), the Petroleum Reserves Corporation, the Rubber Development Corporation, and the War Damage Corporation, among others. See GAO Corporation Manual 32, 38, 169, 182, 219, 279. Other corporations were formed, sometimes under state law, without even the general congressional

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

115 S.Ct. 961                                                                                                    Page 10
130 L.Ed.2d 902, 63 USLW 4109
(Cite as: 513 U.S. 374, 115 S.Ct. 961)

authorization granted the RFC. For example, the Defense Homes Corporation was organized under Maryland law by the Secretary of the Treasury, using emergency funds allocated to the President, *id.,* at 28 ("It is not clear what, if any, specific Federal statutory authority was relied upon for the creation of the Defense Homes Corporation"); and the Tennessee Valley Associated Cooperatives, Inc., was chartered under Tennessee law by the TVA, *id.,* at 244 ("There has been found no Federal statute specifically authorizing the Board of Directors of the Tennessee Valley Authority to organize a corporation"). By 1945, the General Accounting Office's Reference Manual of Government Corporations listed 58 Government corporations, with total assets (in 1945 dollars) of $29.6. See *id.,* at iii, v-vi.

By the end of World War II, Government-created and -controlled corporations had gotten out of hand, in both their number and their lack of accountability. Congress moved to reestablish order in the Government**970 Corporation Control Act (GCCA), 59 Stat. 597, as amended, 31 U.S.C. § 9101 *et seq.* (1988 ed. and Supp. V). See Pritchett, The Government Corporation Control Act of 1945, 40 Am.Pol.Sci.Rev. 495 (1946). The GCCA required that specified corporations, both wholly owned and partially owned by the Government, be audited by the Comptroller General. See 59 Stat. 599, 600. Additionally, the wholly owned corporations were required, for the first time, to submit budgets which would be included in the budget submitted annually to Congress by *390 the President. *Id.,* at 598; see also Leazes 22-23. The GCCA also ordered the dissolution or liquidation of all government corporations created under state law, except for those that Congress should act to reincorporate; and prohibited creation of new Government corporations without specific congressional authorization. 59 Stat. 602; cf. 31 U.S.C. § 9102.

Thus, in the years immediately following World War II, many Government corporations were dissolved, and to our knowledge only one, the Saint Lawrence Seaway Development Corporation, was created. See Leazes 25, 27. In the 1960's, however, the allure of the corporate form was felt again, and new entities proliferated. Many of them followed the traditional model, often explicitly designated as Government agencies and located

within the existing Government structure. See, *e.g.,* Foreign Assistance Act of 1969, § 105, 83 Stat. 809 (creating the Overseas Private Investment Corporation as "an agency of the United States under the policy guidance of the Secretary of State"), as amended, 22 U.S.C. § 2191 *et seq.* (1988 ed. and Supp. V). Beginning in 1962, however, the Government turned to sponsoring corporations that it specifically designated *not* to be agencies or establishments of the United States Government, and declined to subject to the control mechanisms of the GCCA. The first of these, the Communications Satellite Corporation (Comsat), was incorporated under the District of Columbia Business Corporation Act, D.C.Code Ann. § 29-301 *et seq.* (1981 and Supp.1994), see 47 U.S.C. § 731 *et seq.,* with the purpose of entering the private sector, but doing so with Government-conferred advantages, see Moe, *supra,* at 22. Comsat was capitalized entirely with private funds. See Seidman, Government-sponsored Enterprise in the United States, in The New Political Economy: The Public Use of the Private Sector 92 (B. Smith ed. 1975). In contrast to the corporations that had in the past been deemed part of the Government, Comsat's board was to be controlled by its private *391 shareholders; only 3 of its 15 directors were appointed by the President, § 733(a).

The Comsat model, which was seen as allowing the Government to act unhindered by the restraints of bureaucracy and politics, see Moe, CRS Report, at 22, 24, was soon followed in creating other corporations. But some of these new "private" corporations, though said by their charters not to be agencies or instrumentalities of the Government, see, *e.g.,* 47 U.S.C. § 396(b) (Corporation for Public Broadcasting (CPB)); 42 U.S.C. § 2996d(e)(1) (Legal Services Corporation (LSC)), and though not subjected to the restrictions of the GCCA, were (unlike Comsat) managed by boards of directors on which Government appointees had not just a few votes but voting control. See Public Broadcasting Act of 1967, § 201, 81 Stat. 369 (CPB's entire board appointed by President); Legal Services Corporation Act of 1974, § 2, 88 Stat. 379 (same for LSC).

[4] Amtrak is yet another variation upon the Comsat theme. Like Comsat, CPB, and LSC, its authorizing statute declares that it "will not be an agency or establishment of the United States

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

115 S.Ct. 961
130 L.Ed.2d 902, 63 USLW 4109
**(Cite as: 513 U.S. 374, 115 S.Ct. 961)**

Page 11

Government." 84 Stat. 1330; see 45 U.S.C. § 541. Unlike Comsat, but like CPB and LSC, its board of directors is controlled by Government appointees. And unlike all three of these "private" corporations, it *has* been added to the list of corporations covered by the GCCA, see 31 U.S.C. § 9101 (1988 ed. and Supp. V). As one perceptive observer has concluded with regard to the post-Comsat Government- sponsored "private" enterprises:
"There is no valid basis for distinguishing between many government-sponsored enterprises and other types of government activities, except for the fact that they are designed [designated?] by law as 'not an **971 agency and instrumentality of the United States Government.'
  Comparable powers and immunities could be granted to such agencies without characterizing them as non-government." Seidman, *supra,* at 93.

**\*392 IV**

[5][6] Amtrak claims that, whatever its relationship with the Federal Government, its charter's disclaimer of agency status prevents it from being considered a Government entity in the present case. This reliance on the statute is misplaced. Section 541 is assuredly dispositive of Amtrak's status as a Government entity for purposes of matters that are within Congress's control--for example, whether it is subject to statutes that impose obligations or confer powers upon Government entities, such as the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* (1988 ed. and Supp. V), the Federal Advisory Committee Act, 5 U.S.C.App. § 1 *et seq.,* and the laws governing Government procurement, see 41 U.S.C. § 5 *et seq.* (1988 ed. and Supp. V). And even beyond that, we think § 541 can suffice to deprive Amtrak of all those inherent powers and immunities of Government agencies that it is within the power of Congress to eliminate. We have no doubt, for example, that the statutory disavowal of Amtrak's agency status deprives Amtrak of sovereign immunity from suit, see *Sentner v. Amtrak,* 540 F.Supp. 557, 560 (NJ 1982), and of the ordinarily presumed power of Government agencies authorized to incur obligations to pledge the credit of the United States, see, *e.g., Debt Obligations of Nat. Credit Union Admin.,* 6 Op.Off. Legal Counsel 262, 264 (1982). But it is not for Congress to make the final determination of Amtrak's status as a Government entity for purposes of determining the

constitutional rights of citizens affected by its actions. If Amtrak is, by its very nature, what the Constitution regards as the Government, congressional pronouncement that it is not such can no more relieve it of its First Amendment restrictions than a similar pronouncement could exempt the Federal Bureau of Investigation from the Fourth Amendment. The Constitution constrains governmental action "by whatever instruments or in whatever modes that action may be taken." *Ex parte Virginia,* 100 U.S. 339, 346-347, 25 L.Ed. 676 (1880). And under whatever congressional \*393 label. As we said of the Reconstruction Finance Corporation in deciding whether debts owed it were owed the United States Government: "That the Congress chose to call it a corporation does not alter its characteristics so as to make it something other than what it actually is...." *Cherry Cotton Mills, Inc. v. United States,* 327 U.S. 536, 539, 66 S.Ct. 729, 730, 90 L.Ed. 835 (1946).

Amtrak points to two of our opinions that characterize Amtrak as a nongovernmental entity. The first is *National Railroad Passenger Corporation v. Boston & Maine Corp.,* 503 U.S. 407, 410, 112 S.Ct. 1394, 1398, 118 L.Ed.2d 52 (1992), which describes the corporation as "not an agency or instrumentality of the United States Government." But the governmental or nongovernmental nature of Amtrak had no conceivable relevance to the issues before the Court in *Boston & Maine.* The quoted characterization, similar to that contained in the statute, was merely set forth at the beginning of the opinion, in describing the factual background of the case. It is hard to imagine weaker dictum.

The second case is *National Railroad Passenger Corporation v. Atchison, T. & S.F.R. Co.,* 470 U.S. 451, 105 S.Ct. 1441, 84 L.Ed.2d 432 (1985). There the governmental character of Amtrak *was* marginally relevant. The railroads opposing Amtrak in the case argued that a subsequent statute reneging on the Government's *own* obligations was subject to a "more rigorous standard of review" under the Due Process Clause than a statute impairing private contractual obligations. *Id.,* at 471, 105 S.Ct., at 1454. The Court said it did not have to consider that question because the contracts in question were "not between the railroads and the United States but simply between the railroads and the nongovernmental corporation, Amtrak." *Id.,* at

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

470, 105 S.Ct., at 1454. But it develops, later in the opinion, that the Court would not have had to consider that question anyway, since it concluded that the contracts (whether those of the United States or not) did not incur the obligation alleged. The effect of **972 the apparent reliance upon Amtrak's nongovernmental *394 character was *at most* to enable the Court to make, later in the opinion, without applying the "more rigorous standard" urged by the railroads, the superfluous argument that "[e]ven were the Court of Appeals correct that the railroads have a private contractual right ... we disagree with the Court of Appeals' conclusion that the Due Process Clause limited Congress' power to [affect that right as it did]." *Id.,* at 476, 105 S.Ct., at 1457. Moreover, for the purpose at hand in *Atchison* it was quite proper for the Court to treat Congress's assertion of Amtrak's nongovernmental status in § 541 as conclusive. As we have suggested above, even if Amtrak *is* a Government entity, § 541's disavowal of that status certainly suffices to disable that agency from incurring contractual obligations on behalf of the United States. For these reasons, we think that *Atchison* 's assumption of Amtrak's nongovernmental status (a point uncontested by the parties in the case, since it was not Amtrak's governmental character that the railroads relied upon to establish an obligation of the United States) does not bind us here.

                    V

[7] The question before us today is unanswered, therefore, by governing statutory text or by binding precedent of this Court. Facing the question of Amtrak's status for the first time, we conclude that it is an agency or instrumentality of the United States for the purpose of individual rights guaranteed against the Government by the Constitution.

This conclusion seems to us in accord with public and judicial understanding of the nature of Government-created and -controlled corporations over the years. A remarkable feature of the heyday of those corporations, in the 1930's and 1940's, was that, even while they were praised for their status "as agencies separate and distinct, administratively and financially and legally, from the government itself, [which] has facilitated their adoption of commercial methods of accounting and financing, avoidance of political controls, and *395 utilization

of regular procedures of business management," it was fully acknowledged that they were a "device" of "government," and constituted "federal corporate agencies" apart from "regular government departments." Pritchett, 40 Am.Pol.Sci.Rev., at 495. The Reference Manual of Government Corporations, prepared in 1945 by the Comptroller General, contains as one of its Tables "Corporations arranged according to supervising or interested Government department or agency," see GAO Corporation Manual x-xi. This lists the 58 then-extant Government corporations under the various departments and agencies, from the Agriculture Department to the War Department, and then concludes the list with five "Independent corporations"--analogous, one supposes, to the "independent agencies" of the Executive Branch proper. The whole tenor of the Manual is that these corporations are part of the Government.

This Court has shared that view. For example, in *Reconstruction Finance Corporation v. J.G. Menihan Corp.,* 312 U.S. 81, 61 S.Ct. 485, 85 L.Ed. 595 (1941), Chief Justice Hughes, writing for the Court, described the RFC, whose organic statute did not state it to be a Government instrumentality, as, nonetheless, "a corporate agency of the government," and said that "it acts as a governmental agency in performing its functions." *Id.,* at 83, 61 S.Ct., at 486. In *Cherry Cotton Mills, Inc. v. United States,* 327 U.S. 536, 66 S.Ct. 729, 90 L.Ed. 835 (1946), we had little difficulty finding that the RFC was "an agency selected by Government to accomplish purely governmental purposes," *id.,* at 539, 66 S.Ct., at 730, and was thus entitled to the benefit of a statute giving the Court of Claims jurisdiction over "counterclaims ... on the part of the Government of the United States," 28 U.S.C. § 250(2) (1940 ed.). Likewise in *Inland Waterways Corp. v. Young,* 309 U.S. 517, 60 S.Ct. 646, 84 L.Ed. 901 (1940), we found that the Inland Waterways Corporation, which similarly was not specifically designated in its charter as an instrumentality of the United States, see Act of June 3, 1924, 43 Stat. 360, was an agency of the United States, so that its funds were "public moneys" for which national banks *396 could give security under § 45 of the National Bank Act of 1864, 13 Stat. 113, **973309 U.S., at 523-524. Justice Frankfurter wrote for the Court:
    "So far as the powers of a national bank to pledge its assets are concerned, the form which

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Government takes--whether it appears as the Secretary of the Treasury, the Secretary of War, or the Inland Waterways Corporation--is wholly immaterial. The motives which lead Government to clothe its activities in corporate form are entirely unrelated to the problem of safeguarding governmental deposits...." *Id.,* at 523, 60 S.Ct., at 650.

Even Congress itself appeared to acknowledge, at least until recent years, that Government-created and -controlled corporations were part of the Government. The GCCA, discussed above, which brought to an end the era of uncontrolled growth of Government corporations, provided that, without explicit congressional authorization, no corporation should be acquired or created by "any officer or agency of the Federal Government or by any Government corporation *for the purpose of acting as an agency or instrumentality of the United States* ...." § 304(a), 59 Stat. 602 (emphasis added). That was evidently intended to restrict the creation of *all* Government-controlled policy-implementing corporations, and not just some of them. And the companion provision that swept away many of the extant corporations said that no wholly owned government corporation created under state law could continue "as an agency or instrumentality of the United States," § 304(b), 59 Stat. 602. Once again, that was evidently meant to eliminate policy-implementing government ownership of *all* state corporations, and not just some of them. From the 1930's onward, many of the statutes creating Government-controlled corporations said explicitly that they were agencies or instrumentalities of the United States, see, *e.g.,* Act of June 9, 1947, § 1, 61 Stat. 130, as amended, 12 U.S.C. § 635 (creating the *397 Export-Import Bank of Washington as "an agency of the United States of America"); Federal Crop Insurance Act, § 503, 52 Stat. 72, 7 U.S.C. § 1503 (creating Federal Crop Insurance Corporation as "an agency of and within the Department of Agriculture"), and until 1962 none said otherwise. As we have described above, moreover, those later statutes, relatively few in number, took that statement, perhaps too uncritically, from an earlier statute pertaining to a corporation (Comsat) that was *genuinely* private and *not* Government controlled.

[8] That Government-created and -controlled corporations are (for many purposes at least) part of

the Government itself has a strong basis, not merely in past practice and understanding, but in reason itself. It surely cannot be that government, state or federal, is able to evade its most solemn obligations imposed in the Constitution by simply resorting to the corporate form. On that thesis, *Plessy v. Ferguson,* 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896), can be resurrected by the simple device of having the State of Louisiana operate segregated trains through a state-owned Amtrak. In *Pennsylvania v. Board of Directors of City Trusts of Philadelphia,* 353 U.S. 230, 77 S.Ct. 806, 1 L.Ed.2d 792 (1957) *(per curiam),* we held that Girard College, which had been built and maintained pursuant to a privately erected trust, was nevertheless a governmental actor for constitutional purposes because it was operated and controlled by a board of state appointees, which was itself a state agency. *Id.,* at 231, 77 S.Ct., at 806. Amtrak seems to us an *a fortiori* case.

Amtrak was created by a special statute, explicitly for the furtherance of federal governmental goals. As we have described, six of the corporation's eight externally named directors (the ninth is named by a majority of the board itself) are appointed directly by the President of the United States--four of them (including the Secretary of Transportation) with the advice and consent of the Senate. See §§ 543(a)(1)(A), (C)-(D). Although the statute restricts most of the President's choices to persons suggested by certain *398 organizations or persons having certain qualifications, those restrictions have been tailor-made by Congress for this entity alone. They do not in our view establish an absence of control by the Government as a whole, but rather constitute a restriction imposed by one of the political branches upon the other. Moreover, Amtrak is not merely **974 in the temporary control of the Government (as a private corporation whose stock comes into federal ownership might be); it is established and organized under federal law for the very purpose of pursuing federal governmental objectives, under the direction and control of federal governmental appointees. It is in that respect no different from the so-called independent regulatory agencies such as the Federal Communications Commission or the Securities Exchange Commission, which are run by Presidential appointees with fixed terms. It is true that the directors of Amtrak, unlike commissioners of independent regulatory agencies, are not, by the

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

115 S.Ct. 961
130 L.Ed.2d 902, 63 USLW 4109
**(Cite as: 513 U.S. 374, 115 S.Ct. 961)**

Page 14

explicit terms of the statute, removable by the President for cause, and are not impeachable by Congress. But any reduction in the immediacy of accountability for Amtrak directors vis-à-vis regulatory commissioners seems to us of minor consequence for present purposes--especially since, by the very terms of the chartering Act, Congress's "right to repeal, alter, or amend this chapter at any time is expressly reserved." 45 U.S.C. § 541.

[9] Respondent appeals to statements this Court made in a case involving the second Bank of the United States, *Bank of United States v. Planters' Bank of Georgia,* 9 Wheat. 904, 6 L.Ed. 244 (1824) . There we allowed the Planters' Bank, in which the State of Georgia held a noncontrolling interest, see Act of Dec. 19, 1810, § 1, reprinted in Digest of Laws of State of Georgia 34-35 (O. Prince ed. 1822); Act of Dec. 3, 1811, § 1, *id.,* at 35, to be sued in federal court despite the Eleventh Amendment, reasoning that "[t]he State does not, by becoming a corporator, identify itself with the corporation," 9 Wheat., at 907. "The government of the Union," we said, *399 held shares in the old Bank of the United States; but the privileges of the government were not imparted by that circumstance to the bank. The United States was not a party to suits brought by or against the bank in the sense of the constitution." *Id.,* at 908. But it does not contradict those statements to hold that a corporation is an agency of the Government, for purposes of the constitutional obligations of Government rather than the "privileges of the government," when the State has specifically created that corporation for the furtherance of governmental objectives, and not merely holds some shares but controls the operation of the corporation through its appointees.

Respondent also invokes our decision in the *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974), which found the Consolidated Rail Corporation, or Conrail, not to be a federal instrumentality, despite the President's power to appoint, directly or indirectly, 8 of its 15 directors. See *id.,* at 152, n. 40, 95 S.Ct., at 363, n. 40; Regional Rail Reorganization Act of 1973, § 301, 87 Stat. 1004. But we specifically observed in that case that the directors were placed on the board to protect the United States' interest "in assuring payment of the obligations guaranteed by the United States," and

that "[f]ull voting control ... will shift to the shareholders if federal obligations fall below 50% of Conrail's indebtedness." 419 U.S., at 152, 95 S.Ct., at 363. Moreover, we noted, "[t]he responsibilities of the federal directors are not different from those of the other directors--to operate Conrail at a profit for the benefit of its shareholders," *ibid.*--which contrasts with the public interest "goals" set forth in Amtrak's charter, see 45 U.S.C. § 501a. Amtrak is worlds apart from Conrail: The Government exerts its control not as a creditor but as a policymaker, and no provision exists that will automatically terminate control upon termination of a temporary financial interest. [FN5]

> FN5. Section 543(c) purports to divide the authority to select seven directors between the common stockholders and the preferred stockholders upon conversion of one-fourth or more of Amtrak's outstanding preferred stock to common stock. This subsection was originally enacted in 1970, and has not since been amended. It is irreconcilable with the revised provision for a nine-member board, § 543(a)(1). ◄

*400 * * *

[10] We hold that where, as here, the Government creates a corporation by special law, for the furtherance of governmental objectives, and retains for itself permanent authority to appoint a majority of the directors of that corporation, the corporation is part of the Government for purposes of the First **975 Amendment. We express no opinion as to whether Amtrak's refusal to display Lebron's advertisement violated that Amendment, but leave it to the Court of Appeals to decide that. The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

Justice O'CONNOR, dissenting.

The Court holds that Amtrak is a Government

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

entity and therefore all of its actions are subject to constitutional challenge. Lebron, however, expressly disavowed this argument below, and consideration of this broad and unexpected question is precluded because it was not presented in the petition for certiorari. The question on which we granted certiorari is narrower: Whether the alleged suppression of Lebron's speech by Amtrak, as a concededly private entity, should be imputed to the Government. Because Amtrak's decision to reject Lebron's billboard proposal was a matter of private business judgment and not of Government coercion, I would affirm the judgment below.

I

This Court's Rule 14.1(a) provides: "Only the questions set forth in the petition, or fairly included therein, will be considered by the Court." While "[t]he statement of any question *401 presented will be deemed to comprise every subsidiary question," *ibid.,* questions that are merely "related" or "complementary" to the question presented are not "fairly included therein." *Yee v. Escondido,* 503 U.S. 519, 537-538, 112 S.Ct. 1522, 1533-1534, 118 L.Ed.2d 153 (1992) (emphasis deleted). In *Yee,* we held that a regulatory taking argument, while subsidiary to the umbrella question whether a taking had occurred, was only complementary to the physical taking inquiry set forth in the petition and thus was barred under Rule 14.1(a). See *id.,* at 535, 112 S.Ct., at 1532. Here, state action is the umbrella claim. Subsidiary to that claim, but complementary to each other, are two distinct questions: whether Amtrak is a Government entity, and whether Amtrak's conduct as a private actor is nevertheless attributable to the Government.

We granted certiorari on the following question, set forth in the petition:
"Whether the court of appeals erred in holding that Amtrak's asserted policy barring the display of political advertising messages in Pennsylvania Station, New York, was not state action, where:
"(a) the United States created Amtrak, endowed it with governmental powers, owns all its voting stock, and appoints all the members of its Board;
"(b) the United States-appointed Board approved the advertising policy challenged here;
"(c) the United States keeps Amtrak afloat every year by subsidizing its losses; and
"(d) Pennsylvania Station was purchased for

Amtrak by the United States and is shared with several other governmental entities." Pet. for Cert. i.
The question asks whether the challenged policy "was not state action" and therefore may, at first blush, appear to present the umbrella inquiry. *Yee* suggests otherwise. The petition there recited two decisions by the Courts of Appeals and asked: "Was it error for the state appellate court to disregard *402 the rulings and hold that there was no taking under the fifth and fourteenth amendments?" Instead of focusing on whether "there was no taking," we read the question as a whole. Since the decisions by the Courts of Appeals and the lower court opinion involved only physical takings, we concluded: "Fairly construed, then, petitioners' question presented is the equivalent of the question, 'Did the court below err in finding no physical taking?' " 503 U.S., at 537, 112 S.Ct., at 1533.

Just so here. The question asks whether the lower court erred and thus directs our attention to the decisions below. The District Court, in its thorough order, explicitly noted Lebron's theory of the case: "Plaintiff does not contend that Amtrak is a governmental agency. What plaintiff contends is that the federal government is sufficiently entwined in Amtrak's operations and authority **976 that the particular actions at issue must be deemed governmental action." 811 F.Supp. 993, 999 (SDNY 1993). Before the Court of Appeals, in order to distinguish a long line of cases which held that Amtrak is not a Government agency, Lebron stated: "Since Lebron does not contend that Amtrak is a governmental entity per se, but rather is so interrelated to state entities that it should be treated as a state actor here, these cases are inapposite." Brief for Michael A. Lebron in No. 93-7127 (CA2), p. 30, n. 39.

The Court of Appeals, like the District Court, substantively discussed only the second question that Lebron argues here--whether Amtrak's conduct in this case implicates "the presence of government action in the activities of private entities." 12 F.3d 388, 390 (CA2 1993). To introduce its analysis, the Court of Appeals did state that "[t]he Rail Passenger Service Act of 1970 ... created Amtrak as a private, for-profit corporation under the District of Columbia Business Corporation Act," *ibid,* relying on Congress' characterization of the corporation in

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

115 S.Ct. 961
130 L.Ed.2d 902, 63 USLW 4109
(Cite as: 513 U.S. 374, 115 S.Ct. 961)

45 U.S.C. § 541. In so asserting, the Court of Appeals did not " 'pas[s] upon' " the question such that it is now a proper basis for reversal, *ante*, at 965, **403** but rather merely identified the question that the court had to address and focused the inquiry on the precise argument presented by Lebron. This observation by the Court of Appeals is much like--indeed, much less extensive than--our discussion of Amtrak's status as a private corporation in *National Railroad Passenger Corporation v. Atchison, T. & S.F.R. Co.*, 470 U.S. 451, 453-456, 105 S.Ct. 1441, 1445-1447, 84 L.Ed.2d 432 (1985). I agree with the Court that *Atchison* does not bind us, *ante*, at 971-972, but, by the same token, I do not see how the court below could be said to have addressed the issue. A passing observation could not constitute binding precedent; so, too, it could not serve as the basis for reversal.

The question set forth in the petition focused on the specific action by Amtrak, not on the general nature of the corporation as a private or public entity. Lebron asked whether "Amtrak's asserted policy barring the display of political advertising messages in Pennsylvania Station, New York, was not state action." App. to Pet for Cert. i. The list that follows this question, while partially concerning Amtrak's nature as an entity, went to support the thrust of the query, which is whether these enumerated attributes render Amtrak's advertising policy state action. Lebron's emphasis on the specific action challenged is the crucial difference between his alternative arguments for state action. The first inquiry--whether Amtrak is a Government entity-- focuses on whether Amtrak is so controlled by the Government that it should be treated as a Government agency, and all of its decisions considered state action. The second inquiry takes Lebron at his word that Amtrak is *not* a Government entity and instead focuses on the State's influence on particular actions by Amtrak as a private actor.

Fairly construed, the question presented is whether the Court of Appeals erred in holding that the advertising policy of Amtrak, as a private entity, is not attributable to the Federal Government despite the corporation's links thereto. This question is closely related and complementary to, but *404 certainly not inclusive of, the question answered by the Court today, which is whether those links render Amtrak the functional equivalent of a Government agency. In my view, the latter question is barred by Rule 14.1(a).

Relying on *United States Nat. Bank of Ore. v. Independent Ins. Agents of America, Inc.*, 508 U.S. 439, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993), the Court argues that it properly addresses whether Amtrak is a Government entity because that inquiry is "prior to the clearly presented question," namely, whether Amtrak's decision is attributable to the Government. *Ante*, at 966. *Independent Ins. Agents*, however, held only that the Court of Appeals had authority to consider a waived claim *sua sponte* and did not abuse its discretion in doing so. [FN*] That is quite different from the purpose for which **977 the Court now marshals the case, which is to justify its consideration of a waived question in the first instance. As explained below, I do not question the Court's authority, only its prudence. In any event, the dispute in *Independent Ins. Agents* centered on the interpretation of a statute that may not have existed, and, as the Court recognizes, *ante*, at 966, n. 3, the decision simply applied the traditional principle that "[t]here can be no estoppel in the way of ascertaining the existence of a law." *South Ottawa v. Perkins*, 94 U.S. 260, 267, 24 L.Ed. 154 (1877). Here, one need not assume the existence of any predicate legal rule to accept Lebron's word that Amtrak is a private entity.

> FN* The Court would read more into the decision, because we "decline [d] even to brush aside the Court of Appeals' (questionable) contention that there was 'a "duty" to address the status of section 92,' saying only that '[w]e need not decide' that question." *Ante*, at 966, n. 3. But by (prudently) reserving the question, the Court could not have implied its answer. And our "complicit[y] in the [Court of Appeals'] enterprise," *ibid.*, exists only if one indulges in the unlikely inference that we held more than what we said we did.

The mere fact that one question must be answered before another does not insulate the former from Rule 14.1(a) and other waiver rules. In *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), *405 we held that Fourth Amendment

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

claims are not ordinarily cognizable in federal habeas proceedings and distinguished several cases by noting that "the issue of the substantive scope of the writ was not presented in the petition[s] for certiorari." *Id.,* at 481, n. 15, 96 S.Ct., at 3046, n. 15. We thus recognized that those decisions properly avoided the question of cognizability, which question, of course, is logically anterior to the merits of the Fourth Amendment claims presented. In *Steagald v. United States,* 451 U.S. 204, 211, 101 S.Ct. 1642, 1647, 68 L.Ed.2d 38 (1981), we held that the Government had conceded that the petitioner had a Fourth Amendment interest in the searched home, an inquiry that precedes the question that was preserved, whether the search was reasonable. In *Kamen v. Kemper Financial Services, Inc.,* 500 U.S. 90, 97, n. 4, 111 S.Ct. 1711, 1716, n. 4, 114 L.Ed.2d 152 (1991), because the question was neither litigated below nor included in the petition, we assumed the existence of a cause of action under § 20(a) of the Investment Company Act of 1940 before addressing the requirements of such an action. See also *Burks v. Lasker,* 441 U.S. 471, 476, 99 S.Ct. 1831, 1836, 60 L.Ed.2d 404 (1979) (assuming same). Finally, in *McCormick v. United States,* 500 U.S. 257, 111 S.Ct. 1807, 114 L.Ed.2d 307 (1991), the Court held that a state legislator did not violate the anti-extortion Hobbs Act, 18 U.S.C. § 1951, by accepting campaign contributions without an explicit exchange of improper promises. The Court reached this question only after declining to consider whether the Act applies to local officials at all, because that question was neither argued below nor included in the petition for certiorari. *McCormick,* 500 U.S., at 268, n. 6, 111 S.Ct., at 1814, n. 6; see also *id.,* at 280, 111 S.Ct., at 1820 (SCALIA, J., concurring) (accepting the assumption, because the argument was waived, that the Hobbs Act is a "federal 'payment for official action' statute" even though "I think it well to bear in mind that the statute may not exist").

The Court does not take issue with these cases but argues further that, because the question whether Amtrak is a Government entity is "dependent upon many of the same factual inquiries [as the clearly presented question], refusing to regard *406 it as embraced within the petition may force us to assume what the facts will show to be ridiculous, a risk which ought to be avoided." *Ante,* at 966. A certain circularity inheres in this logic, because the

Court must first answer the omitted question in order to determine whether its answer turns on "the same factual inquiries" as the clearly presented question. As for the facts, the record is shaped by the parties' arguments below. Perhaps serendipity has given the Court a factual record adequate to decide a question other than that advanced below, but there is no guarantee of such convergence. It is rather unfair to hold a party to a record that it may have developed differently in response to a different theory of the case. It is this risk of unfairness, rather than the fear of seeming "ridiculous," that we should avoid.

Rule 14.1(a), of course, imposes only a prudential limitation, but one that we disregard "only in the most exceptional cases."**978 *Stone v. Powell, supra,* 428 U.S., at 481, n. 15, 96 S.Ct., at 3046, n. 15; see also *United States v. Mendenhall,* 446 U.S. 544, 551, n. 5, 100 S.Ct. 1870, 1875, n. 5, 64 L.Ed.2d 497 (1980). This is not one of them. As noted before, not only did Lebron disavow the argument that Amtrak is a Government entity below, he did so in order to distinguish troublesome cases. Lebron's postpetition attempt to resuscitate the claim that he himself put to rest is precisely the kind of bait-and-switch strategy that waiver rules, prudential or otherwise, are supposed to protect against. In *Steagald, supra,* 451 U.S., at 211, 101 S.Ct., at 1647, for example, we stated unequivocally that "the Government, through its assertions, concessions, and acquiescence, has lost its right to challenge petitioner's assertion that he possessed a legitimate expectation of privacy in the searched home." I see no difference here.

The Rule's prudential limitation on our power of review serves two important purposes, both of which the Court disserves by deciding that Amtrak is a Government entity. First, the Rule provides notice and enables the respondent to sharpen its arguments in opposition to certiorari. "By *407 forcing the petitioner to choose his questions at the outset, Rule 14.1(a) relieves the respondent of the expense of unnecessary litigation on the merits and the burden of opposing certiorari on unpresented questions." *Yee,* 503 U.S., at 536, 112 S.Ct., at 1533. Lebron argues that Amtrak has waived its Rule 14.1(a) argument by failing to object in the brief in opposition to certiorari. But that is exactly the point: The question set forth did not fairly include an argument that Amtrak is a Government

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

115 S.Ct. 961
130 L.Ed.2d 902, 63 USLW 4109
(Cite as: 513 U.S. 374, 115 S.Ct. 961)

Page 19

Court held that the government had "so far insinuated itself into a position of interdependence with" the private restaurant that it was in effect "a joint participant in the challenged activity." *Id.,* at 725, 81 S.Ct., at 861. Focusing on this language, Lebron argues that various features of Amtrak's structure and management--its statutory genesis, the heavy reliance on federal subsidies, and a board appointed by the President--places it in a symbiotic relationship with the Government such that the decision to ban Lebron's speech should be imputed to the State.

Our decision in *Burton,* however, was quite narrow. We recognized "the limits of our inquiry" and emphasized that our decision depended on the "peculiar facts [and] circumstances present." *Id.,* at 726, 81 S.Ct., at 862. We have since noted that *Burton* limited its "actual holding to lessees of public property," *Jackson v. Metropolitan Edison Co., supra,* 419 U.S., at 358, 95 S.Ct., at 457, and our recent decisions in this area have led commentators to doubt its continuing vitality, see, *e.g.,* L. Tribe, American Constitutional Law § 18-3, p. 1701, n. 13 (2d ed. 1988) ("The only surviving explanation of the result in *Burton* may be that found in Justice Stewart's concurrence").

*410 In *Jackson,* we held that a private utility's termination of service to a customer is not subject to due process challenge, even though the termination was made pursuant to a state law. In doing so, we made clear that the question turns on whether the challenged conduct results from private choice: "Respondent's exercise of the choice allowed by state law where the initiative comes from it and not from the State, does not make its action in doing so 'state action' for purposes of the Fourteenth Amendment." 419 U.S., at 357, 95 S.Ct., at 456 (footnote omitted). The rule applies even where the private entity makes its decision in an environment heavily regulated by the government. *Rendell-Baker, supra,* involved a private school for troubled students who were transferred there by authority of a state law, and for whose education the State paid the school. Public funds comprised 90% to 99% of the school budget. The school fired petitioners, and a state grievance board reviewed that personnel action. Despite the school's pervasive ties to the State, we held that the discharge decisions were not subject to constitutional **980 challenge because those

actions "were not compelled or even influenced by any state regulation." *Id.,* 457 U.S., at 841, 102 S.Ct., at 2771. We noted that "in contrast to the extensive regulation of the school generally, the various regulators showed relatively little interest in the school's personnel matters." *Ibid.* Likewise, in *Blum v. Yaretsky, supra,* we held that the decisions of a regulated hospital to discharge its patients were not subject to constitutional challenge. Although various Medicaid regulations and benefit adjustment procedures may have encouraged the hospital's decisions to discharge its patients early, we held that the State was not "*responsible* for those actions" because such actions "ultimately turn on medical judgments made by private parties according to professional standards that are not established by the State." *Id.,* 457 U.S., at 1005, 1008, 102 S.Ct., at 2786, 2787. See also *San Francisco Arts & Athletics, Inc. v. United States Olympic Comm.,* 483 U.S. 522, 547, 107 S.Ct. 2971, 2986, 97 L.Ed.2d 427 (1987) ("There is no evidence that the Federal Government coerced *411 or encouraged the USOC in the exercise of its right [to deny use of its copyright]").

These cases differ markedly from the "interdependence" or "joint participation" analysis of *Burton* and stand for the principle that, unless the government affirmatively influenced or coerced the private party to undertake the challenged action, such conduct is not state action for constitutional purposes. *Edmonson v. Leesville Concrete Co., supra,* is not to the contrary. In that case, the Court held that a private attorney's exercise of a peremptory challenge is attributable to the government and therefore subject to constitutional inquiry. Although the opinion cited *Burton,* see 500 U.S., at 621, 624, 111 S.Ct., at 2083, 2085, it emphasized that a private party exercising a peremptory challenge enjoys the "overt, significant assistance of the court," *id.,* at 624, 111 S.Ct., at 2084. The decision therefore is an application of *Shelley v. Kraemer,* 334 U.S. 1, 19, 68 S.Ct. 836, 845, 92 L.Ed. 1161 (1948), which focused on the use of the State's coercive power, through its courts, to effect the litigant's allegedly unconstitutional choice. Moreover, *Edmonson* stressed that a litigant exercising a peremptory challenge performs a "traditional function of the government," 500 U.S., at 624, 111 S.Ct., at 2085, a theory of state action established by *Marsh v. Alabama,* 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946), that is

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

agency, and, indeed, the petition was devoted to whether Amtrak's private decision should be imputed to the State. Even at pages 16-18, the petition did not "fairly embrac[e] the argument that Lebron now advances," *ante*, at 965, but rather argued that the composition of Amtrak's board "renders *an otherwise private entity* a state actor," Pet. for Cert. 16 (emphasis added)--thus specifically repeating the concession he now wishes to withdraw. Amtrak could not respond to a point not argued and did not waive an argument that was not at issue. Not until the merits brief did Amtrak have notice that Lebron would contradict his persistent assertion that the corporation was a private entity.

Second, the Rule assists the management of our cases. "Rule 14.1(a) forces the parties to focus on the questions the Court has viewed as particularly important, thus enabling us to make efficient use of our resources." *Yee, supra*, at 536, 112 S.Ct., at 1533. We normally grant only petitions that present an important question of law on which the lower courts are in conflict. Here, the lower courts have generally held that Amtrak is not a Government entity, see, *e.g., Anderson v. National Railroad Passenger Corporation*, 754 F.2d 202, 204 (CA7 1985); *Ehm v. National Railroad Passenger Corporation*, 732 F.2d 1250, 1255 (CA5), cert. denied, 469 U.S. 982, 105 S.Ct. 387, 83 L.Ed.2d 322 (1984), and none of our cases suggest otherwise. Even where the lower courts are in clear conflict, we often defer consideration of novel questions of law to permit further development. Despite the prevalence of publicly owned corporations, whether they are Government agencies is a question *408 seldom answered, and then only for limited purposes. See *Cherry Cotton Mills, Inc. v. United States*, 327 U.S. 536, 539, 66 S.Ct. 729, 730, 90 L.Ed. 835 (1946); *National Railroad Passenger Corporation v. Atchison, T. & S.F.R. Co.*, 470 U.S., at 471, 105 S.Ct., at 1454. Answering this question today merely opens the back door to premature adjudication of similarly broad and novel theories in the future.

Weeding out such endeavors, Rule 14.1(a), like other waiver rules, rests firmly upon a limited view of our judicial power. See, *e.g., Carducci v. Regan*, 714 F.2d 171, 177 (CADC 1983) (Scalia, J.) ("The premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them"). "The doctrine of judicial restraint teaches us that patience in the judicial resolution of conflicts may sometimes produce the most desirable result." Stevens, Some Thoughts on Judicial Restraint, 66 Judicature 177, 183 (1982). Whether the result of today's decision is desirable I do not decide. **979 But I think it clear that the Court has exhibited little patience in reaching that result.

II

Accepting Lebron's concession that Amtrak is a private entity, I must "traverse th[e] difficult terrain," *ante*, at 964, that the Court sees fit to avoid, and answer the question that is properly presented to us: whether Amtrak's decision to ban Lebron's speech, although made by a concededly private entity, is nevertheless attributable to the Government and therefore considered state action for constitutional purposes. Reflecting the discontinuity that marks the law in this area, we have variously characterized the inquiry as whether "there is a sufficiently close nexus between the State and the challenged action," *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974); whether the State, by encouraging the challenged conduct, could be thought "*responsible* for those *409 actions," *Blum v. Yaretsky*, 457 U.S. 991, 1005, 102 S.Ct. 2777, 2786, 73 L.Ed.2d 534 (1982); and whether "the alleged infringement of federal rights [is] 'fairly attributable to the State,' " *Rendell-Baker v. Kohn*, 457 U.S. 830, 838, 102 S.Ct. 2764, 2769, 73 L.Ed.2d 418 (1982), quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937, 102 S.Ct. 2744, 2753, 73 L.Ed.2d 482 (1982). Whatever the semantic formulation, I remain of the view that the conduct of a private actor is not subject to constitutional challenge if such conduct is "fundamentally a matter of private choice and not state action." *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 632, 111 S.Ct. 2077, 2089, 114 L.Ed.2d 660 (1991) (O'CONNOR, J., dissenting).

Lebron relies heavily on *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). There, the Court perceived a symbiotic relationship between a racially segregated restaurant and a state agency from which the restaurant leased public space. Noting that the State stood to profit from the discrimination, the

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

115 S.Ct. 961
130 L.Ed.2d 902, 63 USLW 4109
**(Cite as: 513 U.S. 374, 115 S.Ct. 961)**

independent from *Burton* and not relevant to this case.

Relying thus on *Shelley* and *Marsh*, *Edmonson* did not necessarily extend the "interdependence" rationale of *Burton* beyond the limited facts of that case. Given the pervasive role of government in our society, a test of state action predicated upon public and private "interdependence" sweeps much too broadly and would subject to constitutional challenge the most pedestrian of everyday activities, a problem that the Court recognized in *Burton* itself, see 365 U.S., at 725-726, 81 S.Ct., at 861-862. A more refined inquiry is that established by *Jackson, Rendell-Baker, Blum,* and *San Francisco Arts & Athletics:* The conduct of a private entity is not subject to constitutional scrutiny if the challenged action results from *412 the exercise of private choice and not from state influence or coercion.

Applying this principle to the facts before us, I see no basis to impute to the Government Amtrak's decision to disapprove Lebron's advertisement. Although a number of factors indicate the Government's pervasive influence in Amtrak's management and operation, none suggest that the Government had any effect on Amtrak's decision to turn down Lebron's proposal. The advertising policy that allegedly violates the First Amendment originated with a predecessor to Amtrak, the wholly private Pennsylvania Railroad Company. A 1967 lease by that company, for example, prohibited "any advertisement which in the judgement of Licensor is or might be deemed to be slanderous, libelous, unlawful, immoral, [or] offensive to good taste...." App. 326, ¶ 19. Amtrak simply continued this policy after it took over. The specific decision to disapprove Lebron's advertising was made by Amtrak's Vice President of Real Estate and Operations Development, who, as a corporate officer, was neither appointed by the President nor directed by the President-appointed board to disapprove Lebron's proposal.

**981 Lebron nevertheless contends that the board, through its approval of the advertising policy, controlled the adverse action against him. This contention rests on the faulty premise that Amtrak's directors are state actors simply because they were appointed by the President; it assumes that the board members sit as public officials and not as

business directors, thus begging the question whether Amtrak is a Government agency or a private entity. In any event, even accepting Lebron's premise that the board's approval has constitutional significance, the factual record belies his contention. The particular lease that permitted Amtrak to disallow Lebron's billboard was neither reviewed nor approved directly by the board. In fact, minutes of meetings dating back to 1985 showed that the board approved only one contract between Amtrak and Transportation Displays, Incorporated, *413 the billboard leasing company that served as Amtrak's agent, and even then it is not clear whether the board approved the contract or merely delegated authority to execute the licensing agreement. App. 402. In short, nothing in this case suggests that the Government controlled, coerced, or even influenced Amtrak's decision, made pursuant to corporate policy and private business judgment, to disapprove the advertisement proposed by Lebron.

Presented with this question, the Court of Appeals properly applied our precedents and did not impute Amtrak's decision to the Government. I would affirm on this basis and not reverse the Court of Appeals based on a theory that is foreign to this case. Respectfully, I dissent.

115 S.Ct. 961, 513 U.S. 374, 130 L.Ed.2d 902, 63 USLW 4109

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

290 F.3d 132
**(Cite as: 290 F.3d 132)**

Page 1

**H**

United States Court of Appeals,
Second Circuit.

PERPETUAL SECURITIES, INC.,
Petitioner-Appellant,
v.
Julie TANG and Hua Yu Chen,
Respondents-Appellees.

**Docket No. 01-7901.**

Argued March 26, 2002.
Decided May 9, 2002.

Securities brokerage brought action against customers, seeking to vacate arbitration award in customers' favor, and customers cross-moved for dismissal of brokerage's petition, confirmation of arbitration award, and imposition of Rule 11 sanctions. The United States District Court for the Southern District of New York, Owen, J., 2001 WL 826121, ruled that it lacked jurisdiction to vacate award, confirmed award, and granted sanctions motion. Brokerage appealed. The Court of Appeals, Meskill, Circuit Judge, held that: (1) brokerage's due process claim was insufficient to confer federal question jurisdiction over claim to vacate arbitration award; (2) arbitration panel's failure to apply collateral estoppel and res judicata principles did not support federal question jurisdiction; (3) arbitration panel's alleged failure to apply concept of respondeat superior did not support federal question jurisdiction; (4) district court lacked authority to confirm arbitration award, given absence of independent basis for subject matter jurisdiction; and (5) sanctions award was abuse of discretion due to failure to satisfy Rule 11's procedural safeguards, warranting remand of issue.

Affirmed in part and vacated and remanded in part.

West Headnotes

**[1] Federal Courts** ⇐5
170Bk5 Most Cited Cases

Federal courts are courts of limited jurisdiction.

**[2] Federal Courts** ⇐31
170Bk31 Most Cited Cases

Individual parties cannot confer subject matter jurisdiction where the Constitution and Congress have not.

**[3] Federal Courts** ⇐31
170Bk31 Most Cited Cases

The absence of subject matter jurisdiction is non-waivable.

**[4] Federal Courts** ⇐30
170Bk30 Most Cited Cases

Before deciding any case, federal court is required to assure itself that the case is properly within its subject matter jurisdiction.

**[5] Arbitration** ⇐77(.5)
33k77(.5) Most Cited Cases

Provision of Federal Arbitration Act (FAA) that allows federal district courts to vacate arbitration awards does not confer upon federal district courts subject matter jurisdiction; rather, there must be an independent basis of jurisdiction before district court may entertain petitions under FAA. 9 U.S.C.A. § 10.

**[6] Federal Courts** ⇐241
170Bk241 Most Cited Cases

Federal question jurisdiction exists where a well-pleaded complaint establishes either that federal law creates the cause of action or that plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law. 28 U.S.C.A. § 1331.

**[7] Federal Courts** ⇐241
170Bk241 Most Cited Cases

When deciding whether federal question jurisdiction exists, court must proceed prudently and make pragmatic distinctions between those allegations, if any, that raise substantial questions and those that do not. 28 U.S.C.A. § 1331.

**[8] Federal Courts** ⇐241
170Bk241 Most Cited Cases

In determining whether federal question jurisdiction exists, court examines the nature of the federal question raised in each claim to see if it is

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

290 F.3d 132
**(Cite as: 290 F.3d 132)**

Page 2

sufficiently substantial to warrant federal jurisdiction. 28 U.S.C.A. § 1331.

**[9] Federal Courts ☞242.1**
170Bk242.1 Most Cited Cases

Simply raising a federal issue in a complaint will not automatically confer federal question jurisdiction; rather, court asks whether the cause of action alleged is so patently without merit as to justify the court's dismissal for want of jurisdiction. 28 U.S.C.A. § 1331.

**[10] Constitutional Law ☞254(4)**
92k254(4) Most Cited Cases

State action supporting due process claim may be found based on conduct of private actor only if there is such a close nexus between the state and the challenged action that seemingly private behavior may be fairly treated as that of the state itself. U.S.C.A. Const.Amends. 5, 14.

**[11] Constitutional Law ☞254(4)**
92k254(4) Most Cited Cases

**[11] Federal Courts ☞243**
170Bk243 Most Cited Cases

National Association of Securities Dealers (NASD) was not state actor, and its requirement that its members submit all disputes to compulsory arbitration was not state action, and therefore claim that compulsory arbitration requirement violated brokerage's due process rights was patently without merit and insufficient to confer federal question jurisdiction over brokerage's action to vacate arbitration award entered in favor of customers. U.S.C.A. Const.Amends. 5, 14; 28 U.S.C.A. § 1331

**[12] Exchanges ☞11(11.1)**
160k11(11.1) Most Cited Cases

Collateral estoppel, or issue preclusion, was not applicable to arbitration award granted to brokerage's customers, who asserted claims of unauthorized trading in their account, inasmuch as decision by National Association of Securities Dealers (NASD) not to take disciplinary action against brokerage's employee had no bearing on whether employee or brokerage were financially liable to customers for their conduct, an issue not

considered or decided in connection with discipline issue.

**[13] Exchanges ☞11(11.1)**
160k11(11.1) Most Cited Cases

Doctrine of res judicata, or claim preclusion, did not apply to bar customers' claims for unauthorized trading against securities brokerage, based on decision of National Association of Securities Dealers (NASD) not to take disciplinary action against brokerage's employee; NASD Regulation was not entity with jurisdiction to decide issue before arbitration panel, customers were not a party to NASD's investigation of employee, and issue decided by investigation of employee was wholly different from issue to be decided by arbitration panel.

**[14] Federal Courts ☞243**
170Bk243 Most Cited Cases

Contention that arbitration panel manifestly disregarded tort law concept of respondeat superior when panel ruled in customers' favor on claims against securities brokerage alleging unauthorized trading in customers' account did not give rise to substantial federal question, so as to establish federal question jurisdiction over action in which brokerage sought to vacate arbitration award, given that brokerage did not allege that respondeat superior was issue of federal law that had to be decided by federal court, and given absence of showing that arbitrators did disregard such a principle. 28 U.S.C.A. § 1331.

**[15] Federal Courts ☞198**
170Bk198 Most Cited Cases

District court lacked authority to confirm arbitration award under Federal Arbitration Act (FAA) when there was no independent basis for subject matter jurisdiction over claim seeking confirmation. 9 U.S.C.A. § 1 et seq.; 28 U.S.C.A. § 1331.

**[16] Federal Courts ☞198**
170Bk198 Most Cited Cases

Provision of Federal Arbitration Act (FAA) governing confirmation of arbitration awards does not, by itself, constitute independent grant of subject matter jurisdiction to federal courts. 9 U.S.C.A. § 9; 28 U.S.C.A. § 1331.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

290 F.3d 132
**(Cite as: 290 F.3d 132)**

Page 3

**[17] Federal Civil Procedure 2756.1**
170Ak2756.1 Most Cited Cases

Even though district court lacked jurisdiction to decide merits of parties' claims seeking either to vacate or to confirm arbitration award, it retained power to determine collateral issues, such as appropriateness of sanctions.

**[18] Federal Civil Procedure 2826**
170Ak2826 Most Cited Cases

**[18] Federal Courts 943.1**
170Bk943.1 Most Cited Cases

Awarding Rule 11 sanctions against securities brokerage was abuse of discretion when motion for sanctions was not made separately from other motions or requests and was not served on brokerage before it was filed with district court, contrary to requirements set forth in rule; remand of sanctions issue was therefore warranted. Fed.Rules Civ.Proc.Rule 11(c)(1)(A), 28 U.S.C.A.

**[19] Federal Civil Procedure 2758**
170Ak2758 Most Cited Cases

**[19] Federal Courts 813**
170Bk813 Most Cited Cases

District courts generally have wide discretion in deciding when sanctions are appropriate, and a court's decision to award Rule 11 sanctions is accordingly reviewed for abuse of discretion. Fed.Rules Civ.Proc.Rule 11, 28 U.S.C.A.

**[20] Federal Courts 812**
170Bk812 Most Cited Cases

A district court necessarily abused its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence.

**[21] Federal Civil Procedure 2826**
170Ak2826 Most Cited Cases

Procedural protections set forth by Rule 11 are intended to reduce the number of motions for sanctions and to provide opportunities for parties to avoid sanctions altogether. Fed.Rules Civ.Proc.Rule 11, 28 U.S.C.A.

**[22] Federal Civil Procedure 2827**

170Ak2827 Most Cited Cases

**[22] Federal Civil Procedure 2828**
170Ak2828 Most Cited Cases

A district court can award Rule 11 sanctions absent a motion from a party, but if court determines that sanctions are appropriate, the court must allow the party threatened with sanctions to respond. Fed.Rules Civ.Proc.Rule 11(c)(1)(B), 28 U.S.C.A.

**[23] Federal Civil Procedure 2827**
170Ak2827 Most Cited Cases

District court cannot, under Rule 11, award attorney fees on its own initiative. Fed.Rules Civ.Proc.Rule 11(c)(2), 28 U.S.C.A.
*134 Kevin K. Tung, Flushing, NY, for Appellant.

Michael Schneider, New York City, for Appellees.


Before: OAKES, MESKILL and SACK, Circuit Judges.


MESKILL, Circuit Judge.

Petitioner-appellant Perpetual Securities, Inc. (Perpetual) appeals from a judgment and order of the United States District Court for the Southern District of New York, Owen, *J.*, denying Perpetual's petition to vacate an arbitration award, granting respondents-appellees' petition for confirmation of the award, and granting Rule 11 sanctions against Perpetual in the form of attorney's fees and costs.

The district court determined that because Perpetual had not raised an independent *135 ground of federal jurisdiction in its complaint, the court was without jurisdiction to vacate the arbitration award. After determining, however, that the Federal Arbitration Act conferred upon it jurisdiction to *confirm* an arbitration award, the district court confirmed the award in this case. Further, because Perpetual's arguments attempting to raise a federal question were clearly against Circuit precedent, the district court awarded Rule 11 sanctions in the form of reasonable attorney's fees and costs against Perpetual.

We hold that the district court correctly determined

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

290 F.3d 132
**(Cite as: 290 F.3d 132)**

Page 4

that it lacked jurisdiction to vacate the arbitration award, but that the district court erred in assuming jurisdiction to confirm the arbitration award. Further, we hold that the district court's award of Rule 11 sanctions in the form of attorney's fees against Perpetual was improper. Accordingly, we vacate the order of the district court and remand the case to be dismissed for lack of subject matter jurisdiction and so that the district court can reconsider the sanctions issue.

### BACKGROUND

Respondents-appellees Julie Tang and Hua Yu Chen brought a claim before a National Association of Securities Dealers (NASD) arbitration panel against Perpetual for unauthorized trading in an account maintained by appellees at Perpetual. The claim was brought before the arbitration panel pursuant to the Margin and Option Agreements (Agreements) signed by appellees. The arbitration provision in the Margin Agreement, which is essentially identical to the provision in the Option Agreement, provides that "all controversies which may arise between us ... shall be determined by arbitration. Any arbitration under this agreement shall be conducted before the New York Stock Exchange, Inc. ('NYSE') or the National Association of Securities Dealers, Inc. ('NASD')." The Agreements further stated "[j]udgement upon the award of arbitrators may be entered in any court, state or federal, having jurisdiction."

The complaint before the arbitration panel alleged, *inter alia,* that Yue Chen, an employee of Perpetual, refused to stop trading on appellees' account despite appellees' request. NASD Regulation performed an investigation to determine whether disciplinary action should be taken against Yue Chen and determined that no action would be taken at that time. Perpetual then moved for a dismissal of the case before the arbitration panel, asserting *res judicata* and collateral estoppel claims. Perpetual argued that appellees' claims were based on the conduct of Yue Chen. Because NASD Regulation had determined that no disciplinary action would be taken against Yue Chen, Perpetual argued that NASD Regulation's decision should govern the case against Perpetual and Yue Chen before the arbitration panel. The panel rejected the argument and denied Perpetual's motion.

Following the hearing, Perpetual was ordered to pay $21,000 to appellees in compensatory damages, $5,000 to NASD Dispute Resolution in forum fees, $105 in administrative costs and $3,100 in member fees.

Perpetual initiated an action in the United States District Court for the Southern District of New York seeking to vacate the arbitration award. Appellees cross-moved for dismissal of Perpetual's petition, confirmation of the arbitration award and the imposition of sanctions pursuant to Fed.R.Civ.P. 11. The district court concluded that .it lacked jurisdiction to vacate the arbitration award because Perpetual had failed to present an independent basis for subject matter jurisdiction. **\*136**Perpetual Sec. v. Tang, 2001 WL 826121, at \*1 (S.D.N.Y. July 20, 2001). The district court then concluded that it had jurisdiction to confirm the arbitration award and did so. The district court also awarded Rule 11 sanctions against Perpetual in the form of attorney's fees and costs. *Id.* This appeal followed.

### DISCUSSION

We have jurisdiction to hear this appeal pursuant to 9 U.S.C. § 16(a)(1)(D) (an appeal may be taken from an order confirming or denying confirmation of an award). *See United States v. Corrick,* 298 U.S. 435, 440, 56 S.Ct. 829, 80 L.Ed. 1263 (1936) ("While the District Court lacked jurisdiction, we have jurisdiction on appeal, not of the merits but merely for the purpose of correcting the error of the lower court in entertaining the suit.").

#### I. *Subject Matter Jurisdiction*

[1] Federal courts are courts of limited jurisdiction. Congress has, pursuant to its authority under Article III of the Constitution, granted to district courts jurisdiction to hear cases in which there is a federal question and cases based on diversity of citizenship of the parties. U.S. Const. art. III, § 1 ("The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish."); *id.* art. III, § 2 (delineating the limits of the "judicial Power"); 28 U.S.C. § 1331 (granting jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States"); *id.* § 1332 (granting jurisdiction "where the matter in controversy exceeds the sum or value of $75,000 ... and is between[, *inter alia,*] citizens of different States").

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

290 F.3d 132
**(Cite as: 290 F.3d 132)**

Page 5

[2][3][4] Individual "parties cannot confer subject matter jurisdiction where the Constitution and Congress have not. The absence of such jurisdiction is non-waivable; before deciding any case we are required to assure ourselves that the case is properly within our subject matter jurisdiction." *Wynn v. AC Rochester,* 273 F.3d 153, 157 (2d Cir.2001) (per curiam) (citing *Bender v. Williamsport Area Sch. Dist.,* 475 U.S. 534, 541, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986)).

A.

[5] Section 10 of the Federal Arbitration Act (FAA), 9 U.S.C. § 10, allowing federal district courts to vacate arbitration awards, does not confer upon federal district courts subject matter jurisdiction. *United States v. Am. Soc. of Composers, Authors & Publishers,* 32 F.3d 727, 731 (2d Cir.1994); *Harry Hoffman Printing v. Graphic Communications, Int'l Union, Local 261,* 912 F.2d 608, 611 (2d Cir.1990); *see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 25 n. 32, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983) ("The Arbitration Act is something of an anomaly in the field of federal-court jurisdiction. It creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate, yet it does not create any independent federal-question jurisdiction."). "There must be an independent basis of jurisdiction before a district court may entertain petitions under the Act." *Harry Hoffman Printing,* 912 F.2d at 611.

There is no allegation that there is diversity jurisdiction; although the parties appear to be diverse, the amount in controversy is less than the statutorily required $75,000. 28 U.S.C. § 1332. Therefore, for subject matter jurisdiction to exist here, the dispute must raise a federal question. Perpetual recognized this by pleading jurisdiction under 28 U.S.C. § 1331 in its complaint.

*137 [6][7][8] "Federal question jurisdiction exists where a well- pleaded complaint 'establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a *substantial question of federal law.*' " *Greenberg v. Bear, Stearns & Co.,* 220 F.3d 22, 25 (2d. Cir.2000) (emphasis added) (quoting *Franchise Tax Bd. v. Constr. Laborers Vacation Trust,* 463 U.S. 1, 27-28, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983)). When deciding whether

federal question jurisdiction exists, we must proceed prudently and make pragmatic distinctions between those allegations, if any, that raise substantial questions and those that do not. *Id.* at 26, 103 S.Ct. 2841 (citing *Barbara v. New York Stock Exch.,* 99 F.3d 49, 54 (2d Cir.1996)). In so doing, we examine "the nature of the federal question raised in [each] claim to see if it is sufficiently substantial to warrant federal jurisdiction." *Greenblatt v. Delta Plumbing & Heating Corp.,* 68 F.3d 561, 570 (2d Cir.1995).

[9] Simply raising a federal issue in a complaint will not automatically confer federal question jurisdiction. Rather, we ask "whether the cause of action alleged is *so patently without merit* as to justify ... the court's dismissal for want of jurisdiction." *Duke Power Co. v. Carolina Env. Study Group,* 438 U.S. 59, 70, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978) (quotation marks omitted); *accord Oneida Indian Nation v. County of Oneida,* 414 U.S. 661, 666, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974) (noting that federal jurisdiction existed because plaintiff's assertion that its claim was based in federal law was "not "so insubstantial, implausible, foreclosed by prior decisions of [the Supreme] Court, or otherwise completely devoid of merit as not to involve a federal controversy within the jurisdiction of the District Court").

B.

[10] The gravamen of Perpetual's claim before the district court was that its due process rights under the Fifth and Fourteenth Amendments were violated because NASD requires its members to submit to compulsory arbitration of all disputes. In order for this argument to be colorable, Perpetual must show that NASD's conduct constituted state action; otherwise, there is no constitutional violation. *Jackson v. Metro. Edison Co.,* 419 U.S. 345, 349, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974) (private conduct is not subject to the requirements of the Fourteenth Amendment, no matter how discriminatory or wrongful); *Desiderio v. Nat'l Assoc. of Sec. Dealers,* 191 F.3d 198, 206 (2d Cir.1999) ( "A threshold requirement of plaintiff's [Fifth Amendment due process claim and other] constitutional claims is a demonstration that in denying plaintiff's constitutional rights, the defendant's conduct constituted state action." (citing *United States v. Int'l Bhd. of Teamsters,* 941 F.2d 1292, 1295 (2d Cir.1991))). Perpetual can meet

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

290 F.3d 132
**(Cite as: 290 F.3d 132)**

Page 6

this burden by showing that NASD is a state actor. *See Jackson,* 419 U.S. at 349, 95 S.Ct. 449. But even if NASD is a private actor, "state action may be found if, though only if, there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.' " *Brentwood Academy v. Tenn. Secondary Sch. Athletic Ass'n,* 531 U.S. 288, 295, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001) (quoting *Jackson,* 419 U.S. at 351, 95 S.Ct. 449).

In *Desiderio,* when confronted with the specific question whether NASD was a state actor, we held:
  The NASD is a private actor, not a state actor. It is a private corporation that receives no federal or state funding. Its creation was not mandated by statute, *138 nor does the government appoint its members or serve on any NASD board or committee. Moreover, the fact that a business entity is subject to "extensive and detailed" state regulation does not convert that organization's actions into those of the state.
191 F.3d at 206 (citing *Jackson,* 419 U.S. at 350, 95 S.Ct. 449). This conclusion was repeated in our recent decision in *D.L. Cromwell Invs. v. NASD Regulation,* 279 F.3d 155, 161-63 (2d Cir.2002). In *Desiderio* we thoroughly analyzed whether a compulsory arbitration clause constituted state action despite NASD's status as a private actor. We held that "[t]he SEC's mere approval of [compulsory arbitration] is not sufficient to justify holding the state liable for the effects of the arbitration clause." *Desiderio,* 191 F.3d at 207 (quotation marks omitted). Although the context of the arbitration clause at issue in *Desiderio* differs from the context of the arbitration clause at issue here, Perpetual has not alleged that the SEC required or even encouraged NASD or any other self-regulating private organization to adopt compulsory arbitration.

It is clear that NASD is not a state actor and its requirement of mandatory arbitration is not state action. Perpetual cited *Desiderio* in its brief before the district court and on appeal and does not attempt to distinguish it; it simply asserts that NASD is a state actor. In support of this bald assertion, Perpetual cites *Lebron v. Nat'l R.R. Passenger Corp.,* 513 U.S. 374, 115 S.Ct. 961, 130 L.Ed.2d 902 (1995). *Lebron* is clearly distinguishable; Amtrak, the corporation at issue in *Lebron,* was created by the government "by special law for the

furtherance of government objectives," and the government "retain[ed] for itself permanent authority to appoint a majority of the directors of" Amtrak. *Id.* at 400, 115 S.Ct. 961. There is no commonality between NASD and Amtrak.

In its brief, Perpetual also encourages this Court to employ a new test when determining whether a private corporation is a "state actor" for purposes of the Constitution. In the case at hand, the application of the test would require us to ask whether, in NASD's absence, the government would need to take over the role of regulator of NASD's member companies. Perpetual's proposed test is contrary to the analysis required by the Supreme Court in *Lebron* and the other cases Perpetual cites for support:
  First, ... [t]he complaining party must ... show[, in addition to the fact that the entity is regulated by the state,] that there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself....
  Second, ... a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State....
  Third, the required nexus may be present if the private entity has exercised powers that are traditionally the exclusive prerogative of the State.
*Blum v. Yaretsky,* 457 U.S. 991, 1004-05, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982) (quotation marks and citations omitted); *see Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 941, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982) (private use of challenged government procedures with the help of government officials constitutes state action). We decline to ignore such clear direction from the Supreme Court in favor of Perpetual's proposed test.

[11] Given the clear and unambiguous precedent in this Circuit holding that *139 NASD is a private actor and that the adoption of compulsory arbitration by it does not constitute state action, the district court did not err in determining that Perpetual's due process argument failed to confer jurisdiction over Perpetual's action to vacate the arbitration award. *See Duke Power,* 438 U.S. at 70, 98 S.Ct. 2620 ("[T]he test is whether the cause of action alleged is *so patently without merit* as to

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

290 F.3d 132
(Cite as: 290 F.3d 132)

justify ... the court's dismissal for want of jurisdiction." (quotation marks omitted)). Because NASD is a private actor and because there is no nexus between its challenged action (compulsory arbitration) and the state, Perpetual's claim of a due process violation is patently without merit.

C.

We have intimated that an allegation that an arbitration panel manifestly disregarded federal law will give rise to federal question jurisdiction. *See Greenberg,* 220 F.3d at 27. In its complaint, Perpetual alleged that the arbitration panel "manifestly disregarded ... the legal principle[s] of Collateral Estoppel and Res Judicata" and "manifestly disregarded ... the law of tort whereby awarding [appellees'] compensatory damages without grounds." It is clear that Perpetual's allegations cannot be the basis for subject matter jurisdiction.

*1. Collateral Estoppel and Res Judicata*

Perpetual's collateral estoppel and *res judicata* arguments are completely without merit. The decision by NASD Regulation not to seek disciplinary action against Yue Chen has no relevance whatsoever to the arbitration panel's decision.

[12] Collateral estoppel, or issue preclusion, is not applicable here. That NASD Regulation decided not to take disciplinary action against Yue Chen has no bearing on whether Yue Chen or Perpetual are financially liable to appellees for their misconduct; the issue of their financial liability was not considered or decided by NASD Regulation. *See Murphy v. Gallagher,* 761 F.2d 878, 879 (2d Cir.1985) ("Issue preclusion refers to the preclusive effect of a judgment that prevents a party from litigating a second time an issue of fact or law *that has once been decided.*" (emphasis added)).

[13] Similarly, *res judicata,* or claim preclusion, is not applicable for three reasons: (1) NASD Regulation is not an entity with jurisdiction to decide the issue before the arbitration panel; (2) appellees were not a party to NASD's investigation of Yue Chen; and (3) the issue decided by NASD's investigation was wholly different from the issue to be decided by the arbitration panel. *See id.* ("Under the doctrine of claim preclusion a

judgment, *once rendered by a court of competent jurisdiction,* will be treated thereafter as the full measure of relief to be accorded *between the same parties on the same ... cause of action.*" (emphasis added) (quotation marks omitted)). Perpetual assumes that because NASD Regulation investigated Yue Chen on the basis of appellees' allegations, appellees were somehow "parties" to that investigation. It is clear that is not the case. [FN1]

> FN1. We note that despite its decision not to take disciplinary action against Yue Chen, NASD Regulation specifically stated that its decision was made "in the exercise of its regulatory discretion, and is not intended to nor should it be construed as a reflection of the accuracy of" appellees' allegations.

*2. Respondeat Superior*

[14] Perpetual also argues that the arbitration panel manifestly disregarded tort *140 law--specifically the tort law concept of *respondeat superior.* The gravamen of Perpetual's claim is that, under the doctrine of *respondeat superior,* the panel could not have found Perpetual liable without first finding Yue Chen liable. Since the panel did not find Yue Chen liable, Perpetual argues that the panel must have erred in finding Perpetual liable.

As an initial matter, there is no allegation by Perpetual that *respondeat superior* is an issue of federal law that needs to be decided by a federal court. *Cf. Greenberg,* 220 F.3d at 27. Second, there is little or no evidence that the arbitrators did indeed disregard such a principle. The arbitrators could have found for appellees even absent a finding of *respondeat superior.* As the district court pointed out in its Memorandum and Order, "the arbitrator[s] may have concluded that there was negligent supervision of the employee and thus imposed an award on the brokerage house but not the individual broker." *Perpetual Sec.,* 2001 WL 826121, at *1 n. 3. The language in *Duke Power* and *Oneida Indian Nation* makes evident that Perpetual's *respondeat superior* claim does not raise a substantial federal question.

D.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

290 F.3d 132
**(Cite as: 290 F.3d 132)**

Page 8

[15] Although the district court was correct in determining that it lacked jurisdiction over Perpetual's claim to vacate the arbitration award, it erred in determining that section 9 of the FAA conferred jurisdiction to the district court to *confirm* an arbitration award. As noted above, the FAA creates a substantive body of law but does not, by itself, confer federal question subject matter jurisdiction to the district courts to entertain claims brought under the Act. *Moses H. Cone Mem. Hosp.,* 460 U.S. at 25 n. 32, 103 S.Ct. 927.

We have spoken generally about the necessity for an independent ground of federal question jurisdiction when a claim is brought under the FAA, and have indicated in cases confirming an award pursuant to section 9 that jurisdiction would not exist unless there was an independent ground for jurisdiction. *Smiga v. Dean Witter Reynolds,* 766 F.2d 698, 703-04 (2d Cir.1985) (holding that jurisdiction existed because of, *inter alia,* diversity of parties and amount in controversy); *Kallen v. Dist. 1199, Nat'l Union of Hosp. and Health Care Employees,* 574 F.2d 723, 724-26 (2d Cir.1978) (implying that an independent ground for federal jurisdiction might be necessary to confirm a commercial arbitration award); *Ballantine Books v. Capital Distrib. Co.,* 302 F.2d 17, 19 (2d Cir.1962) (holding that jurisdiction to confirm award existed because parties were diverse and amount in controversy exceeded statutory amount); *see also Harry Hoffman Printing,* 912 F.2d at 611 n. 1 (implying that section 9 and section 10 should be viewed similarly with respect to their lack of ability to grant jurisdiction to the federal courts).

[16] To the extent that our past cases did not explicitly hold that section 9 does not, by itself, constitute an independent grant of subject matter jurisdiction to federal courts, we now so hold. Our holding is consistent with the only other Courts of Appeals decisions we have found that have explicitly addressed this issue. *See Loral Corp. v. Swiftships,* 77 F.3d 420, 421-22 (11th Cir.1996); *Weststar Assoc. v. Tin Metals Co.,* 752 F.2d 5, 7-8 (1st Cir.1985); *Gen. Atomic Co. v. United Nuclear Corp.,* 655 F.2d 968, 969 (9th Cir.1981). Since there was no independent basis for subject matter jurisdiction, the district court lacked the authority to confirm the arbitration award. We thus vacate that portion of the district court's judgment.

**\*141 II. *Rule 11 Sanctions***

[17][18] Although the district court lacked jurisdiction to decide the merits of the underlying action, it retained the power to determine collateral issues, such as the appropriateness of sanctions. *See Willy v. Coastal Corp.,* 503 U.S. 131, 137-39, 112 S.Ct. 1076, 117 L.Ed.2d 280 (1992) (affirming imposition of Rule 11 sanctions even when it was later determined that district court lacked subject matter jurisdiction); *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 396, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990) (noting that "the imposition of a Rule 11 sanction is not a judgment on the merits of an action" and that the determination of whether an attorney abused the judicial process and what sanctions might be appropriate was a "collateral issue" that "may be made after the principal suit has been terminated").

[19][20] "[D]istrict courts generally have wide discretion in deciding when sanctions are appropriate. A court's decision to award Rule 11 sanctions is accordingly reviewed for abuse of discretion." *Morley v. Ciba- Geigy Corp.,* 66 F.3d 21, 24 (2d Cir.1995) (quotation marks and citations omitted). "A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Cooter & Gell,* 496 U.S. at 405, 110 S.Ct. 2447.

In its ruling, the district court stated:
[T]he record suggests that Perpetual's motion constitutes vexatious and wanton economic coercion by a broker-dealer against customers who prevailed at arbitration (receiving a relatively small amount of compensatory damages) and now must bear the cost of defending a frivolous motion. I decline to let such a result stand and grant Respondent's motion for reasonable attorney's fees and costs pursuant to Fed.R.Civ.P. 11.
*Perpetual Sec.,* 2001 WL 826121, at \*1.

[21][22][23] Rule 11 provides, in pertinent part:
(c) *Sanctions.* If, after notice and a reasonable opportunity to respond, the court determines that subdivision (b) [governing frivolous claims] has been violated, the court may, subject to the conditions stated below, impose an appropriate sanction upon the attorneys, law firms, or parties that have violated subdivision (b) or are responsible for the violation.
(1) *How Initiated.*

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

(A) *By Motion.* A motion for sanctions under this rule shall be made separately from other motions or requests and shall describe the specific conduct alleged to violate subdivision (b). It shall be served ... but shall not be filed with or presented to the court unless, within 21 days after service of the motion ... the challenged paper, claim, defense, contention, allegation, or denial is not withdrawn or appropriately corrected.

Fed.R.Civ.P. 11. These procedural protections are intended to reduce the number of motions for sanctions and to provide opportunities for parties to avoid sanctions altogether. *See Hadges v. Yonkers Racing Corp.,* 48 F.3d 1320, 1327 (2d Cir.1995). [FN2]

> FN2. A district court can award sanctions absent a motion from a party. But if a district court determines that sanctions are appropriate, the court must allow the party threatened with sanctions to respond. Thus, even if we were to consider the district court's imposition of sanctions as being on its own initiative, Perpetual was not afforded an opportunity to respond because the district court did not enter an order to show cause. *See* Fed.R.Civ.P. 11(c)(1)(B) ("On its own initiative, the court may enter an order describing the specific conduct that appears to violate [ Rule 11(b)] and directing an attorney, law firm, or party to show cause why it has not violated [the rule]."). In addition, a district court cannot, under Rule 11, award attorney's fees on its own initiative. Fed.R.Civ.P. 11(c)(2) (attorney's fees may be awarded on motion only).

**\*142** Perpetual correctly points out that appellees' motion for Rule 11 sanctions was not "made separately from other motions or requests." Fed.R.Civ.P. 11(c)(1)(A). Instead, appellees' request for sanctions was included in their memorandum addressing the underlying issues before the district court. Similarly, appellees did not serve their motion on Perpetual prior to filing it with the court. *See id.* Perpetual was therefore not afforded the benefits of the twenty-one day "safe harbor provision" allowing it the opportunity to withdraw or correct its allegedly frivolous claims. [FN3]

> FN3. Rule 11(c)(2)(A) provides that "[m]onetary sanctions may not be awarded against a represented party for a violation of subdivision (b)(2)." Fed.R.Civ.P. 11(c)(2)(A). We note that in *Baffa v. Donaldson, Lufkin & Jenrette Securities Corp.,* 222 F.3d 52 (2d Cir.2000), we determined that an order to pay attorney's fees was an abuse of discretion because it was a form of monetary penalty in contravention of Rule 11(c)(2)(A). *Id.* at 57.

The district court's awarding of sanctions against Perpetual in contravention of the explicit procedural requirements of Rule 11 was thus an abuse of discretion. [FN4] *See Hadges,* 48 F.3d at 1327-29. We vacate the judgment of the district court and remand the case for reconsideration of the sanctions issue. Our decision to remand for reconsideration of the sanctions issue does not conflict with our decision in *Hadges* to reverse an award of sanctions for failure to adhere to the procedural requirements of Rule 11. *See Hadges,* *48 F.3d at 1329. In *Hadges,* it was clear that the sanctioned party would have corrected his misstatements had he been afforded the opportunity to do so; a reversal was thus appropriate. *See id.* at 1328. Here, there is no indication that Perpetual would have corrected or amended its frivolous arguments even had it been given the opportunity. Therefore, after considering all of the circumstances, we believe a remand of the sanctions question is the more appropriate course of action. *See Baffa,* 222 F.3d at 57-58 (after determining that sanctions were not imposed according to Rule 11's procedural requirements, court vacated judgment and allowed district court to "revisit the issue of Rule 11 sanctions" on remand); *Nuwesra v. Merrill Lynch, Fenner & Smith,* 174 F.3d 87, 95 (2d Cir.1999) (per curiam) (remanding for reconsideration of sanctions despite "concerns about the evidentiary basis for" sanctions).

> FN4. The district court noted in its Memorandum and Order that "[d]uring an off-the-record sidebar" it informed Perpetual's attorney that it was inclined to grant appellees' request for sanctions. *Perpetual Sec.,* 2001 WL 826121, at *1 n. 2. The district court encouraged Perpetual "to ascertain whether the matter could be

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

290 F.3d 132
**(Cite as: 290 F.3d 132)**

Page 10

resolved without judicial intervention." *Id.* The district court's efforts to "save everyone time and money" while well-intentioned and in line with the purposes of Rule 11 fell short of meeting the strict procedural requirements of the rule.

## CONCLUSION

For the reasons stated above, the judgment of the district court is affirmed in part, vacated in part, and remanded. The district court is instructed to dismiss the case for lack of subject matter jurisdiction. If it wishes, it may reconsider the issue of sanctions consonant with the requirements of Rule 11. The parties shall bear their own costs.

290 F.3d 132

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

502 F.Supp. 543
(Cite as: 502 F.Supp. 543)

Page 1

**H**

United States District Court, S. D. New York.

Wilbert MOORE and Malcolm Turner, individually
and on behalf of all others
similarly situated, Plaintiffs,
v.
Philip ROSS, individually and as Industrial
Commissioner of the State of New
York, New York State Department of Labor, Louis
Sitkin, individually and as
Chairman of the New York State Unemployment
Insurance Appeal Board, John A.
Rogalin, individually and as a Member of the New
York State Unemployment
Insurance Appeal Board, James R. Rhone,
individually and as a Member of the New
York State Unemployment Insurance Appeal
Board, Harry Zankel, individually and
as a Member of the New York State Unemployment
Insurance Appeal Board, and G.
Douglas Pugh, individually and as a Member of the
New York State Unemployment
Insurance Appeal Board, Defendants.

**No. 79 Civ. 1825 (RLC).**

Dec. 5, 1980.

Class action was brought challenging
constitutionality of procedures employed by New
York State Unemployment Insurance Appeal
Board. The case was construed as presenting cross
motions for summary judgment as well as a motion
for class certification. The District Court, Robert L.
Carter, J., held that: (1) there was no equal
protection violation because claimants were able to
appear before administrative law judge but not
before Appeal Board; (2) case was inappropriate for
class certification; (3) Board's reversing
administrative law judge's credibility determinations
without holding further hearings is not arbitrary per
se; (4) there was no due process violation in instant
cases as Board was engaged in procedure of
deriving inferences contrary to examiner's findings
from record evidence; (6) there was no due process
violation per se in Board's denying claims and
reversing hearing examiner without stating specific
reasons and evidence relied on; and (7) there were
no due process violations in instant case as same
portions of Board's opinion that demonstrated
inappropriateness of requiring a further hearing also

explained why the Board rejected examiner's
findings, although Board's decision might be found
unsupported by substantial evidence.

Summary judgment for defendants; complaint
dismissed.

West Headnotes

**[1] Social Security and Public Welfare** ⊂⇒662
356Ak662 Most Cited Cases

Decisions of New York State Unemployment
Insurance Appeal Board are final only if supported
by substantial evidence. N.Y.Labor Law § 623.

**[2] Constitutional Law** ⊂⇒242.3(3)
92k242.3(3) Most Cited Cases

Fact that unemployment compensation claimants
whose cases that are decided by administrative law
judge are able to appear before the actual decision
maker whereas claimants whose cases are decided
by New York State Unemployment Insurance
Appeal Board are not does not violate equal
protection; the two sets of claimants do not
constitute a suspect classification and the Board's
practices are at least minimally rational, in that
hearings both before the ALJ and the Board would
raise administrative costs. N.Y.Labor Law §§ 620,
subd. 1, 621, subds. 1, 3.

**[3] Federal Civil Procedure** ⊂⇒161.1
170Ak161.1 Most Cited Cases

Action challenging constitutionality of procedures
employed by New York State Unemployment
Insurance Appeal Board, specifically, reversing
credibility determinations of a hearing examiner
without holding a hearing de novo and reversing a
hearing examiner without stating specific reasons
and evidence relied on, would not be certified as
class action; class certification would do little more
than pose a risk of class members being bound by
judgment which did not rightfully apply to them.
N.Y.Labor Law §§ 500 et seq., 624;
U.S.C.A.Const. Amend. 14; Fed.Rules Civ.Proc.
Rules 23, 23(a), (b)(1)(A, B), (b)(2), 28 U.S.C.A.

**[4] Declaratory Judgment** ⊂⇒342
118Ak342 Most Cited Cases

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

502 F.Supp. 543
(Cite as: 502 F.Supp. 543)

Page 2

A court will assume that a state agency will comply with due process requirements in all cases even when the requirements are articulated by declaratory judgments in individual actions. U.S.C.A.Const. Amend. 14.

**[5] Federal Courts ⟷47.1**
170Bk47.1 Most Cited Cases
(Formerly 170Bk47)

*Younger* abstention was not appropriate in action by two unemployment compensation benefits claimants challenging constitutionality of procedures employed by New York State Unemployment Insurance Appeal Board as there was presently no on-going proceeding with respect to plaintiffs' cases in New York State courts, and fact that plaintiffs could have appealed or could presently appeal to state court was no grounds for *Younger* abstention. N.Y.Labor Law §§ 500 et seq., 624; U.S.C.A.Const. Amend. 14.

**[6] Federal Courts ⟷42**
170Bk42 Most Cited Cases

Abstention should not be used to impose an exhaustion of remedies requirement on civil plaintiffs raising federal constitutional claims against state administrative bodies.

**[7] Constitutional Law ⟷278.7(3)**
92k278.7(3) Most Cited Cases

Unemployment insurance benefits cannot be treated differently from aid to families with dependent children benefits; since the individual's stake in the outcome is so vital, the *Goldberg* due process requirements apply with full force and entitle a claimant to an evidentiary hearing at which counsel may be present, to an assurance that the decision maker's conclusion will rest solely on legal rules and evidence adduced at the hearing and to a statement of reasons for the decision and evidence relied on. N.Y.Labor Law §§ 500 et seq., 624; U.S.C.A.Const. Amend. 14.

**[8] Social Security and Public Welfare ⟷611.1**
356Ak611.1 Most Cited Cases
(Formerly 356Ak611)

There is no constitutional infirmity per se in having an unemployment compensation hearing before an administrative law judge when the final decision is

made by an appeal board which has only the record before it. N.Y.Labor Law §§ 500 et seq., 624; U.S.C.A.Const. Amend. 14.

**[9] Constitutional Law ⟷318(1)**
92k318(1) Most Cited Cases

Governmental determinations unsupported by substantial evidence may constitute irrational action and thus a denial of due process. U.S.C.A.Const. Amend. 14.

**[10] Constitutional Law ⟷251.5**
92k251.5 Most Cited Cases

"Procedural due process review" looks at procedures regularly employed to determine whether they inherently pose unacceptable risks of arbitrary governmental action while "substantial evidence review" looks at how the procedures were followed in a specific case to decide whether, after an examination of specific pertinent evidence, a considerable risk of arbitrariness is apparent. U.S.C.A.Const. Amend. 14.

**[11] Constitutional Law ⟷251.3**
92k251.3 Most Cited Cases

It is not the rule that due process is implicated only when the risk of arbitrariness is apparent on the face of the articulated statutory formula as a statutory scheme may be applied in a manner that presents the same inherent and predictable risk of arbitrariness that would justify invalidation of the legislation if the defect had been apparent from a reading of the enactment and in such circumstances the need for due process is not lessened by the fact that arbitrariness is traceable to administrative discretion rather than to acts of the Legislature. U.S.C.A.Const. Amend. 14.

**[12] Administrative Law and Procedure ⟷791**
15Ak791 Most Cited Cases

**[12] Constitutional Law ⟷318(1)**
92k318(1) Most Cited Cases

Due process and substantial evidence review are not coextensive; in some circumstances the close reading of a record will show a decision to be unsupported by substantial evidence even though there is nothing inherently arbitrary about the decision-making procedure, while due process

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

502 F.Supp. 543
**(Cite as: 502 F.Supp. 543)**

violations are to be found when the decision-making process is intrinsically defective such that individual determinations unsupported by substantial evidence will predictably recur. U.S.C.A.Const. Amend. 14.

**[13] Constitutional Law ⬅318(1)**
92k318(1) Most Cited Cases

Likelihood of erroneous determinations, corresponding need for additional procedures to reduce such likelihood and magnitude of harm caused to individual claimants by erroneous adverse adjudications are major factors to be taken into account in deciding what process is due in the administrative sphere. U.S.C.A.Const. Amend. 14.

**[14] Constitutional Law ⬅318(1)**
92k318(1) Most Cited Cases

Where judicial review in state courts is guaranteed by statute and where substantial evidence test is statutorily required, it would be inappropriate to proclaim a federal due process violation on grounds which are simply tantamount to saying that the particular decision is unsupported by substantial evidence. U.S.C.A.Const. Amend. 14.

**[15] Constitutional Law ⬅278.7(3)**
92k278.7(3) Most Cited Cases

Availability of state court review does not automatically insulate procedure utilized by New York State Unemployment Insurance Appeal Board from due process scrutiny as if the decision-making procedure is inherently defective, remediation is not effected by availability of subsequent judicial review. N.Y.Labor Law §§ 500 et seq., 623, 624; U.S.C.A.Const. Amend. 14; Social Security Act, § 303(a)(3), 42 U.S.C.A. § 503(a)(3).

**[16] Social Security and Public Welfare ⬅611.1**
356Ak611.1 Most Cited Cases
(Formerly 356Ak611)

Where many unemployment compensation claimants will face destitution if benefits are denied it is important not only that their claims be given fair consideration, but that fair consideration be given promptly. Social Security Act, § 303(a)(3), 42 U.S.C.A. § 503(a)(3); U.S.C.A.Const. Amend. 14.

**[17] Social Security and Public Welfare ⬅**

**620.10**
356Ak620.10 Most Cited Cases

If procedures employed by New York State Unemployment Insurance Appeal Board were inherently prone toward arbitrariness such that it could be foreseen that numerous claimants would be put through an additional set of appeals to receive the type of fair consideration which the Board should provide in the first place, it would be unconscionable to approve the defective practices on the ground that claimants could later appeal. N.Y.Labor Law §§ 500 et seq., 623, 624; U.S.C.A.Const. Amend. 14; Social Security Act, § 303(a)(3), 42 U.S.C.A. § 503(a)(3).

**[18] Administrative Law and Procedure ⬅763**
15Ak763 Most Cited Cases

It is preferable that arbitrary procedures be corrected than to require numerous aggrieved claimants to appeal individually in order to secure relief from administrative caprice.

**[19] Social Security and Public Welfare ⬅ 620.15**
356Ak620.15 Most Cited Cases

It is not arbitrary per se for New York State Unemployment Insurance Appeal Board to reverse credibility determinations of an administrative law judge without holding further hearings at which claimants are entitled to appear, present evidence and have their testimonial demeanor assessed firsthand. N.Y.Labor Law §§ 500 et seq., 624; U.S.C.A.Const. Amend. 14; Social Security Act, § 303(a)(3), 42 U.S.C.A. § 503(a)(3).

**[20] Constitutional Law ⬅278.7(3)**
92k278.7(3) Most Cited Cases

**[20] Social Security and Public Welfare ⬅ 620.15**
356Ak620.15 Most Cited Cases

It would be impermissible for New York State Unemployment Insurance Appeal Board to substitute its own assessment of a witness' demeanor without seeing and hearing the witness personally; however, reversal on ground of inferences derived from record evidence is not necessarily arbitrary or violative of due process, provided the inference is derived from evidence

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

502 F.Supp. 543
**(Cite as: 502 F.Supp. 543)**

Page 4

credited by the examiner, or if based on evidence rejected by the hearing officer there must be other credible record evidence which makes the discredited evidence viable, thereby warranting a departure from the examiner's holding. N.Y.Labor Law §§ 500 et seq., 624; U.S.C.A.Const. Amend. 14; Social Security Act, § 303(a)(3), 42 U.S.C.A. § 503(a)(3).

**[21] Constitutional Law ⟨═⟩278.7(3)**
92k278.7(3) Most Cited Cases

Where opinion of the New York State Unemployment Insurance Appeal Board demonstrates that it has made a bona fide effort to justify credibility reversals by reliance on matters in the record, due process is not violated if requirement that administrative due process must be found in the administrative record has been met. N.Y.Labor Law §§ 500 et seq., 624; U.S.C.A.Const. Amend. 14; Social Security Act, § 303(a)(3), 42 U.S.C.A. § 503(a)(3).

**[22] Constitutional Law ⟨═⟩278.7(3)**
92k278.7(3) Most Cited Cases

There were no due process violations in New York State Unemployment Insurance Appeal Board's reversing credibility determinations of hearing examiner, who had awarded benefits, where Board made bona fide attempt to base its opinion on record evidence and referred to "contradictions in claimant's statements," which were supposedly apparent in the record and noted that despite prior warnings about lateness claimant had made no effort to contact his employer and in second case Board rejected claimant's contention that he notified a co- worker of his absence in view of co-worker's testimony to the contrary as hearing examiner had not specifically discredited co-worker's testimony. N.Y.Labor Law §§ 500 et seq., 624; U.S.C.A.Const. Amend. 14; Social Security Act, § 303(a)(3), 42 U.S.C.A. § 503(a)(3).

**[23] Courts ⟨═⟩489(1)**
106k489(1) Most Cited Cases

In constitutional challenge to procedures employed by New York State Unemployment Insurance Appeal Board, district court would not decide whether evidence was sufficient to support reversal of examiner's credibility findings as such task was properly for the state courts in their application of

the substantial evidence test. N.Y.Labor Law §§ 500 et seq., 623, 624; Social Security Act, § 303(a)(1), 42 U.S.C.A. § 503(a)(1); U.S.C.A.Const. Amend. 14.

**[24] Social Security and Public Welfare⟨═⟩620.15**
356Ak620.15 Most Cited Cases

Where New York State Unemployment Insurance Appeal Board was engaged in procedure of deriving inferences contrary to examiner's findings from evidence contained in the record, the Board was not required to hold a further hearing before reversing credibility determinations, there being no evidence casting doubt on the bona fide nature of the Board's deliberations. N.Y.Labor Law §§ 500 et seq., 624; U.S.C.A.Const. Amend. 14; Social Security Act, § 303(a)(3), 42 U.S.C.A. § 503(a)(3).

**[25] Evidence ⟨═⟩83(1)**
157k83(1) Most Cited Cases

Absent evidence to the contrary, a state official's good faith must be presumed. U.S.C.A.Const. Amend. 14.

**[26] Constitutional Law ⟨═⟩318(1)**
92k318(1) Most Cited Cases

As long as an agency's methods of deciding on the record are not inherently prone to arbitrariness, the due process clause will not dictate what specific procedures must be used. U.S.C.A.Const. Amend. 14.

**[27] Constitutional Law ⟨═⟩318(1)**
92k318(1) Most Cited Cases

Whether statement of an agency decision is sufficiently detailed and informative to comport with minimum due process depends on whether it satisfies the purposes of the reasons and evidence requirement when read in conjunction with the hearing record, and the more extensive and confusing a record is the more detailed and informative the statement must be. U.S.C.A.Const. Amend. 14.

**[28] Constitutional Law ⟨═⟩278.7(3)**
92k278.7(3) Most Cited Cases

Since hearings on claims for unemployment

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

502 F.Supp. 543                                                                 Page 5
**(Cite as: 502 F.Supp. 543)**

insurance tend to be brief and uncomplicated, a cursory statement of reasons and evidence will often be sufficient to satisfy due process, and there is no constitutional infirmity per se in referring to the record, rather than repeating record evidence, if the factual inferences drawn are specific enough to make apparent on a reading of the record what the supporting evidence is. N.Y.Labor Law §§ 500 et seq., 624; U.S.C.A.Const. Amend. 14; Social Security Act, § 303(a)(3), 42 U.S.C.A. § 503(a)(3).

**[29] Constitutional Law ⬅279.7(3)**
92k278.7(3) Most Cited Cases

There was no due process violation in New York State Unemployment Insurance Appeal Board's reversing hearing examiner without stating specific reasons and the evidence relied on provided that the Board's opinion makes it possible to infer why it rejected the hearing examiner's findings; to require Board to specifically address ALJ's decision would be to elevate form over substance. N.Y.Labor Law § § 500 et seq., 624; U.S.C.A.Const. Amend. 14; Social Security Act, § 303(a)(3), 42 U.S.C.A. § 503(a)(3).

**[30] Administrative Law and Procedure ⬅741**
15Ak741 Most Cited Cases

Judicial review of an appeals board's decision contrary to that of a hearing examiner is facilitated by an explanation of why the examiner's findings were discarded as appraising adequacy of such explanation is a principal task of the reviewing court.

**[31] Constitutional Law ⬅278.7(3)**
92k278.7(3) Most Cited Cases

There was no due process violation in New York State Unemployment Insurance Appeal Board's reversing hearing examiner's allowance of claims without stating specific reasons and evidence relied on where same portions of the Board's opinions that demonstrated the inappropriateness of requiring a further hearing also explained why the Board rejected the examiner's findings and Board's cursory opinion did not appear inherently unsuited to drawing the necessary inferences. N.Y.Labor Law § § 500 et seq., 624; U.S.C.A.Const. Amend. 14; Social Security Act, § 303(a)(3). 42 U.S.C.A. § 503(a)(3).

**[32] Courts ⬅489(1)**
106k489(1) Most Cited Cases

Although bald references by New York State Unemployment Insurance Appeal Board to contradictions in unemployment benefits claimant's testimony might not be adequately clarified by a reading of the record, in which case the Board's reversal of hearing examiner's allowance of claim could properly be found unsupported by substantial evidence, such determination was best left to state courts as Board otherwise satisfied due process requirement of a cognizable attempt to give an explanation and Board's reference to contradictions in testimony passed muster as such a cognizable attempt, albeit barely so. N.Y.Labor Law § § 500 et seq., 624; U.S.C.A.Const. Amend. 14; Social Security Act, § 303(a)(3), 42 U.S.C.A. § 503(a)(3).
*547 Robert Abrams, Atty. Gen. of the State of New York, New York City, for defendants; Donald Sticklor, Asst. Atty. Gen., New York City, of counsel.

Kalman Finkel, Attorney-in-Charge, Civil Division, Morton B. Dicker, Attorney- in-Charge, Legal Aid Society, John E. Kirklin, Director of Litigation, Legal Aid Society, Civil Appeals & Law Reform Unit, New York City, for plaintiffs; Paula Galowitz, Kenneth G. Rothstein, Constance P. Carden, New York City, of counsel.


OPINION

ROBERT L. CARTER, District Judge.

[1] This case has been brought as a class action challenging the constitutionality of procedures employed by the New York State Unemployment Insurance Appeal *548 Board ("Appeal Board" or "Board"). Pursuant to the state statutory scheme, N.Y.Labor Law ss 500 et seq. (McKinney) (1977), unemployment insurance claims are decided by a process comprised of an initial determination and an option of administrative review for unsuccessful claimants.[FN1] The first level of review is a hearing before an Administrative Law Judge ("ALJ") whose decision may be appealed by any affected party to the Appeal Board. The Board has the power to review and reverse the ALJ's findings on all questions of fact and law, and its determinations in turn may be reviewed for substantial evidentiary support in the state courts.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

502 F.Supp. 543                                                    Page 6
**(Cite as: 502 F.Supp. 543)**

N.Y.Labor Law s 624.[FN2]

FN1. Statutory procedures guarantee claimants a hearing before an ALJ provided they request it within 30 days of an unfavorable decision on the initial eligibility determination and that the ALJ's decision will be final on all matters of law and fact unless appealed within 20 days. New York Labor Law ss 620(1), 621(1) (McKinney). On appeal, the Appeal Board has the power to hear argument, hold an additional hearing, remand to the ALJ or make a decision on the basis of the record and evidence previously submitted. Id. s 621(3). The Appeal Board must render a written decision promptly; the decision must include a statement of the issues, the findings of fact and conclusions and reasons for the decision. 12 N.Y.C.R.R. s 464.1(a). The decision of the Appeal Board is final on all questions of fact and, unless appealed from, is final on all questions of law. Labor Law s 623. However, its regulations provide that the Appeal Board may reopen any of its decisions on its own motion or on the application of a party, 12 N.Y.C.R.R. s 463.6(a), and in reopened cases, its regulations provide that the Board may receive further evidence. 12 N.Y.C.R.R. s 463.6(b).

FN2. Judicial review is available in the Appellate Division of the New York Supreme Court to any party affected by the Appeal Board's decision provided that proceedings are initiated within thirty days of when the Board serves notice of its decision. New York Labor Law s 624. New York Labor Law s 623 states that the Appeal Board's decisions shall be final on all questions of fact. State courts have interpreted this to mean that decisions are final only if supported by substantial evidence. See Fisher v. Levine, 36 N.Y.2d 146, 150, 365 N.Y.S.2d 828, 325 N.E.2d 151 (1975) ("as to pure questions of fact, and factual inferences to be drawn therefrom, a decision of the Appeal Board, which then acts quasi- judicially, would be

conclusive upon the courts if supported by substantial evidence." and McGee v. Levine, 324 N.Y.S.2d 455, 456 (3rd Dept. 1971) (the Board's "determination must be supported by substantial evidence; there must be a basis in the record for each of the Board's findings.")

[2] The two named plaintiffs, Wilbert Moore and Malcolm Turner, are unsuccessful claimants whose applications were initially upheld by the ALJ, and subsequently overturned by the Appeal Board. No appeal has been taken to the state courts. Their complaint is two-fold.[FN3] They argue that the due process clause of the Fourteenth Amendment is violated [FN4] by the Appeal Board in rejecting claims and reversing credibility determinations of a hearing examiner without holding a hearing de novo at which the Board itself is present to see the witnesses and hear their testimony. Plaintiffs contend that the Board's practice of denying claims and reversing a hearing examiner without stating the specific reasons and evidence relied upon for its adverse determination also implicates due process considerations. Plaintiffs argue that these procedures violate due process without regard to any subsequent outcome in the state courts.

FN3. In one of their briefs plaintiffs argued that they had an equal protection claim based on the fact that claimants whose cases were decided by the ALJ were able to appear before the actual decisionmaker whereas claimants whose cases were decided by the Appeal Board were not. This argument has no merit. The two sets of claimants do not constitute a suspect classification, and the Board's practices are at least minimally rational in that hearings before both the ALJ and the Board would raise administrative costs.

FN4. Plaintiffs' claim is brought under the due process clause and the fair hearing requirement of the Social Security Act. 42 U.S.C. s 503(a)(3). However, plaintiffs did not argue that the Act imposes any stricter procedural requirements than the due process clause itself. Accordingly, we interpret the Act as merely setting the

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

502 F.Supp. 543
(Cite as: 502 F.Supp. 543)

Page 7

context in which the due process claim is raised and made no decision on whether the Act's requirements are more stringent than those of fundamental due process.

In this litigation Moore and Turner seek to represent a class composed of all unsuccessful claimants for unemployment insurance in New York state who have been **549 aggrieved by one or the other of the above practices and procedures of the Appeal Board.

The parties have stipulated that it isa policy and practice of the Appeal Board 1) to review de novo and make a de novo determination of fact and law on all issues, including credibility, without necessarily holding a further hearing, and 2) to make findings of fact and render opinions and decisions, including reasons, without specifying the evidence relied upon other than a reference to the record and without necessarily making reference to the decision of the ALJ.

Defendants contend that the Board's decisions in the instant cases fully comport with due process standards, were clearly based on the record in each case and that the reasons for the Board's determinations are self-evident.

In Moore's case the crucial issue was whether he had had personal compelling reasons for not reporting to work on time or whether his lateness constituted misconduct and therefore a justifiable cause for discharge. The hearing examiner held that Moore's family responsibilities were the cause of his lateness and that no wilful misconduct was involved.[FN5] The Appeal Board reversed, rejecting Moore's claim of personal, compelling reasons for his lateness.[FN6]

> FN5. The examiner's decision in the Moore case in pertinent part reads:
> The testimony at the hearing established that claimant was discharged due to his lateness after taking his son to school. Since claimant's family responsibilities constituted a personal, compelling reason under the law for his lateness, I find that he did not lose his employment due to misconduct in connection therewith.

> FN6. The Appeal Board decision reads as follows:
> The credible evidence establishes that claimant was late on December 19, 1977 after receiving warnings about latenesses. Although he knew that he would be late on that day he failed to notify his employer. In view of the contradictions in claimant's statements, we reject his contention that he was late due to a compelling reason. We conclude that the claimant lost his employment through misconduct in connection therewith.

In Turner's case the issue was whether he had called in to report his intended absence or was absent without giving notice in violation of company rules. The hearing examiner accepted Turner's testimony but the Appeal Board rejected it and held that Turner had lost his job because of misconduct.[FN7]

> FN7. According to the ALJ's opinion in the Turner case:
> The employer's official regulations required that an employee, who was to be absent, notify his immediate supervisor of his intended absence. Claimant had done this prior to May 19, 1977, and his calls had been accepted. Instructions had been given prior to May 19, that his calls were not to be received by his immediate supervisor or any co-worker. Claimant called to report his intended absence on May 19, 1977. The person receiving the call, a shipping clerk, declined to pass the word along. Claimant made further attempts to contact the personnel manager. His calls were not put through. He came to work in person to report his absence because of illness and he was not seen by the personnel manager, although he stood in the personnel manager's doorway and observed a conference between the personnel manager and other officers of the corporation. It is significant that claimant stayed on the employer's premises long enough to do work for them in delivering boxes to another floor and that he did this with the full consent and acquiescence of his supervisor, the lead

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

502 F.Supp. 543
**(Cite as: 502 F.Supp. 543)**

Page 8

mail clerk. In weighing the testimony it is noted that the employer's written instructions require an employee to give notice directly to his immediate supervisor. Claimant's immediate supervisor was not permitted to take notice from him. In this instance, therefore, the claimant complied with the employer's directions concerning giving notice of absence and the employer failed to accept and receive the notice they demanded. Here claimant was fired for failing to report his absence on May 19, 1977. Claimant did report his absence and the employer refused to receive the report. This is not misconduct on the claimant's part. I reject the employer's contention that claimant reported that he was in jail in the State of New Jersey for trespassing, and therefore, could not call to report his absence. I reject the employer's contention that threatening telephone calls were received by him on behalf of the claimant to prevent testimony on behalf of the employer. It is significant that the alleged theatres were not reported to the police and were not previously reported to the Department of Labor.

The Appeal Board held to the contrary as follows:

The evidence establishes that claimant did not call his employer within one hour prior to his starting time, as the employer required. Significantly, claimant had been placed on final warning and he knew that his job was in jeopardy if he continued to violate the attendance rules. We reject claimant's contention that he notified a co-worker of his absence, in view of the co-worker's testimony to the contrary. Under the circumstances we conclude that claimant lost his employment through misconduct in connection therewith.

**\*550** There are presently three motions before the court. Defendants have moved for judgment on the pleadings, alternatively on the grounds that the court should abstain under the doctrine of Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and that plaintiffs have not presented any actionable claim. Plaintiffs have moved for class certification under Rule 23, F.R.Civ.P., and for summary judgment. Since defendants have

relied upon matters not contained in the pleadings to support their motion, and plaintiffs have agreed that defendants' motion is properly treated as one for summary judgment, we will construe the case as presenting cross-motions for summary judgment, as well as a motion for class certification.

Class certification

[3] Plaintiffs have moved for class certification under Rule 23(a), F.R.Civ.P., and Rule 23(b)(2), or in the alternative, Rule 23(b)(1)(A) or (B), F.R.Civ.P. Plaintiffs' claims are directed at the practices of the Appeal Board, and not at the statute or regulations pursuant to which the Board acts. While the requirements of Rule 23(a) as to numerosity, commonality, typicality, and adequate representation would seem to be met, certification of the class is not warranted under either Rule 23(b)(2), 23(b)(1)(A) or (B).

Despite the parties' stipulation as to Appeal Board practices, it is difficult to see how the issues raised here can be decided apart from the facts of each case. Thus, while it is possible that defendants' handling of appeals may in some instances violate due process, it cannot be said that defendants have "acted or refused to act ˄on' grounds generally applicable to the class," Rule 23(b)(2), F.R.Civ.P., and thus the prosecution of separate actions, rather than creating a risk of inconsistent adjudications, Rule 23(b)(1)(A), or impairing the ability of absent members to protect their interest, Rule 23(b)(1)(B), would be required to adjudicate the issues raised in each controversy.

[4] Moreover, unemployment insurance is not a fixed and limited fund in danger of depletion, so the risks referred to in Rule 23(b)(1)(B) are not apposite. Since we can assume that a state agency will comply with due process requirements in all cases even when the requirements are articulated by declaratory judgments in individual actions, see Vulcan Society v. Civil Service Commission, 490 F.2d 387 (2d Cir. 1973); McDonald v. McLucas, 371 F.Supp. 831 (S.D.N.Y.) (Metzner, J.), aff'd, 419 U.S. 987, 95 S.Ct. 297, 42 L.Ed.2d 261 (1974), there will be no substantial risk of "inconsistent or varying adjudications" tending to establish "incompatible standards of conduct" for defendants. Rule 23(b)(1)(A), F.R.Civ.P. Class certification in this case would do little more than pose a risk of class members being bound by a judgment which

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

don't rightfully apply to them. Manners v. Romney, E.D.N.Y., Civil Action No. 71 Civ. 550, slip opinion at 11-12 (Dooling, J.). Accordingly, the motion for certification is denied, and the cases will be treated as individual claims.

The issue of abstention

[5][6] Defendants' argument for abstention under the doctrine of Younger v. Harris, supra, must be rejected. Although the administration of unemployment insurance programs arguably constitutes a significant state interest, there is presently no on-going proceeding with regard to the Moore and Turner cases in the New York state courts. The mere fact that Moore and Turner could have appealed, or could now appeal to the state courts is not grounds for *551 Younger abstention. See Chung v. Ross, 78 Civ. 949 (S.D.N.Y.1978) (Stewart, J.). Abstention should not be used to impose an exhaustion of remedies requirement on civil plaintiffs raising federal constitutional claims against state administrative bodies, and we do not read Levy v. Lewis, 635 F.2d 960, 2d Cir., 1980, as reaching a contrary result. Unlike Younger and its progeny, e. g. Huffman v. Pursue, Ltd., 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975); Juidice v. Vail, 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977), both this case and the administrative proceedings below were initiated by the plaintiffs and present no features that would justify making "an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it." Colorado River Water Conservation District v. U. S., 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976).

Reversals of Credibility Determinations by the Appeal Board

[7] At the outset it should be noted that we join the courts which have held that unemployment insurance benefits cannot be treated differently from the AFDC benefits in Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); Pregent v. New Hampshire Dept. of Employment Security, 361 F.Supp. 782 (D.N.H.1973), vacated as moot, 417 U.S. 903, 94 S.Ct. 2595, 41 L.Ed.2d 207 (1974); Java v. California Dept. of Human Resources Development, 317 F.Supp. 875 (N.D.Cal.1970), affirmed on other grounds, [FN8] 402 U.S. 121, 91 S.Ct. 1347, 28 L.Ed.2d 666 (1971); White v. State of Vermont, 335 F.Supp. 856 (D.Vt.1971);

Drumright v. Padzieski, 436 F.Supp. 310 (E.D.Mich.1977). Because the individual's stake in the outcome of the Board's determinations is so vital, the due process requirements articulated in Goldberg, supra, apply here with full force. Not only will many unemployed persons face the same "brutal need" as welfare recipients, see Goldberg v. Kelly, 397 U.S. 254, 261, 90 S.Ct. 1011, 1016, 25 L.Ed.2d 287 (1970), but an adverse determination of an unemployment insurance claim will in many cases be based upon an official finding of misconduct which will impair the claimant's chances of obtaining a decent job in the future. These requirements entitle the claimant to an evidentiary hearing at which counsel may be present, to an assurance that the decisionmaker's conclusion will "rest solely on the legal rules and evidence adduced at the hearing," and to a statement of the reasons for the decision and the evidence relied upon. Goldberg, 397 U.S. at 271, 90 S.Ct. at 1022.

> FN8. In California Department of Human Resources Development v. Java, 402 U.S. 121, 91 S.Ct. 1347, 28 L.Ed.2d 666 (1971), the Supreme Court found the Department's practices in violation of the Social Security Act's requirement that benefits be paid "when due," 42 U.S.C. s 503(a)(1), and therefore did not reach the due process issue.

Defendants do not argue that the requirements of Goldberg are inapplicable. Rather they contend that the Board's current practices comply with these requirements. We are inclined to agree, at least insofar as its practices are represented by the two individual cases before us.

[8] Nonetheless, we recognize that the issue is difficult and requires careful analysis. Plaintiffs acknowledge that the famous dicta of Morgan v. United States, 298 U.S. 468, 481, 56 S.Ct. 906, 911, 80 L.Ed. 1288 (1936), "the one who decides must hear," cannot be taken literally in all circumstances. [FN9] There is no constitutional infirmity per se in having the hearing before an ALJ when the final decision is made by a Board which has only the record before it. Plaintiffs make the narrower argument *552 that when the Board reverses credibility determinations, claimants are

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

502 F.Supp. 543
**(Cite as: 502 F.Supp. 543)**

entitled to appear before it to present evidence and to have their testimonial demeanor assessed first-hand.

> FN9. In National Nutritional Foods Association v. FDA, 491 F.2d 1141 (2d Cir. 1974) Judge Friendly noted that the dictum articulated in Morgan v. United States, 298 U.S. 468, 56 S.Ct. 906, 80 L.Ed. 1288 (1936) ("Morgan I"), if it ever was intended literally must have been abandoned shortly thereafter since Morgan v. United States, 313 U.S. 409, 61 S.Ct. 999, 85 L.Ed. 1429 (1941) ("Morgan IV") "took back most or all of what the first decision had given." 491 F.2d at 1144.

Plaintiffs' contention is superficially appealing. The Supreme Court has recently noted the delicacy of reversing credibility determinations without appraising the witnesses in person. In holding that a federal court consistent with constitutional strictures could adopt the findings of a magistrate in a suppression hearing without holding a new hearing Chief Justice Burger stated, however, that the court assumed it

> unlikely that a district judge would reject a magistrate's proposed findings on credibility when those findings are dispositive and substitute the judge's own appraisal; to do so without seeing and hearing the witness or witnesses whose credibility is in question could well give rise to serious questions which we do not reach.

United States v. Raddatz, 447 U.S. 667, 681 n.7, 100 S.Ct. 2406, 2415 n.7, 65 L.Ed.2d 424, 48 USLW 4813, 4817 n.7 (June 23, 1980).

That there is substantial risk of arbitrariness when an ALJ's findings on credibility are reversed without a hearing de novo is attested to by numerous decisions holding such reversals not to be supported by substantial evidence. See, e. g., Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); Ward v. N. L. R. B., 462 F.2d 8 (5th Cir. 1972); Penasquitos Village, Inc. v. N. L. R. B., 565 F.2d 1074 (9th Cir. 1977) ("when the Board second-guesses the Examiner and gives credence to testimony which he has found-either expressly or by implication-to be inherently untrustworthy, the substantiality of that evidence is tenuous at best" id. at 1077); and

compare NLRB v. Jackson Maintenance Corp., 283 F.2d 569 (2d Cir. 1960) (Board's determination upheld on slight but undiscredited evidence) and NLRB v. Jamaica Towing, Inc., 602 F.2d 1100 (2d Cir. 1979) (rejection of ALJ's findings upheld because issue was not credibility). Significantly, however, none of these cases hold that credibility reversals will necessarily be found unsupported by substantial evidence in the absence of a second hearing before the final decisionmaker. Rather the general rule is that the Board "may certainly overrule the ALJ), even where credibility is involved, if his findings conflict with strong inferences from evidence which he credited." Utica Observer-Dispatch, Inc. v. NLRB, 229 F.2d 575, 577 (2d Cir. 1956). But "departures from the Examiner's findings are vulnerable if they fail to reflect attentive consideration to the Examiner's decision." Greater Boston Television Corp. v. FCC, 444 F.2d 841, 853 (D.C.Cir.1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971).

[9] The question of substantial evidence is relevant to our inquiry because governmental determinations unsupported by substantial evidence may constitute irrational action and thus a denial of due process. As Chief Judge MacMahon has noted,

> The terms "arbitrary" and "capricious" embrace a concept which emerges from the due process clauses of the Fifth and Fourteenth Amendments of the United States Constitution and operates to guarantee that the acts of government will be grounded on established legal principles and have a rational factual basis. A decision is arbitrary or capricious when it is not supported by substantial evidence or when there is no reasonable justification for the decision.

Canty v. Board of Education, City of New York, 312 F.Supp. 254, 256 (S.D.N.Y.1970).

[10] Procedural due process review looks at procedures regularly employed to determine whether they inherently pose unacceptable risks of arbitrary governmental action. Substantial evidence review looks at how the procedures were followed in a specific case to decide whether, after an examination of specific pertinent evidence, a considerable risk of arbitrariness is apparent.

[11] In some instances a decision unsupported by substantial evidence may also be the product of decisionmaking procedures *553 that violate due process. But we normally associate due process

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

claims with an assessment of a statutory scheme of administrative review. Judicial oversight of particular determinations made pursuant to the statutory scheme usually take the form, instead, of substantial evidence review. However, this distinction should not be frozen into a principle that due process is implicated only when the risk of arbitrariness is apparent on the face of the articulated statutory formula. A statutory scheme may be applied in a manner that presents the same inherent and predictable risk of arbitrariness that would justify invalidation of the legislation if this defect had been apparent from a reading of the enactment. In such circumstances the need for due process is not lessened by the fact that arbitrariness is traceable to administrative discretion rather than to acts of the legislature. Cf. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 410-414, 91 S.Ct. 814, 820-22, 28 L.Ed.2d 136 (1971) (action being the product of agency discretion does not in general establish nonreviewability under the Administrative Procedure Act).

[12] Notwithstanding this overlap, due process and substantial evidence review are not coextensive. In some circumstances a close reading of the record will show a decision to be unsupported by substantial evidence even though there is nothing inherently arbitrary about the decisionmaking procedures. Due process violations are to be found when the decisionmaking process is intrinsically defective such that individual determinations unsupported by substantial evidence will predictably recur.

[13][14] The importance of this distinction is highlighted in cases, such as the one currently before us, where substantial evidence review is delegated to the state courts. The United States Supreme Court in other contexts has expressed displeasure with the idea of federal due process claims being the basis for federal court adjudication when adequate remedies are provided by a state forum. Paul v. Davis, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976); Bishop v. Wood, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); Ingraham v. Wright, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977). The Court's concern that due process not be construed too expansively is apposite to situations where the availability of state court review diminishes the probability of grievous harm caused by erroneous determinations going

unredressed. The likelihood of erroneous determinations, the corresponding need for additional procedures to reduce this likelihood, and the magnitude of harm caused to individual claimants by erroneous adverse adjudications are all major factors to be taken into account in deciding what process is due. Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). Thus in applying the Mathews balancing test we must take into account the fact that judicial review in the state courts of the claims here is guaranteed by statute, and where state court substantial evidence review is provided statutorily, it would be inappropriate to proclaim a federal due process violation on grounds which are simply tantamount to saying that the particular decision is unsupported by substantial evidence. Moreover, it would be improper for us to render any decision on whether the Board's reversals of ALJ's credibility findings in the Moore and Turner cases are supported by substantial evidence. The question has not been raised by the parties, and furthermore such review has been committed by statute to the Appellate Division of the New York State Supreme Court. N.Y.Labor Law s 624 (McKinney).

[15][16][17][18] However, this does not mean that the availability of state court review automatically insulates the Appeal Board from due process scrutiny. If the decisionmaking procedure is inherently defective, remediation is not effected by the availability of subsequent judicial review. Where many claimants will face destitution if benefits are denied it is important not only that their claims be given fair consideration, but that fair consideration be given promptly. Goldberg v. Kelly, supra; California Department of Human Resources Development *554 v. Java, supra. If the Board's practice is inherently prone toward arbitrariness such that we can foresee numerous claimants being put through an additional set of appeals to receive the type of fair consideration which the Board should have provided in the first place, then it would be unconscionable to approve the defective practices on the ground that claimants could later appeal. It is preferable that arbitrary procedures be corrected than to require numerous aggrieved claimants to appeal individually in order to secure relief from administrative caprice.

[19][20][21] With these considerations in mind we turn to the specific matter before us of the Appeal Board reversing credibility determinations without

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

502 F.Supp. 543
**(Cite as: 502 F.Supp. 543)**

Page 12

holding further hearings. Regardless of the wisdom of this practice, we cannot say that it is arbitrary per se. As has been explained in Penasquitos Village, Inc. v. N. L. R. B., 565 F.2d 1074, 1078 (9th Cir. 1977), rejection of an examiner's credibility determinations can be grounded in "testimonial inferences" which are based on demeanor at the hearing, but they can also be based on "derivative inferences" which are drawn from evidence contained in the record itself. While it would not be permissible for the Board to substitute its own assessment of a witness's demeanor without seeing and hearing the witness personally, reversal grounded on inferences derived from evidence contained in the record is not necessarily arbitrary or a violation of due process. As is suggested by Utica Observer-Dispatch, supra, 229 F.2d at 577, the inferences must be derived from evidence credited by the examiner, or if based upon evidence rejected by the hearing officer, there must be other creditable evidence in the record which makes the discredited evidence viable, thereby warranting a departure from the examiner's holding. When the Appeal Board's opinion demonstrates that it has made a bona fide effort to justify credibility reversals by reliance on matters in the record, due process is not violated because the requirement that "administrative due process must be found in the administrative record," Garvey v. Freeman, 397 F.2d 600, 611 (10th Cir. 1968), has been met.

[22] In Moore's case the Appeal Board made a bona fide attempt to base its divergent opinion as to Moore's credibility on evidence contained in the record. It referred to "contradictions in claimant's statements," which are supposedly apparent in the record, and it noted that despite prior warnings about lateness, Moore had made no effort to contact his employer as would be expected of an employee who was unavoidably detained yet attempting to be punctual. In Turner's case the Board rejected "claimant's contention that he notified a co-worker of his absence, in view of the co-worker's testimony to the contrary." Although the hearing examiner reached a different conclusion, he did not specifically discredit the testimony of the co-worker. Thus it appears that the Board could properly rely upon such testimony, or at least the impropriety of such reliance is not so patent as to constitute a due process violation.

[23][24][25] In neither case do we decide whether the Board's evidence was sufficient to support

reversal of the examiner's findings on credibility. That task is properly left to the state courts in their application of the substantial evidence test. We merely hold that in these two cases the Board's opinions adequately demonstrate that the Board was engaged in the procedure of deriving inferences contrary to the examiner's findings from evidence contained in the record. Thus in these two cases the Board was not required to hold a further hearing before reversing credibility determinations.

We recognize that a different question would be presented if the Board's opinions were not written in good faith. To use superficially adequate procedures to effect a deliberate concealment of arbitrariness would certainly violate due process. However, no evidence presented in this lawsuit casts doubt upon the bona fide nature of the Board's deliberations. In the absence of evidence to the contrary, a state official's good faith must be presumed. See *555Starr v. Federal Aviation Administration, 589 F.2d 307, 315 (7th Cir. 1978); cf. F. C. C. v. Schreiber, 381 U.S. 279, 85 S.Ct. 1459, 14 L.Ed.2d 383 (1965); Bishop v. Wood, 426 U.S. 341, 350, 96 S.Ct. 2074, 2080, 48 L.Ed.2d 684 (1976).

[26] We also recognize that in Turner's case the ALJ's opinion is substantially more detailed and persuasive than the Board's opinion. However, that is not the question before us. We are called upon only to decide whether the procedures followed by the Board are inherently defective, and on this point we cannot accept plaintiff's contentions. It may be that sound administrative policy would dictate that further hearings be held routinely whenever credibility determinations are reversed. The heightened risk of error under such circumstances, see authorities cited supra at 7, may well justify the additional time and expense of a second hearing. However, this argument is properly addressed to the New York legislature which defines the powers and functions of the Appeal Board. Recent precedents of the Second Circuit have made clear that as long as an agency's methods of deciding on the record are not inherently prone to arbitrariness, the due process clause will not dictate what specific procedures must be used by the Board. See Fields v. Blum, 629 F.2d 825 (2d Cir. 1980) (reversing a district court finding of due process violation in the State's practice of allowing administrative appeals in welfare cases to be decided by a designee of the Commissioner who has not read or heard the

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

complete transcript of the hearings in such cases). Also see companion case Yaretsky v. Blum, 629 F.2d 817 (2d Cir. 1980).

The Board's Statements of Reasons and Evidence

Beginning with Goldberg v. Kelly, supra, several Supreme Court decisions have held that the decisionmaker must state reasons for his determination and give the evidence relied upon. In addition, this requirement has been applied to welfare terminations, parole revocation (Morrissey v. Brewer, 408 U.S. 471, 488-9, 92 S.Ct. 2593, 2603-04, 33 L.Ed.2d 484 (1972)), probation revocation (Gagnon v. Scarpelli, 411 U.S. 778, 786, 93 S.Ct. 1756, 1761, 33 L.Ed.2d 331 (1973)) and prison disciplinary proceedings (Wolff v. McDonnell, 418 U.S. 539, 564-5, 94 S.Ct. 2963, 2978-79, 41 L.Ed.2d 935 (1974)). It has also been applied to discharge of a school superintendent ( Staton v. Mayes, 552 F.2d 908, 916 (10th Cir. 1977) ), discharge of a school teacher (Kinsella v. Board of Education, 378 F.Supp. 54, 60 (W.D.N.Y.1974) (three judge panel), aff'd without published opinion, 542 F.2d 1165 (2d Cir. 1976)), and denial of application for parole (United States ex rel. Johnson v. Chairman, New York State Board of Parole, 500 F.2d 925 (2d Cir.), vacated sub nom Regan v. Johnson, 419 U.S. 1015, 95 S.Ct. 488, 42 L.Ed.2d 289 (1974); Haymes v. Regan, 525 F.2d 540 (2d Cir. 1975); Zurak v. Regan, 550 F.2d 86 (2d Cir.) cert. denied 433 U.S. 914, 97 S.Ct. 2988, 53 L.Ed.2d 1101 (1977).

Defendants concede that the requirement applies to the Board's decisions, but contend that the Board's current practices constitute adequate compliance. Plaintiffs admit that the statement of reasons need not amount to "formal findings of fact and conclusions of law," Goldberg, supra, 397 U.S. at 271, 90 S.Ct. at 1022, but claim that the Board's practices are inadequate in two respects. They object to the Board's supporting its factual determinations by referring to the record rather than specifically repeating the evidence in its opinion. They also contend that a mere statement of reasons for the decision is not sufficient if it does not include an explanation of why the Board reversed the hearing examiner's conclusions. Defendants have stipulated that the Board does not necessarily specify "the evidence relied upon other than a reference to the record," or make any specific reference to the decision of the ALJ. Supra at 2.

The major purposes of the reasons and evidence requirement are "to protect against arbitrary and capricious decisions or actions grounded upon impermissible or erroneous considerations," Zurak v. Regan, supra, 550 F.2d at 95, to safeguard against a decision on ex parte evidence, *556Staton v. Mayes, supra, 552 F.2d at 916, and perhaps most importantly to facilitate judicial review by enabling a court to determine whether the decision was based upon "an impermissible reason," or "no reason at all." Johnson, supra, 500 F.2d at 943; Haymes, supra, 525 F.2d at 544. In order to accomplish these purposes the statement must "evince the Board's consideration of relevant factors" and make accessible "the essential facts from which the Board's inferences have been drawn." Haymes, supra at 544. An additional purpose has been highlighted by Congress in its explanation of the similar requirement in the Administrative Procedure Act, 5 U.S.C. s 557(c)(3)(A):

The requirement that the agency must state the basis for its findings and conclusions means that such findings and conclusions must be sufficiently related to the record as to advise the parties of the record basis.

"Senate Report on A.P.A.", 79th Congress, 1st Session, S.Rep.No. 752 (1945).

[27][28] In appraising the Board's decisions claimants and reviewing courts have available to them the record of the hearing as well as the Board's written decision. Whether a statement is sufficiently detailed and informative to comport with minimum due process depends upon whether it satisfies the purposes mentioned above when read in conjunction with the hearing record. The more extensive and confusing a record is, the more detailed and informative the statement must be. However, hearings on claims for unemployment insurance tend to be brief and uncomplicated. Thus a cursory statement of reasons and evidence will often be sufficient. There is no constitutional infirmity per se in referring to the record, rather than repeating evidence in the record, if the factual inferences drawn are specific enough to make apparent upon a reading of the record what the supporting evidence is.

[29] Similarly, there is no infirmity in not referring specifically to the hearing examiner's findings, provided the Board's opinion makes it possible to infer why the Board rejected those findings. "Due Process, unlike some legal rules, is not a technical

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

conception with a fixed content unrelated to time, place and circumstances." Cafeteria Workers v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961); Mathews v. Eldridge, 424 U.S. 319, 334, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Also see Simard v. Board of Education of Town of Groton, 473 F.2d 988, 992 (2d Cir. 1973). To require that the Board specifically address the ALJ's decision would be to elevate form over substance in a ·manner contrary to the spirit of Mathews v. Eldridge, supra.

[30][31][32] To be sure, judicial review is facilitated by an explanation of why the examiner's findings were discarded. Appraising the adequacy of such an explanation is a principal task of the reviewing court. Greater Boston Television Corp. v. FCC, supra, 444 F.2d 841. Also see Brennan v. Gilles & Cotting, Inc., 504 F.2d 1255, 1264 (4th Cir. 1974) ("administrative agencies must explain the grounds for their rejection of an ALJ's disposition of a case.") However we can find no due process violation in the Moore and Turner cases because the same portions of the Board's opinions that demonstrate the inappropriateness of requiring a further hearing also explain why the Board rejected the examiner's findings. The fact that the Board's reasoning is not fully perspicuous, is not fatal so long as the necessary inferences can reasonably be drawn. The Board's cursory opinions in the Moore and Turner cases do not appear inherently unsuited for this purpose. We recognize that the bald reference to contradictions in Moore's testimony may not be adequately clarified by a reading of the record, in which case the Board's decision could properly be found unsupported by substantial evidence. However, that determination is best left to the state courts pursuant to New York Labor Law s 624. The adequacy of the Board's explanation for rejecting the examiner's findings is a matter for substantial evidence review; due process requires only a cognizable attempt to give an explanation. Although the Board's reference to contradictions in the testimony in the Moore case is neither amply *557 supported nor carefully articulated in the opinion, it does pass muster as a cognizable attempt, albeit barely so. In any event, we find no due process violations in either case.

Therefore, summary judgment is granted to defendants and plaintiffs' complaint is dismissed.

IT IS SO ORDERED.

502 F.Supp. 543

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

588 N.E.2d 621
**(Cite as: 412 Mass. 82, 588 N.E.2d 621)**

C

Supreme Judicial Court of Massachusetts,
Suffolk.

Jayne K. BENMOSCHE
v.
BOARD OF REGISTRATION IN MEDICINE.

Argued Dec. 2, 1991.
Decided March 2, 1992.

Board of Registration in Medicine revoked physician's registration to practice medicine and fined her $10,000 for misrepresenting qualifications and lacking a medical degree. Physician sought review. The Supreme Judicial Court, Suffolk County, Nolan, J., denied the physician's motions to vacate stipulation that the parties had submitted to the Board and to present additional evidence. Thereafter, the Court, Abrams, J., held that: (1) Board's decision was supported by substantial evidence, and (2) physician was not entitled to remand for presentation of additional evidence.

Affirmed and remanded.

West Headnotes

**[1] Stipulations ⟜14(7)**
363k14(7) Most Cited Cases

Stipulated testimony of two witnesses in proceeding challenging physician's license to practice medicine was legally equivalent to live testimony of the two witnesses, and satisfied all rights of cross-examination, even though physician did not stipulate to truthfulness of their testimony.

**[2] Health ⟜209**
198Hk209 Most Cited Cases
(Formerly 299k11.3(3) Physicians and Surgeons)

Decision of Board of Registration in Medicine to revoke a physician's registration to practice medicine and to fine her $10,000 for misrepresenting her qualifications and lacking a medical degree was supported by the evidence; physician stipulated to testimony of dean and registrar of medical school indicating that the physician did not possess qualifications required by

law to be a registered physician and did not possess required certificate from Educational Commission for Foreign Medical Graduates (ECFMG).

**[3] Health ⟜218**
198Hk218 Most Cited Cases
(Formerly 299k11.3(4) Physicians and Surgeons)

**[3] Health ⟜223(1)**
198Hk223(1) Most Cited Cases
(Formerly 299k11.3(4) Physicians and Surgeons)

Physician whose registration to practice medicine was revoked was not entitled to remand of case to Board of Registration in Medicine for presentation of additional evidence; the "new" evidence physician would have Board consider failed to meet requirements of being material and there being "good reasons" for failure to present it in original proceeding. M.G.L.A. c. 30A, § 14(6).

**[4] Administrative Law and Procedure ⟜820**
15Ak820 Most Cited Cases

Reviewing court may order that "additional evidence be taken before the agency" only upon a showing that it is "material" and that there was "good reason" for failure to present it in the original proceeding. M.G.L.A. c. 30A, § 14(6).
**621*82 Daniel M. Kelly, Springfield, for plaintiff.

Judith Fabricant, Asst. Atty. Gen., for defendant.

Before LIACOS, C.J., and WILKINS, ABRAMS, NOLAN and GREANEY, JJ.

ABRAMS, Justice.

A single justice of this court reserved and reported the request of the plaintiff, Jayne K. Benmosche, to set aside a decision of the Board of Registration in Medicine (board) revoking her registration to practice medicine and fining her $10,000. In the alternative, Benmosche asks that we remand the case to the board for the presentation of additional *83 evidence. We conclude that the Board's decision was supported by substantial evidence showing that Benmosche misrepresented her qualifications and lacked a medical degree.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

588 N.E.2d 621                                                                                      Page 2
(Cite as: 412 Mass. 82, 588 N.E.2d 621)

Furthermore, Benmosche has not made the necessary showing to justify remand. See G.L. c. 30A, § 14(6) (1990 ed.). We affirm.

*Prior judicial proceedings.* Benmosche initiated this action by seeking review of the board's decision in the Superior Court pursuant to G.L. c. 30A, § 14 (1990 ed.). She then petitioned a single justice of this **622 court to transfer the case pursuant to G.L. c. 211, § 4A (1990 ed.). The single justice granted the petition and the case was transferred to the Supreme Judicial Court for the county of Suffolk.

In November, 1989, Benmosche filed two motions, one seeking to vacate a stipulation that the parties had submitted to the board and the other, to present additional evidence. Both were denied by the single justice. After those rulings, over a year passed with no action by Benmosche to bring the action to judgment. The case was heard on the merits on May 15, 1991. On May 16, 1991 the single justice reserved and reported the case to the full court.

*Facts.* Benmosche applied for limited physician licensure as a hospital intern in Massachusetts in 1979. In support of that application, she swore under oath that she had attended medical school from 1972 to 1976 at the Universidad Central del Este (UCE) in the Dominican Republic, and submitted a document, purportedly signed by the dean of the UCE medical school, verifying that she had attended the school from 1972 through 1976 and received her doctor of medicine degree in 1977. On the basis of that application, she was granted a limited license. She worked as an intern and resident at Baystate Medical Center for three and one-half years. In 1982, she applied for full licensure, again swearing that she attended UCE medical school from 1972 to 1976. She also submitted a certificate from the Educational Commission for Foreign Medical Graduates (ECFMG) in support of her application. She received a full license in 1983, *84 which she renewed in 1985, once again representing that she had graduated from UCE medical school.

On February 11, 1987, the board temporarily suspended Benmosche and issued an "order to show cause" why she should not be disciplined for obtaining her medical license by fraudulently claiming to have received a doctor of medicine degree from UCE medical school. In support of its order, the board referred to correspondence from the dean of the UCE medical school stating that Benmosche had attended UCE but withdrew without receiving a degree.

A hearing officer conducted a hearing on the suspension one week later. The board submitted as evidence, among other things, a notarized letter received on February 11, from Dr. Ray Casterline, vice president of the ECFMG. In his letter Dr. Casterline stated the following. In April of 1981, as part of a routine credential evaluation, ECFMG had written to the dean of the UCE medical school and requested verification of Benmosche's diploma. In response, Dr. Casterline had received a letter from the dean, Dr. Juan Silva, reporting that any diploma submitted by Benmosche was false, because she had withdrawn from the school in 1976 without receiving a degree. After ECFMG wrote to Benmosche informing her that a question "had been raised," Benmosche telephoned ECFMG to report that a mistake had been made. ECFMG directed her to obtain written verification from Dr. Silva. ECFMG subsequently received a letter, dated February 8, 1983, purportedly from Dr. Silva, stating that an error had been made and that Benmosche's diploma was indeed valid. As a result of that letter, ECFMG issued Benmosche a permanent certificate. In 1987, ECFMG received a telephone call from UCE indicating that the 1983 letter was a forgery. ECFMG wrote to Dr. Silva requesting clarification. In response, it received a copy of a letter Dr. Silva had sent to the CIGNA Health Plan of Massachusetts, dated January 14, 1987, stating that (1) Benmosche had not received a degree from UCE; (2) she had withdrawn from UCE in 1976, and (3) the 1983 letter purporting to be from Dr. Silva was a forgery. On January 30, 1987, Dr. Casterline *85 received a call from someone claiming to be an attorney representing UCE. The caller asked ECFMG not to take any further action until "the matter [had] been settled." Dr. Casterline informed the caller that the request would have to be in writing from Dr. Silva. Dr. Casterline received no such written request. He notified the board that, based on the information he had, Benmosche's ECFMG certificate was invalid.

Benmosche testified on her own behalf at the hearing. She called to the hearing officer's attention a document which she **623 identified as the diploma which she had received from UCE, but

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

588 N.E.2d 621
(Cite as: 412 Mass. 82, 588 N.E.2d 621)

Page 3

she declined to offer the document in evidence. The hearing officer therefore refused to consider the document. On cross-examination, Benmosche testified that she did not attend her graduation, could name only two of her classmates, and did not know where those two could be located.

On March 10, 1987, the hearing officer recommended that the Benmosche's summary suspension should remain in effect until such time as there was a full hearing and decision on the merits. The board adopted the hearing officer's recommendation. The hearing on the merits was held on July 31, 1987. The evidence at that hearing consisted of the evidence already received at the previous hearing, a stipulation signed by the parties, and an affidavit of Dr. Silva executed before a United States vice-consul.

In his affidavit Dr. Silva swears that: (1) Benmosche registered at UCE in 1975 but did not graduate and does not hold a degree from UCE; (2) he never certified to the board that Benmosche had received a degree from UCE, and any such certification is therefore a forgery; and (3) Benmosche's diploma and the 1983 letter purported to be from him also are forgeries.

The parties stipulated that Benmosche "does not possess the qualifications required by law to be a registered physician," and "does not possess the ECFMG certificate." They further stipulated that "the Board ... may, without further notice to her, revoke her certificate of registration." The stipulation recited the substance of the testimony Dr. Silva *86 would give (as stated in his affidavit) if called to the hearing. It also recited that the registrar and keeper of the records of the UCE medical school would, if called, testify that, according to UCE records, Benmosche registered in 1975 but did not receive any grades and did not graduate. Benmosche did not, however, stipulate to the truthfulness of the testimony.

The board issued its final decision and order on September 7, 1988, revoking Benmosche's registration to practice medicine and fining her $10,000. See *Kvitka v. Board of Registration in Medicine,* 407 Mass. 140, 142-144, 551 N.E.2d 915 (1990). The board denied two subsequent motions by Benmosche, one for reconsideration and one to reopen the case for further administrative review.

*The board's decision.* We modify or set aside a board decision if, among other things, the decision is "[u]nsupported by substantial evidence." G.L. c. 30A, § 14(7)(*e* ) (1990 ed.). " 'Substantial evidence' means such evidence as a reasonable mind might accept as adequate to support a conclusion." G.L. c. 30A, § 1(6) (1990 ed.). See *Embers of Salisbury, Inc. v. Alcoholic Beverages Control Comm'n,* 401 Mass. 526, 528, 517 N.E.2d 830 (1988); *Lycurgus v. Director of the Div. of Employment Sec.,* 391 Mass. 623, 627-628, 462 N.E.2d 326 (1984). In reviewing the board's decision, we are required to "give due weight to the experience, technical competence, and specialized knowledge of the agency, as well as to the discretionary authority conferred upon it." G.L. c. 30A, § 14. See *Keigan v. Board of Registration in Medicine,* 399 Mass. 719, 723, 506 N.E.2d 866 (1987); *Levy v. Board of Registration & Discipline in Medicine,* 378 Mass. 519, 525, 392 N.E.2d 1036 (1979). The board's conclusion will stand if it "*could* have been made by reference to the logic of experience" (emphasis in original). *Alsabti v. Board of Registration in Medicine,* 404 Mass. 547, 549, 536 N.E.2d 357 (1989), quoting *New Boston Garden Corp. v. Assessors of Boston,* 383 Mass. 456, 466, 420 N.E.2d 298 (1981).

[1][2] Benmosche argues that the board's decision was not supported by substantial evidence. The board's case against her, she claims, consisted only of "Dr. Silva's letters (and a letter from Dr. Casterline written because of Dr. Silva's letters)." *87 These letters, says Benmosche, are uncorroborated hearsay, insufficient to support the board's decision. However, in light of Benmosche's binding stipulation, [FN1] **624 the board did not need to rely on those letters. Benmosche herself, in addition to stipulating that she did not possess the qualifications required by law to be a registered physician, and did not possess an ECFMG certificate, stipulated to what Dr. Silva and the UCE registrar would have testified if they had been called. That stipulated testimony is legally equivalent to the live testimony of the two witnesses, and satisfies all rights of cross-examination. See *Sac & Fox Indians of the Miss. in Iowa v. Sac & Fox Indians of the Miss. in Okla.,* 220 U.S. 481, 488-489, 31 S.Ct. 473, 476-477, 55 L.Ed. 552 (1910) ( "evidence, hearsay or *ex parte* ... may be admitted by consent ... and then should be given whatever weight it would have but for technical rules"); *Embers of Salisbury, Inc.,*

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

588 N.E.2d 621
(Cite as: 412 Mass. 82, 588 N.E.2d 621)

Page 4

*supra* at 531, 517 N.E.2d 830 (treating stipulated testimony presented to administrative board as equivalent to live testimony); *Mollahan v. McGrath,* 357 Mass. 229, 232, 257 N.E.2d 430 (1970), quoting *Frati v. Jannini,* 226 Mass. 430, 431, 115 N.E. 746 (1917) ("When a case is heard on an agreement of the parties as to the evidence, 'the agreement merely takes the place of the evidence which otherwise would be introduced in the usual way ...' "); *Lowell Coop. Bank v. Sheridan,* 284 Mass. 594, 598, 188 N.E. 636 (1933) ("stipulation of the parties that the treasurer of the plaintiff if present would testify to [certain facts] is in substance an agreement as to the evidence to be considered by the court"). Accord *Southdale Center, Inc. v. Lewis,* 260 Minn. 430, 434, 110 N.W.2d 857 (1961) (stipulated testimony "waives the adverse party's right to cross-examine that particular witness"). The fact that Benmosche did not stipulate to the truthfulness of their testimony if of no moment. The board was entitled to credit the stipulation as to Dr. Silva and the registrar's testimony. The board's decision was more than amply supported by the evidence before it. Cf. ***88** *Assessors of Boston v. Flying Tiger Line Inc.,* 404 Mass. 359, 361, 535 N.E.2d 231 (1989) ("stipulation of facts provided substantial evidence on which the board could properly decide [the] statutory question").

> FN1. A party is bound by its own stipulation "unless the court vacates it as improvident or not conducive to justice." *Pereira v. New England LNG Co.,* 364 Mass. 109, 114, 301 N.E.2d 441 (1973), and cases cited.

[3] *Request for remand.* The "new" evidence that Benmosche would have the board consider consists of (1) a letter from a "certified graphoanalyst" (unaccompanied by any information about her credentials), stating that, in her opinion, "there is a greater than 80% probability that" the signatures on six documents, incongruously including letters stating that Benmosche does not possess a UCE medical degree as well as a diploma naming Benmosche as the recipient of a UCE medical degree, are all "the authentic signatures of Dr. Silva"; [FN2] (2) an affidavit of one Juan Cambero, who swears, among other things, that he is an attorney in the Dominican Republic and that

he "encounter[ed] obstacles" when he attempted to review Benmosche's files at UCE; and (3) Benmosche's own affidavit in which she swears, among other things, that she has "a valid medical degree and a valid medical diploma from [UCE]."

> FN2. Notably, the signature, purportedly Dr. Silva's, on the 1983 letter which stated that Benmosche's diploma was valid was never compared to the other documents.

[4] Under G.L. c. 30A, § 14(6), a reviewing court may order that "additional evidence be taken before the agency" only upon a showing that it is "material" and that there was "good reason" for the failure to present it in the original agency proceeding. See *Fanion v. Director of the Div. of Employment Sec.,* 391 Mass. 848, 850, 464 N.E.2d 69 (1984); *She Enters., Inc. v. State Bldg. Code Appeals Bd.,* 20 Mass.App.Ct. 271, 273, 480 N.E.2d 39 (1985). It is evident that none of Benmosche's "new" evidence meets either requirement. Thus, our denial of her remand request merits no further discussion.

The request for a remand to the board for reconsideration is denied. The appeal from the decision of the Board of Registration in Medicine is remanded to the county court with directions to enter a judgment affirming the decision of the ***89** board revoking ****625** Benmosche's registration to practice medicine and imposing a fine of $10,000.

*So ordered.*

588 N.E.2d 621, 412 Mass. 82

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

## LexisNexis" by Credit Card

| Home | LexisNexis®<br>by Credit Card | My<br>Products | Bookstore | Products<br>& Services | Sign Off |

View: Full | Cite          Documents Purchased | New Search          Auto-Cite® | Shepard's®          View in Printable Form

**Your browser settings may prevent your return to this document. Please print or download this document before selecting another.**

**Document Links:**
Start of Document
PRIOR HISTORY:
DISPOSITION:
CASE SUMMARY
PROCEDURAL POSTURE:
OVERVIEW:
OUTCOME:
LexisNexis(TM) HEADNOTES - Core Concepts -
DECISION:
SUMMARY:
LEXIS HEADNOTES - Classified to U.S. Digest Lawyers' Edition:
SYLLABUS:
COUNSEL:
JUDGES:
OPINIONBY:
OPINION:
DISSENTBY:
DISSENT:

SHEPARD'S®

*531 U.S. 288, *; 121 S. Ct. 924, **;*
*148 L. Ed. 2d 807, ***; 2001 U.S. LEXIS 964*

BRENTWOOD ACADEMY v. TENNESSEE SECONDARY SCHOOL ATHLETIC ASSOCIATION, ET AL.

No. 99-901

SUPREME COURT OF THE UNITED STATES

531 U.S. 288; 121 S. Ct. 924; 148 L. Ed. 2d 807; 2001 U.S. LEXIS 964; 69 U.S.L.W. 4085; 2001 Cal. Daily Op. Service 1435; 2001 Daily Journal DAR 1793; 2001 Colo. J. C.A.R. 913; 14 Fla. L. Weekly Fed. S 74

October 11, 2000, Argued
February 20, 2001, Decided

**PRIOR HISTORY:** ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT.

**DISPOSITION:** 180 F.3d 758, reversed and remanded.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Petitioner secondary school sued respondent athletic association under 42 U.S.C.S. § 1983, alleging that respondent unconstitutionally imposed sanctions against petitioner. The district court held that respondent was a state actor subject to suit under the statute. Upon writ of certiorari, petitioner appealed the judgment of the Court of Appeals for the Sixth Circuit, which reversed the district court's finding.

**OVERVIEW:** Respondent was a not-for-profit corporation organized to regulate interscholastic sport among public and private high schools in the state. Respondent imposed sanctions on petitioner's athletic

activities based upon alleged recruiting violations. Petitioner alleged that the sanction was unconstitutional, and respondent argued that it was not a state actor subject to constitutional limitations. The court held that respondent's activity constituted state action in view of the pervasive entwinement of state school officials in the structure of the ostensibly private respondent, and there was no substantial reason to claim unfairness in applying constitutional standards to respondent. Respondent consisted of schools, primarily public schools, represented by school officials acting within the scope of their official duties during official school hours. Also, the state education board acknowledged respondent's authority and was represented in respondent's committees. Neither the unproven threat of expanded civil rights litigation nor the fact that respondent's member schools were under any state actors precluded the imposition of constitutional restraints.

**OUTCOME:** Judgment that respondent was not a state actor was reversed. The substantial entwinement of state actors in respondent's regulation of state interscholastic sport permitted petitioner's civil rights action. Respondent's functions were accomplished by school officials, primarily from public schools, and the state education board acknowledged respondent's regulatory authority over school athletics.

**CORE TERMS:** state action, entwinement, athletic, interscholastic, public schools, membership, state actor, recruiting, public school, state-action, public function, entity, entwined, board of control, park, high school, retirement system, sport, join, interscholastic athletic, regulations, tournaments, pervasive, team, Fourteenth Amendment, high schools, involvement, ostensibly, statewide, voting

### LexisNexis(TM) HEADNOTES - Core Concepts - ✦ Hide Concepts

Constitutional Law > Civil Rights Enforcement > Civil Rights Act of 1871 > State Action
HN1 ✦ If U.S. Const. amend. XIV is not to be displaced, its ambit cannot be a simple line between States and people operating outside formally governmental organizations, and the deed of an ostensibly private organization or individual is to be treated sometimes as if a State had caused it to be performed. Thus, state action may be found if, though only if, there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself.

Constitutional Law > Civil Rights Enforcement > Civil Rights Act of 1871 > State Action
HN2 ✦ If a defendant's conduct satisfies the state-action requirement of U.S. Const. amend. XIV, the conduct also constitutes action under color of state law for 42 U.S.C.S. § 1983 purposes.

Constitutional Law > Civil Rights Enforcement > Civil Rights Act of 1871 > State Action
HN3 ✦ The character of a legal entity is determined neither by its expressly private characterization in statutory law, nor by the failure of the law to acknowledge the entity's inseparability from recognized government officials or agencies.

Constitutional Law > Civil Rights Enforcement > Civil Rights Act of 1871 > State Action
HN4 ✦ When the relevant facts show pervasive entwinement to the point of largely overlapping identity between an ostensibly private organization and a governmental entity, the implication of state action is not affected by pointing out that the facts might not loom large under a different test.

View References Turn Off Lawyers' Edition Display

**DECISION:** Tennessee statewide association incorporated to regulate athletic competition among state's public and private secondary schools held to be state actor for purposes of Federal Constitution's Fourteenth Amendment.

**SUMMARY:** The Tennessee Secondary School Athletic Association (TSSAA) was a not-for-profit membership corporation organized to regulate interscholastic sport among public and private high schools in Tennessee. Although no school was forced to join, almost all the state's public high schools (about 290 such schools, or 84 percent of the TSSAA's voting membership) and 55 private schools were members. Under the TSSAA's bylaws, each member school was represented by its principal or a faculty member, who had a vote in selecting members of the TSSAA's governing bodies--the board of control and the legislative council--from eligible principals, assistant principals, and superintendents. Half of the governing bodies' meetings were held during official school hours, and public schools largely provided for the TSSAA's financial support. The terms of a former rule of Tennessee's state board of education had expressly designated the TSSAA as regulator of interscholastic athletics in the state's public schools. Although these terms had been deleted in 1996, (1) members of the state board continued to be assigned, by reason of their office, to serve as members of the TSSAA's governing bodies; (2) the TSSAA's ministerial employees were treated as state employees to the extent of being eligible for membership in the state's retirement system; (3) the TSSAA enforced rules and regulations reviewed and approved by the state board; and (4) the state board allowed students to satisfy the board's physical education requirement by taking part in interscholastic athletics sponsored by the TSSAA. In 1997, the TSSAA's board of control found that a private parochial high school that belonged to the TSSAA had violated a TSSAA rule that prohibited undue influence in recruiting athletes. The TSSAA accordingly (1) placed the school's athletic program

on probation for 4 years, (2) declared the school's football and boys' basketball teams ineligible to compete in playoffs for 2 years, and (3) imposed a 3,000 fine. The school, claiming that enforcement of the rule was state action and a violation of provisions including the Federal Constitution's Fourteenth Amendment, sued the TSSAA and its executive director in the United States District Court for the Middle District of Tennessee under 42 USCS 1983. The District Court, ruling the TSSAA to be a state actor under 1983 and the Fourteenth Amendment, entered summary judgment for the school and enjoined the TSSAA from enforcing the rule (13 F Supp 2d 670). The United States Court of Appeals for the Sixth Circuit, in reversing the District Court's judgment and in vacating the injunction, expressed the view that the TSSAA was not a state actor, in that the TSSAA (1) had no symbiotic relationship with the state, (2) was not engaging in a traditional and exclusive public function, and (3) was not responding to state compulsion (180 F3d 758, rehearing in banc denied 190 F3d 705).

On certiorari, the United States Supreme Court reversed the Court of Appeals' judgment and remanded the case for further proceedings. In an opinion by Souter, J., joined by Stevens, O'Connor, Ginsburg, and Breyer, JJ., it was held that the TSSAA had engaged in state action, for purposes of the Fourteenth Amendment, when enforcing the rule against the member school, because (1) the TSSAA's nominally private character was overborne by a pervasive entwinement of state school officials in the TSSAA's structure, and (2) there was no substantial reason to claim unfairness in applying constitutional standards to the TSSAA.

Thomas, J., joined by Rehnquist, Ch. J., and Scalia and Kennedy, JJ., dissenting, expressed the view that (1) a finding of state action ought not to be based upon mere "entwinement"; (2) a private organization's acts constituted state action only when the organization (a) performed a public function, (b) was created, coerced, or encouraged by the government, or (c) acted in a symbiotic relationship with the government; and (3) the TSSAA's action of enforcing the recruiting rule was not fairly attributable to the state.

**LEXIS HEADNOTES - Classified to U.S. Digest Lawyers' Edition:**

[***HN1]
CONSTITUTIONAL LAW §520
-- Fourteenth Amendment -- school athletic association

Headnote: [1A] [1B]
A statewide association incorporated to regulate interscholastic athletic competition among the state's public and private secondary schools engages in state action, for purposes of the Federal Constitution's Fourteenth Amendment, when enforcing a rule of the association against a member school, where (1) the association's nominally private character is overborne by a pervasive entwinement of state school officials in the association's structure, and (2) there is no substantial reason to claim unfairness in applying constitutional standards to the association. (Thomas, J., Rehnquist, Ch. J., and Scalia and Kennedy, JJ., dissented from this holding.)

[***HN2]
CONSTITUTIONAL LAW §520
-- Fourteenth Amendment -- school athletic association

Headnote: [2A] [2B] [2C] [2D]
With respect to a statewide association incorporated to regulate interscholastic athletic competition among the state's public and private secondary schools, there is an entwinement of state school officials in the association's structure to a degree that requires the conclusion that the association is a state actor under the Federal Constitution's Fourteenth Amendment, where (1) the association, to the extent of 84 percent of its membership, is an organization of public schools represented by school officials acting in their official capacity to provide an integral element of secondary public schooling; and (2) although the terms of a former rule of the state's board of education--which rule expressly designated the association as regulator of interscholastic athletics in the state's public schools--have been deleted, (a) members of the state's board of education continue to be assigned, by reason of their office, to serve as members of the association's governing bodies, (b) the association's ministerial employees are treated as state employees to the extent of being eligible for membership in the state's retirement system, (c) the association enforces rules and regulations reviewed and approved by the state's board, and (d) the state's board allows students to satisfy its physical education requirement by taking part in interscholastic athletics sponsored by the association. (Thomas, J., Rehnquist, Ch. J., and Scalia and Kennedy, JJ., dissented from this holding.)

[***HN3]
CONSTITUTIONAL LAW §520
-- Fourteenth Amendment -- school athletic association

Headnote: [3A] [3B]
With respect to the United States Supreme Court's holding that a statewide association incorporated to regulate interscholastic athletic competition among the state's public and private secondary schools engages in state action, for purposes of the Federal Constitution's Fourteenth Amendment, when enforcing a rule of the association against a member school, the facts supporting such a holding--which facts show a pervasive entwinement of state school officials in the association's structure--are not outweighed by (1) the suggestion that the holding will somehow trigger an epidemic of unprecedented federal litigation, where the record raises no such reason for alarm; or (2) the contention that, because any public school applying the association's rules is itself subject to suit under 42 USCS 1983 or Title IX of the Education Amendments of 1972 (20 USCS 1681 et seq.), there is supposedly no need to treat the association as a state actor.

[***HN4]

CONSTITUTIONAL LAW §520
-- Fourteenth Amendment -- state action

Headnote: [4A] [4B]
In plotting a line between state action that is subject to scrutiny under the Federal Constitution's Fourteenth Amendment and private conduct that is not subject to such scrutiny, (1) the judicial obligation is not only to preserve an area of individual freedom by limiting the reach of federal law and to avoid the imposition of responsibility on a state for conduct that the state could not control, but also to assure that constitutional standards are invoked when it can be said that the state is responsible for the specific conduct of which a plaintiff complains; (2) state action may be found if and only if there is such a close nexus between the state and the challenged action that seemingly private behavior may be fairly treated as that of the state itself; and (3) no one fact can function as a necessary condition across the board for finding state action--nor is any set of circumstances absolutely sufficient--for there may be some countervailing reason against attributing activity to the government.

[***HN5]
CIVIL RIGHTS §26

CONSTITUTIONAL LAW §520
-- state action -- color of state law

Headnote: [5A] [5B]
If a defendant's conduct satisfies the state-action requirement of the Federal Constitution's Fourteenth Amendment, then the conduct also constitutes action under color of state law for purposes of 42 USCS 1983.

[***HN6]
CONSTITUTIONAL LAW §520
-- Fourteenth Amendment -- state actor

Headnote: [6]
The character of a legal entity as a state actor, for purposes of the Federal Constitution's Fourteenth Amendment, is determined neither by the entity's expressly private characterization in statutory law nor by the failure of the law to acknowledge the entity's inseparability from recognized government officials or agencies.

[***HN7]
CONSTITUTIONAL LAW §520
-- Fourteenth Amendment -- state action -- symbiosis

Headnote: [7A] [7B]
In determining whether a legal entity engages in state action for purposes of the Federal Constitution's Fourteenth Amendment, a criterion of state action such as symbiosis--that is, a symbiotic relationship between the state and the entity--looks not to form but to an underlying reality.

[***HN8]
CONSTITUTIONAL LAW §520
-- Fourteenth Amendment -- state action -- entwinement

Headnote: [8]
In determining whether an ostensibly private organization is a state actor for purposes of the Federal Constitution's Fourteenth Amendment, public entwinement in the organization's management and control will support a conclusion that the organization ought to be charged with a public character and judged by constitutional standards. (Thomas, J., Rehnquist, Ch. J., and Scalia and Kennedy, JJ., dissented from this holding.)

[***HN9]
APPEAL §1289
-- presumptions -- test for state action

Headnote: [9]
On certiorari to review a Federal Court of Appeals' judgment as to whether a statewide association incorporated to regulate interscholastic athletic competition among the state's public and private secondary schools may be regarded as engaging in state action, for purposes of the Federal Constitution's Fourteenth Amendment, when enforcing a rule of the association against a member school, the United States Supreme Court will assume, for the sake of argument, that application of the public function criterion--that is, whether the association is performing a traditional and exclusive public function--would result in a finding of no state action on the part of the association.

[***HN10]
CONSTITUTIONAL LAW §520
-- Fourteenth Amendment -- state action -- coercion

Headnote: [10]

A United States Supreme Court holding--that a statewide association incorporated to regulate interscholastic athletic competition among the state's public and private secondary schools engaged in state action, for purposes of the Federal Constitution's Fourteenth Amendment, when enforcing a rule of the association against a member school--is not affected by the consideration that the state neither coerced nor encouraged the actions complained of, where the court's holding is based on a showing of pervasive entwinement of state school officials in the association's structure. (Thomas, J., Rehnquist, Ch. J., and Scalia and Kennedy, JJ., dissented from this holding.)

[***HN11]
CONSTITUTIONAL LAW §520
-- Fourteenth Amendment -- state action

Headnote: [11]
Government coercion or encouragement may, under some circumstances, justify characterizing an ostensibly private action as public instead, for purposes of the Federal Constitution's Fourteenth Amendment.

[***HN12]
CONSTITUTIONAL LAW §520
-- Fourteenth Amendment -- state action

Headnote: [12]
Facts which suffice to show that an ostensibly private action is to be characterized as public action for purposes of the Federal Constitution's Fourteenth Amendment--or facts which, standing alone, would require such a finding--may sometimes be outweighed in the name of some value at odds with finding public accountability in the circumstances.

[***HN13]
CONSTITUTIONAL LAW §520
-- Fourteenth Amendment -- state action -- public defender

Headnote: [13]
Although an employee's full-time public employment would be conclusive of state action with respect to the Federal Constitution's Fourteenth Amendment for some purposes, the actions of a defense lawyer who is employed by a county are private with respect to the Fourteenth Amendment, where the lawyer is acting within the scope of the lawyer's duty as a public defender, for (1) a public defender does not act on behalf of the state, but rather is the state's adversary; and (2) the state-action doctrine does not convert opponents into virtual agents.

**SYLLABUS:** Respondent not-for-profit athletic association (Association) regulates interscholastic sport among Tennessee public and private high schools. Most of the State's public high schools are members, representing 84% of the Association's membership. School officials make up the voting membership of the Association's governing council and control board, which typically hold meetings during regular school hours. The Association is largely funded by gate receipts. Association staff, although not state employees, may join the state retirement system. The Association sets membership standards and student eligibility rules and has the power to penalize any member school that violates those rules. The State Board of Education (State Board) has long acknowledged the Association's role in regulating interscholastic competition in public schools, and its members sit as nonvoting members of the Association's governing bodies. When the Association penalized petitioner Brentwood Academy for violating a recruiting rule, Brentwood sued the Association and its executive director under 42 U.S.C. § 1983, claiming that the rule's enforcement was state action that violated the First and Fourteenth Amendments. The District Court granted Brentwood summary judgment, enjoining the rule's enforcement, but the Sixth Circuit found no state action and reversed.

*Held:* The Association's regulatory activity is state action owing to the pervasive entwinement of state school officials in the Association's structure, there being no offsetting reason to see the Association's acts in any other way. Pp. 5-17.

(a) State action may be found only if there is such a "close nexus between the State and the challenged action" that seemingly private behavior "may be fairly treated as that of the State itself." *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 351, 42 L. Ed. 2d 477, 95 S. Ct. 449. No one fact is a necessary condition for finding state action, nor is any set of circumstances sufficient, for there may be some countervailing reason against attributing activity to the government. The facts that can bear on an attribution's fairness -- *e.g.,* a nominally private entity may be a state actor when it is entwined with governmental policies or when government is entwined in its management or control, *Evans v. Newton,* 382 U.S. 296, 299, 301, 15 L. Ed. 2d 373, 86 S. Ct. 486 -- unequivocally show that a legal entity's character is determined neither by its expressly private characterization in statutory law, nor by the law's failure to acknowledge its inseparability from recognized government officials or agencies. In *National Collegiate Athletic Assn. v. Tarkanian,* 488 U.S. 179, 102 L. Ed. 2d 469, 109 S. Ct. 454, this Court anticipated that state action could be found when there is public entwinement in the management or control of an organization whose member public schools are all within a single State. Pp. 6-9.

(b) The necessarily fact-bound inquiry leads to the conclusion of state action here. The Association's nominally private character is overborne by the pervasive entwinement of public institutions and public officials in its composition and workings, and there is no substantial reason to claim unfairness in applying constitutional standards to it. To the extent of 84% of its membership, the Association is an organization of public schools represented by their officials acting in their official capacity to provide an integral element of secondary public schooling, interscholastic athletics. There would be no recognizable Association without the public school officials, who overwhelmingly determine and perform all but the Association's purely ministerial acts. Only the 16% minority of private school memberships keeps the entwinement of the association and public

schools from being total and their identities totally indistinguishable. To complement the entwinement from the bottom up the State has provided entwinement from the top down: State Board members sit ex officio on the Association's governing bodies and Association employees participate in the state retirement system. Entwinement to the degree shown here requires that the Association be charged with a public character and judged by constitutional standards. Pp. 9-13.

(c) Entwinement is also the answer to the Association's several arguments that the instant facts would not support a state action finding under various other criteria, e.g., the public function test, *Rendell-Baker v. Kohn*, 457 U.S. 830, 73 L. Ed. 2d 418, 102 S. Ct. 2764 distinguished. Pp. 13-15.

(d) Although facts showing public action may be outweighed in the name of a value at odds with finding public accountability in the circumstances, e.g., *Polk County v. Dodson*, 454 U.S. 312, 322, 70 L. Ed. 2d 509, 102 S. Ct. 445, no such countervailing value is present here. The Association's fear that reversing the judgment will trigger an epidemic of federal litigation is unfounded. Save for the Sixth Circuit, every Court of Appeals to consider a statewide athletic association like this one has found it to be a state actor, and there has been no litigation explosion in those jurisdictions. Nor should the Association have dispensation merely because the public schools themselves are state actors subject to suit under § 1983 and Title IX of the Education Amendments of 1972. Pp. 15-16.

180 F.3d 758, reversed and remanded.

**COUNSEL:** James F. Blumstein argued the cause for petitioner.

Barbara D. Underwood argued the cause for the United States, as amicus curiae, by special leave of court.

Richard L. Colbert argued the cause for respondents.

**JUDGES:** SOUTER, J., delivered the opinion of the Court, in which STEVENS, O'CONNOR, GINSBURG, and BREYER, JJ., joined. THOMAS, J., filed a dissenting opinion, in which REHHQUIST, C. J., and SCALIA and KENNEDY, JJ., joined.

**OPINIONBY:** SOUTER

**OPINION:** [**927]  [***814]  [*290]

JUSTICE SOUTER delivered the opinion of the Court.

[***HR1A]  [1A]
[***HR2A]  [2A]
[***HR3A]  [3A]
The issue is whether a statewide association incorporated to regulate interscholastic athletic competition among public and private secondary schools may be regarded as engaging in state action when it enforces a rule against a member school. The association in question here includes most public schools located within the State, acts through their representatives, draws its officers from them, is largely funded [*291] by their dues and income received in their stead, and has historically been seen to regulate in lieu of the State Board of Education's exercise of its own authority. We hold that the association's regulatory activity may and should be treated as state action owing to the pervasive entwinement of state school officials in the structure of the association, there being [**928] no offsetting reason to see the association's acts in any other way.

I

Respondent Tennessee Secondary School Athletic Association (Association) is a not-for-profit membership corporation organized to regulate interscholastic sport among the public and private high schools in Tennessee that belong to it. No school is forced to join, but without any other authority actually regulating interscholastic athletics, it enjoys the memberships of almost all the State's public high schools (some 290 of them or 84% of the Association's voting membership), far outnumbering the 55 private schools that belong. A member school's team may play or scrimmage only against the team of another member, absent a dispensation.

The Association's rulemaking arm is its legislative council, while its board of control tends to administration. The voting membership of each of these nine-person committees is limited under the Association's bylaws to high school principals, assistant principals, and superintendents elected by the member schools, and the public school administrators who so serve typically attend meetings during regular school hours. Although the Association's staff members are not paid by the State, they are eligible to join the State's public retirement system for its employees. Member schools pay dues to the Association, though the bulk of its revenue is gate receipts at member teams' football and basketball tournaments, many of them held in public arenas rented by the Association.

The constitution, bylaws, and rules of the Association set standards of school membership and the eligibility of students to play in interscholastic games. Each school, for [*292] example, is regulated in awarding financial aid, most coaches must have a Tennessee state teaching license, and players must meet minimum academic standards and hew to limits on student employment. Under the bylaws, "in all matters pertaining to the athletic relations of his school," App. 138, the principal is responsible to the Association, which has the power "to suspend, to fine, or otherwise penalize any member school for the violation of any of the rules of the Association or for other just cause," id. at 100.

Ever since the Association was incorporated in 1925, Tennessee's State Board of Education (State Board) has (to use its own words) [***815] acknowledged the corporation's functions "in providing standards, rules and regulations for interscholastic competition in the public schools of Tennessee," id. at 211. More recently, the State Board cited its statutory authority, Tenn. Code Ann. § 49-1-302 (App. 220), when it adopted language expressing the relationship between the Association and the Board. Specifically, in 1972, it went so far as to adopt a rule expressly "designating" the Association as "the organization to supervise and regulate the athletic activities in which the public junior and senior high schools in Tennessee participate on an interscholastic basis." Tennessee State Board of Education, Administrative Rules and Regulations, Rule 0520-1-2-.26 (1972) (later moved to Rule 0520-1-2-.08). The Rule provided that "the authority granted herein shall remain in effect until revoked" and instructed the State Board's chairman to "designate a person or persons to serve in an ex-officio capacity on the [Association's governing bodies]." App. 211. That same year, the State Board specifically approved the Association's rules and regulations, while reserving the right to review future changes. Thus, on several occasions over the next 20 years, the State Board reviewed, approved, or reaffirmed its approval of the recruiting Rule at issue in this case. In 1996, however, the State Board dropped the original Rule 0520-1-2-.08 expressly designating the Association [*293] as regulator; it substituted a statement "recognizing the value of participation in interscholastic athletics and the role of [the Association] in coordinating [**929] interscholastic athletic competition," while "authorizing the public schools of the state to voluntarily maintain membership in [the Association]." Id. at 220.

The action before us responds to a 1997 regulatory enforcement proceeding brought against petitioner, Brentwood Academy, a private parochial high school member of the Association. The Association's board of control found that Brentwood violated a rule prohibiting "undue influence" in recruiting athletes, when it wrote to incoming students and their parents about spring football practice. The Association accordingly placed Brentwood's athletic program on probation for four years, declared its football and boys' basketball teams ineligible to compete in playoffs for two years, and imposed a $ 3,000 fine. When these penalties were imposed, all the voting members of the board of control and legislative council were public school administrators.

Brentwood sued the Association and its executive director in federal court under Rev. Stat. § 1979, 42 U.S.C. § 1983 claiming that enforcement of the Rule was state action and a violation of the First and Fourteenth Amendments. The District Court entered summary judgment for Brentwood and enjoined the Association from enforcing the Rule. 13 F. Supp. 2d 670 (MD Tenn. 1998). In holding the Association to be a state actor under § 1983 and the Fourteenth Amendment, the District Court found that the State had delegated authority over high school athletics to the Association, characterized the relationship between the Association and its public school members as symbiotic, and emphasized the predominantly public character of the Association's membership and leadership. The [***816] court relied on language in National Collegiate Athletic Assn. v. Tarkanian, 488 U.S. 179, 193, n. 13, 102 L. Ed. 2d 469, 109 S. Ct. 454 (1988), suggesting that statewide interscholastic athletic associations are state actors, and on other federal cases [*294] in which such organizations had uniformly been held to be acting under color of state law.

The United States Court of Appeals for the Sixth Circuit reversed. 180 F.3d 758 (1999). It recognized that there is no single test to identify state actions and state actors but applied three criteria derived from Blum v. Yaretsky, 457 U.S. 991, 73 L. Ed. 2d 534, 102 S. Ct. 2777 (1982), Lugar v. Edmondson Oil Co., 457 U.S. 922, 73 L. Ed. 2d 482, 102 S. Ct. 2744 (1982), and Rendell-Baker v. Kohn, 457 U.S. 830, 73 L. Ed. 2d 418, 102 S. Ct. 2764 (1982), and found no state action under any of them. It said the District Court was mistaken in seeing a symbiotic relationship between the State and the Association, it emphasized that the Association was neither engaging in a traditional and exclusive public function nor responding to state compulsion, and it gave short shrift to the language from Tarkanian on which the District Court relied. Rehearing en banc was later denied over the dissent of two judges, who criticized the panel decision for creating a conflict among state and federal courts, for being inconsistent with Tarkanian, and for lacking support in the "functional" analysis of private activity required by West v. Atkins, 487 U.S. 42, 101 L. Ed. 2d 40, 108 S. Ct. 2250 (1988), for assessing the significance of cooperation between public officials and a private actor. 191 F.3d 705 (CA6 1999) (Merritt, J., dissenting from denial of rehearing en banc).

We granted certiorari, 528 U.S. 1153 (2000), to resolve the conflict n1 and now reverse.

- - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - -

n1 A number of other courts have held statewide athletic associations to be state actors. Griffin High School v. Illinois High School Assn., 822 F.2d 671, 674 (CA7 1987); Clark v. Arizona Interscholastic Assn., 695 F.2d 1126, 1128 (CA9 1982), cert. denied, 464 U.S. 818, 78 L. Ed. 2d 90, 104 S. Ct. 79 (1983); In re United States ex rel. Missouri State High School Activities Assn., 682 F.2d 147, 151 (CA8 1982); Louisiana High School Athletic Assn. v. St. Augustine High School, 396 F.2d 224, 227-228 (CA5 1968); Oklahoma High School Athletic Assn. v. Bray, 321 F.2d 269, 272-273 (CA10 1963); Indiana High School Athletic Assn. v. Carlberg, 694 N.E.2d 222, 229 (Ind. 1997); Mississippi High School Activities Assn., Inc. v. Coleman, 631 So. 2d 768, 774-775 (Miss. 1994); Kleczek v. Rhode Island Interscholastic League, Inc., 612 A.2d 734, 736 (R. I. 1992); see also Moreland v. Western Penn. Interscholastic Athletic League, 572 F.2d 121, 125 (CA3 1978) (state action conceded).

- - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - -

[*295]  [**930]

II

A

[***HR4A]  [4A]
[***HR5A]  [5A]

Our cases try to plot a line between state action subject to Fourteenth Amendment scrutiny and private conduct (however exceptionable) that is not. *Tarkanian, supra,* at 191; *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 349, 42 L. Ed. 2d 477, 95 S. Ct. 449 (1974). The judicial obligation is not only to "preserve an area of individual freedom by limiting the reach of federal law' and avoid the imposition of responsibility on a State for conduct it could not control," *Tarkanian, supra,* at 191 (quoting *Lugar, supra,* at 936-937), but also to assure that constitutional standards are invoked "when it can be said that the State is *responsible* for the specific [***817] conduct of which the plaintiff complains," *Blum, supra,* at

1004 (emphasis in original). **HN1** If the Fourteenth Amendment is not to be displaced, therefore, its ambit cannot be a simple line between and people operating outside formally governmental organizations, and the deed of an ostensibly private organization or individual is to be treated sometimes as if a State had caused it to be performed. Thus, we say that state action may be found if, though only if, there is such a "close nexus between the State and the challenged action" that seemingly private behavior "may be fairly treated as that of the State itself." *Jackson, supra,* at 351. n2

[***HR5B] [5B]

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n2 **HN2** If a defendant's conduct satisfies the state-action requirement of the Fourteenth Amendment, the conduct also constitutes action "under color of state law" for § 1983 purposes. *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 935, 73 L. Ed. 2d 482, 102 S. Ct. 2744 (1982)

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

[***HR4B] [4B]
What is fairly attributable is a matter of normative judgment, and the criteria lack rigid simplicity. From the range of circumstances that could point toward the State behind an individual face, no one fact can function as a necessary condition across the board for finding state action; nor is any set of circumstances absolutely sufficient, for there may be some [*296] countervailing reason against attributing activity to the government. See *Tarkanian,* 488 U.S. at 193, 196; *Polk County v. Dodson,* 454 U.S. 312, 70 L. Ed. 2d 509, 102 S. Ct. 445 (1981)

Our cases have identified a host of facts that can bear on the fairness of such an attribution. We have, for example, held that a challenged activity may be state action when it results from the State's exercise of "coercive power," *Blum,* 457 U.S. at 1004, when the State provides 'significant encouragement, either overt or covert,' *ibid.* or when a private actor operates as a "willful participant in joint activity with the State or its agents," *Lugar, supra,* at 941 (internal quotation marks omitted). We have treated a nominally private entity as a state actor when it is controlled by an "agency of the State," *Pennsylvania v. Board of Directors of City Trusts of Philadelphia,* 353 U.S. 230, 231, 1 L. Ed. 2d 792, 77 S. Ct. 806 (1957) (per curiam), when it has been delegated a public function by the State, cf., *e.g., West v. Atkins,* at 56; *Edmonson v. Leesville Concrete Co.,* 500 U.S. 614, 627-628, 114 L. Ed. 2d 660, 111 S. Ct. 2077 (1991), when it is "entwined with governmental policies" or when government is "entwined in [its] management or control," *Evans v. Newton,* 382 U.S. 296, 299, 301, 15 L. Ed. 2d 373, 86 S. Ct. 486 (1966).

[***HR6] [6]

Amidst such variety, examples may be the best teachers, and examples from [**931] our cases are unequivocal in showing that the character of a legal entity is determined neither by its expressly private characterization in statutory law, nor by the failure of the law to acknowledge the entity's inseparability from recognized government officials or agencies. *Lebron v. National Railroad Passenger Corporation,* 513 U.S. 374, 130 L. Ed. 2d 902, 115 S. Ct. 961 (1995), held that Amtrak was the Government for constitutional purposes, regardless of its congressional designation as private; it was organized [***818] under federal law to attain governmental objectives and was directed and controlled by federal appointees. *Pennsylvania v. Board of Directors of City Trusts of Philadelphia, supra,* held the privately endowed Gerard College to be a state actor and enforcement of its private founder's limitation of admission [*297] to whites attributable to the State, because, consistent with the terms of the settlor's gift, the college's board of directors was a state agency established by state law. Ostensibly the converse situation occurred in *Evans v. Newton, supra,* which held that private trustees to whom a city had transferred a park were nonetheless state actors barred from enforcing racial segregation, since the park served the public purpose of providing community recreation, and 'the municipality remained entwined in [its] management [and] control," *id.* at 301.

These examples of public entwinement in the management and control of ostensibly separate trusts or corporations foreshadow this case, as this Court itself anticipated in *Tarkanian, supra. Tarkanian* arose when an undoubtedly state actor, the University of Nevada, suspended its basketball coach, Tarkanian, in order to comply with rules and recommendations of the National Collegiate Athletic Association (NCAA). The coach charged the NCAA with state action, arguing that the state university had delegated its own functions to the NCAA, clothing the latter with authority to make and apply the university's rules, the result being joint action making the NCAA a state actor.

To be sure, it is not the strict holding in *Tarkanian* that points to our view of this case, for we found no state action on the part of the NCAA. We could see, on the one hand, that the university had some part in setting the NCAA's rules, and the Supreme Court of Nevada had gone so far as to hold that the NCAA had been delegated the university's traditionally exclusive public authority over personnel. Id. at 193. But on the other side, the NCAA's policies were shaped not by the University of Nevada alone, but by several hundred member institutions, most of them having no connection with Nevada, and exhibiting no color of Nevada law. Id. at 193. Since it was difficult to see the NCAA, not as a collective membership,

but as surrogate for the one State, we held the organization's connection with Nevada [*298] too insubstantial to ground state action claim. Id. at 193, 196.

But dictum in *Tarkanian* pointed to a contrary result on facts like ours, with an organization whose member public schools are all within a single State. "The situation would, of course, be different if the [Association's] membership consisted entirely of institutions located within the same State, many of them public institutions created by the same sovereign." Id. at 193, n. 13. To support our surmise, we approvingly cited two cases: *Clark* v. *Arizona Interscholastic Assn.*, 695 F.2d 1126 (CA9 1982), cert. denied, 464 U.S. 818, 78 L. Ed. 2d 90, 104 S. Ct. 88 (1983), a challenge to a state high school athletic association that kept boys from playing on girls' interscholastic volleyball teams in every *Louisiana High School Athletic Assn.* v. *St. Augustine High School*, 396 F.2d 224 [***819] (CA5 1968), a parochial school's attack on the racially segregated system of interscholastic high school athletics maintained by the athletic association. In each instance, the [**932] Court of Appeals treated the athletic association as a state actor.

B

[***HR1B] [1B]
Just as we foresaw in *Tarkanian*, the "necessarily fact-bound inquiry," *Lugar*, 457 U.S. at 939, leads to the conclusion of state action here. The nominally private character of the Association is overborne by the pervasive entwinement of public institutions and public officials in its composition and workings, and there is no substantial reason to claim unfairness in applying constitutional standards to it.

The Association is not an organization of natural persons acting on their own, but of schools, and of public schools to the extent of 84% of the total. Under the Association's bylaws, each member school is represented by its principal or a faculty member, who has a vote in selecting members of the governing legislative council and board of control from eligible principals, assistant principals and superintendents. [*299]

Although the findings and prior opinions in this case include no express conclusion of law that public school officials act within the scope of their duties when they represent their institutions, no other view would be rational, the official nature of their involvement being shown in any number of ways. Interscholastic athletics obviously play an integral part in the public education of Tennessee, where nearly every public high school spends money on competitions among schools. Since a pickup system of interscholastic games would not do, these public teams need some mechanism to produce rules and regulate competition. The mechanism is an organization overwhelmingly composed of public school officials who select representatives (all of them public officials at the time in question here), who in turn adopt and enforce the rules that make the system work. Thus, by giving these jobs to the Association, the 290 public schools of Tennessee belonging to it can sensibly be seen as exercising their own authority to meet their own responsibilities. Unsurprisingly, then, the record indicates that half the council or board meetings documented here were held during official school hours, and that public schools have largely provided for the Association's financial support. A small portion of the Association's revenue comes from membership dues paid by the schools, and the principal part from gate receipts at tournaments among the member schools. Unlike mere public buyers of contract services, whose payments for services rendered do not convert the service providers into public actors, see *Rendell-Baker*, 457 U.S. at 839-843, the schools here obtain membership in the service organization and give up sources of their own income to their collective association. The Association thus exercises the authority of the predominantly public schools to charge for admission to their games; the Association does not receive this money from the schools, but enjoys the schools' moneymaking capacity as its own.

[***HR2B] [2B]
In sum, to the extent of 84% of its membership, the Association is an organization of public schools represented by their officials acting [***820] in their official capacity to provide an integral element of secondary public schooling. There would be no recognizable Association, legal or tangible, without the public school officials, who do not merely control but overwhelmingly perform all but the purely ministerial acts by which the Association exists and functions in practical terms. Only the 16% minority of private school memberships prevents the entwinement of the Association and the public school system from being total and their identities totally indistinguishable.

To complement the entwinement of public school officials with the Association from the bottom up, the State of Tennessee has provided for entwinement from top down. State Board members are assigned ex officio to serve as members of the board of control and legislative council, and the [**933] Association's ministerial employees are treated as state employees to the extent of being eligible for membership in the state retirement system.

It is, of course, true that the time is long past when the close relationship between the surrogate association and its public members and public officials acting as such was attested frankly. As mentioned, the terms of the State Board's Rule expressly designating the association as regulator of interscholastic athletics in public schools was deleted in 1996, the year after a Federal District Court held that the Association was a state actor because its rules were "caused, directed and controlled by the Tennessee Board of Education," *Graham* v. *TSSAA*, No. 1:95-CV-044, 1995 WL 115890, *5 (ED Tenn., Feb. 20, 1995). n3

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n3 The District Court in *Graham* held that "this delegation of authority to TSSAA by Tennessee, standing alone, is sufficient to make TSSAA a state actor" under the "state compulsion test," which it understood to provide that a State could exercise such coercive power or provide such significant encouragement, either overt or covert, that the choice of the private actor must be deemed to be that of the State as a matter of law. 1995 WL 115890, at *4-*5 (citing *Blum* v. *Yaretsky*, 457 U.S. 991, 1004, 73 L. Ed. 2d 5341, 102 S. Ct. 2777 (1982)).



- - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

[***HR2C] [2C]
[***HR7A] [*301] [7A]
But the removal of the designation language from Rule 0520-1-2-.08 affected nothing but words. Today the State Board's member-designees continue to sit on the Association's committees as nonvoting members, and the State continues to welcome Association employees in its retirement scheme. The close relationship is confirmed by the Association's enforcement of the same preamendment rules and regulations reviewed and approved by the State Board (including the recruiting Rule challenged by Brentwood), and by the State Board's continued willingness to allow students to satisfy its physical education requirement by taking part in interscholastic athletics sponsored by the Association. The most one can say on the evidence is that the State Board once freely acknowledged the Association's official character but now does it by winks and nods. n4 The amendment to the Rule in 1996 [***821] affected candor but not the "momentum" of the Association's prior involvement with the State Board. *Evans* v. *Newton*, 382 U.S. at 301. The District Court spoke to this point in finding that because of "past state and [*302] practice," "the conduct of the parties has not materially changed" since 1996, "the connections between TSSAA and the State [being] still pervasive and entwined." 13 F. Supp. 2d at 681.

[***HR7B] [7B]

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - -

n4 The significance of winks and nods in state-action doctrine seems to be one of the points of the dissenters' departure from the rest of the Court. In drawing the public-private action line, the dissenters would emphasize the formal clarity of the legislative decision to authorize the appointment of Gerard College's trustees, see *supra*, at   , *post*, at   , in preference to our reliance on the practical certainty in this case that public officials will control operation of the Association under its bylaws. Similarly, the dissenters stress the express formality of the special statute defining Amtrak's ties to the Government, see *supra*, at   , *post*, at   , in contrast to the reality in this case that the Association's organizers structured the Association's relationships to the officialdom of public education. But if formalism were the sine qua non of state action, the doctrine would vanish owing to the ease and inevitability of its evasion, and for just that reason formalism has never been controlling; for example, a criterion of state action like symbiosis (which the dissenters accept, *post*, at   ) looks not to form but to an underlying reality.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - -

[***HR2D] [2D]
[***HR8] [8]
The entwinement down from the State Board is therefore unmistakable, just as the entwinement up from the member public schools is overwhelming. Entwinement will support a conclusion that an ostensibly private organization ought to be charged with a public character and judged by constitutional standards; entwinement to the degree shown here requires it.

C

Entwinement is also the answer to the Association's several arguments offered to [**934] persuade us that the facts would not support a finding of state action under various criteria applied in other cases. These arguments are beside the point, simply because the facts justify a conclusion of state action under the criterion of entwinement, a conclusion in no sense unsettled merely because other criteria of state action may not be satisfied by the same facts.

[***HR9] [9]
The Association places great stress, for example, on the application of a public function test, as exemplified in *Rendell-Baker* v. *Kohn*, 457 U.S. 830, 73 L. Ed. 2d 418, 102 S. Ct. 2764 (1982). There, an apparently private school provided education for students whose special needs made it difficult for them to finish high school. The record, however, failed to show any tradition of providing public special education to students unable to cope with a regular school, who had historically been cared for (or ignored) according to private choice. It was true that various public school districts had adopted the practice of referring students to the school and paying their tuition, and no one disputed that providing the instruction aimed at a proper public objective and conferred a public benefit. But we held that the performance of such a public function did not permit a finding of state action on the part of the school unless the function performed was exclusively and traditionally [*303] one, as it was not in that case. The Association argues that application of the public function criterion would produce the same result here, and we will assume, *arguendo*, that it would. But this case does not turn on a public function test, any more than *Rendell-Baker* had anything to do with entwinement of public officials in the special school.

[***HR10] [10]
[***HR11] [11]
For the same reason, it avails the Association nothing to stress that the State neither coerced nor encouraged the actions complained of. "Coercion" and "encouragement" are like "entwinement" in [***822] referring to kinds of facts that can justify characterizing an ostensibly private action as public instead. Facts that address any of these criteria are significant, but no one criterion must necessarily be applied. [**935] When,

therefore, the relevant facts show pervasive entwinement to the point of largely overlapping identity, the implication of state action is not affected by pointing out that the facts might not loom large under a different test.

D

[***HR12] [12]
[***HR13] [13]
This is not to say that all of the Association's arguments are rendered beside the point by the public officials' involvement in the Association, for after application of the entwinement criterion, or any other, there is a further potential issue, and the Association raises it: even facts that suffice to show public action (or, standing alone, would require such a finding) may be outweighed in the name of some value at odds with finding public accountability in the circumstances. In *Polk County*, 454 U.S. at 322, a defense lawyer's actions were deemed private even though she was employed by the county and was acting within the scope of her duty as a public defender. Full-time public employment would be conclusive of state action for some purposes, see *West* v. *Atkins*, 487 U.S. at 50, accord, *Lugar*, 457 U.S. at 935, n. 18, but not when the employee is doing a defense lawyer's primary job; then, the public defender does "not act on behalf of the State; he is the State's adversary." *Polk County*, supra, at [*304] 323, n.13. The state-action doctrine does not convert opponents into virtual agents.

[***HR3B] [3B]
The assertion of such a countervailing value is the nub of each of the Association's two remaining arguments, neither of which, however, persuades us. The Association suggests, first, that reversing the judgment here will somehow trigger an epidemic of unprecedented federal litigation. Brief for Respondents 35. Even if that might be counted as a good reason for a *Polk County* decision to call the association's [**935] action private, the record raises no reason for alarm here. Save for the Sixth Circuit, every Court of Appeals to consider a statewide athletic association like the one here has found it a state actor. This majority view began taking shape even before *Tarkanian*, which cited two such decisions approvingly, see supra, at 9, (and this was six years after *Blum*, *Rendell-Baker*, and *Lugar*, on which the Sixth Circuit relied here). No one, however, has pointed to any explosion of § 1983 cases against interscholastic athletic associations in the affected jurisdictions. Not to put too fine a point on it, two District Courts in Tennessee have previously held the Association itself to be a state actor, see *Graham*, 1995 WL 115890, at *5; *Crocker* v. *Tennessee Secondary School Athletic Assn.*, 735 F. Supp. 753 (MD Tenn. 1990), affirmance order, 908 F.2d 972, 973 (CA6 1990), but there is no evident wave of litigation working its way across the State. A reversal of the judgment here portends nothing more than the harmony of an outlying Circuit with precedent otherwise uniform.

Nor do we think there is anything to be said for the Association's contention that there is no need to treat [***823] it as a state actor since any public school applying the Association's rules is itself subject to suit under § 1983 or Title IX of the Education Amendments of 1972, 86 Stat. 373, 20 U.S.C. §§ 1681-1688. Brief for Respondents 30. If Brentwood's claim were pushing at the edge of the class of possible defendant state actors, an argument about the social utility of expanding [*305] that class would at least be on point, but because we are nowhere near the margin in this case, the Association is really asking for nothing less than a dispensation for itself. Its position boils down to saying that the Association should not be dressed in state clothes because other, concededly public actors are; that Brentwood should be kept out of court because a different plaintiff raising a different claim in a different case may find the courthouse open. Pleas for special treatment are hard to sell, although saying that does not, of course, imply anything about the merits of Brentwood's complaint; the issue here is merely whether Brentwood properly names the Association as a § 1983 defendant, not whether it should win on its claim.

The judgment of the Court of Appeals for the Sixth Circuit is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

It is so ordered.

DISSENTBY: THOMAS

DISSENT: JUSTICE THOMAS, with whom THE CHIEF JUSTICE, JUSTICE SCALIA, and JUSTICE KENNEDY join, dissenting.

We have never found state action based upon mere "entwinement." Until today, we have found a private organization's action to constitute state action only when the organization performed a public function; was created, coerced, or encouraged by the government; or acted in a symbiotic relationship with the government. The majority's holding -- that the Tennessee Secondary School Athletic Association's enforcement of its recruiting rule is state action -- not only extends state-action doctrine beyond its permissible limits but also encroaches upon the realm of individual freedom that the doctrine was meant to protect. I respectfully dissent.

I

Like the state-action requirement of the Fourteenth Amendment, the state-action element of 42 U.S.C. § 1983 excludes from its coverage "merely private [*306] conduct, however discriminatory or wrongful." *American Mfrs. Mut. Ins. Co.* v. *Sullivan*, 526 U.S. 40, 50, 143 L. Ed. 2d 130, 119 S. Ct. 977 (1999) (internal quotation marks omitted). "Careful adherence to the 'state action' requirement" thus "preserves an area of individual freedom by limiting the reach of federal law and federal judicial power." *Lugar* v. *Edmondson Oil Co.*, 457 U.S. 922, 936, 73 L. Ed. 2d 482, 102 S. Ct. 2744 [**936] (1982). The state-action doctrine also promotes important values of federalism, "avoiding the imposition of responsibility on a State for conduct it could not control." *National Collegiate Athletic Assn.* v. *Tarkanian*, 488 U.S. 179, 191, 102 L. Ed. 2d 469, 109 S. Ct. 454

(1988). Although we have used many different tests to identify state action, they all have a common purpose. Our goal in every case is to [***824] determine whether an action "can fairly be attributed to the State." *Blum* v. *Yaretsky*, 457 U.S. 991, 1004, 73 L. Ed. 2d 534, 102 S. Ct. 2777 (1982); *American Mfrs.*, *supra*, at 52.

A

Regardless of these various tests for state action, common sense dictates that the TSSAA's actions cannot fairly be attributed to the State, and thus cannot constitute state action. The TSSAA was formed in 1925 as a private corporation to organize interscholastic athletics and to sponsor tournaments among its member schools. Any private or public secondary school may join the TSSAA by signing a contract agreeing to comply with its rules and decisions. Although public schools currently compose 84% of the TSSAA's membership, the TSSAA does not require that public schools constitute a set percentage of its membership, and, indeed, no public school need join the TSSAA. The TSSAA's rules are enforced not by a state agency but by its own board of control, which comprises high school principals, assistant principals, and superintendents, none of whom must work at a public school. Of course, at the time the recruiting rule was enforced in this case, all of the board members happened to be public school officials. However, each board member acts in [*307] a representative capacity on behalf of all the private and public schools in his region of Tennessee, and not simply his individual school.

The State of Tennessee did not create the TSSAA. The State does not fund the TSSAA and does not pay its employees; in fact only 4% of the TSSAA's revenue comes from the dues paid by member schools; the bulk of its operating budget is derived from gate receipts at tournaments it sponsors. The State does not permit the TSSAA to use state-owned facilities for a discounted fee, and it does not exempt the TSSAA from state taxation. No Tennessee law authorizes the State to coordinate interscholastic athletics or empowers another entity to organize interscholastic athletics on behalf of the State. n2 The only [**937] state pronouncement acknowledging [*308] the TSSAA's existence is one providing that the [***825] State Board of Education permits public schools to maintain membership in the TSSAA if they so choose. n3

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n1 Although the TSSAA's employees, who typically are retired teachers, are allowed to participate in the state retirement system, the State does not pay any portion of the employer contribution for them. The TSSAA is one of three private associations, along with the Tennessee Education Association and the Tennessee School Boards Association, whose employees are statutorily permitted to participate in the state retirement system. Tenn. Code Ann. § 8-35-118 (1993).

n2 The first formal state acknowledgement of the TSSAA's existence did not occur until 1972, when the State Board of Education passed a resolution stating that it "recognizes and designates [the TSSAA] as the organization to supervise and regulate the athletic activities in which the public junior and senior high schools of Tennessee participate in on an interscholastic basis." App. 211. There is no indication that the TSSAA invited this resolution or that the resolution in any way altered the actions of the TSSAA or the State following its adoption. In fact, it appears that the resolution was not entirely accurate: The TSSAA does not supervise or regulate regular season interscholastic contests. In any event, the resolution was revoked in 1996. Contrary to the majority's reference to its revocation as being "winks and nods," *ante*, at 12, the repeal of the 1972 resolution appears to have had no more impact on the TSSAA's operation than did its passage.

The majority also cites this resolution to support its assertion that "ever since the Association was incorporated in 1925 Tennessee's State Board of Education . . . has acknowledged the Association's function 'in providing standards, rules and regulations for interscholastic competition in the public schools of Tennessee.'" *Ante*, at 3. However, there is no evidence in the record that suggests that the State of Tennessee or the State Board of Education had any involvement or interest in the TSSAA prior to 1972.

n3 The rule provides: "The State Board of Education recognizes the value of participation in interscholastic athletics and the role of the Tennessee Secondary School Athletic Association in coordinating interscholastic athletic competition. The State Board of Education authorizes the public schools of the state to voluntarily maintain membership in the Tennessee Secondary School Athletic Association." Tenn. Comp. Rules & Regs. § 0520-1-2-.08(1) (2000).

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

Moreover, the State of Tennessee has never had any involvement in the particular action taken by the TSSAA in this case: the enforcement of the TSSAA's recruiting rule prohibiting members from using "undue influence" on students or their parents or guardians "to secure or to retain a student for athletic purposes." App. 115. There is no indication that the State has ever had any interest in how schools choose to regulate recruiting. n4 In fact, the TSSAA's authority to enforce its recruiting rule arises solely from the voluntary membership contract that each member school signs, agreeing to conduct its athletics in accordance with the rules and decisions of the TSSAA.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n4 The majority relies on the fact that the TSSAA permits members of the State Board of Education to serve ex officio on its board of control to support its "top-down" theory of state action. But these members are not voting members of the TSSAA's board of control, and thus cannot exert any control over its actions.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

B

Even approaching the issue in terms of any of the Court's specific state-action tests, the conclusion is the same: The TSSAA's enforcement of its recruiting rule against Brentwood Academy is not state action. In applying these tests, [*309] courts of course must place the burden of persuasion on the plaintiff, not the defendant, because state action is an element of a § 1983 claim. *American Mfrs. Mut. Ins. Co. v. Atkins*, 487 U.S. 42, 48, 101 L. Ed. 2d 40, 108 S. Ct. 2250 (1988).

The TSSAA has not performed a function that has been "traditionally exclusively reserved to the State." *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 352, 42 L. Ed. 2d 447, 95 S. Ct. 449 (1974). The organization of interscholastic sports is neither a traditional nor an exclusive public function of the States. Widespread organization and administration of interscholastic contests by schools did not begin until the 20th century. See M. Lee, A History of Physical Education and Sports in the U.S.A. 73 (1983) (explaining that what little interscholastic athletics there was in the 19th century "came almost entirely in the closing decade of the century and was largely pupil inspired, pupil controlled, and [pupil coached]"); id. at 68, 146 (stating that no control of high school sports occurred until 1896, when a group of teachers in Wisconsin set up a committee to control such contests, and pointing out that "it was several years before the idea caught on in other states"). Certainly, in Tennessee the State did not even show an interest in interscholastic athletics until 47 years after the TSSAA had been in existence and had been organizing athletic contests throughout the State. Even then, the [***826] State Board of Education merely acquiesced in the TSSAA's action and did not assume the role of regulating interscholastic athletics. Cf. *Blum*, 457 U.S. at 1004-1005 ("Mere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives . . ."); see also *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 164-165, 56 L. Ed. 2d 185, 98 S. Ct. 1729 (1978). The TSSAA no doubt serves the public, particularly the public schools, but the mere provision of a service to the public does not render such provision a traditional [**938] and exclusive public function. See *Rendell-Baker v. Kohn*, 457 U.S. 830, 842, 73 L. Ed. 2d 418, 102 S. Ct. 2764 (1982). [*310]

It is also obvious that the TSSAA is not an entity created and controlled by the government for the purpose of fulfilling a government objective, as was Amtrak in *Lebron v. National Railroad Passenger Corporation*, 513 U.S. 374, 394, 130 L. Ed. 2d 902, 115 S. Ct. 961. See also *Pennsylvania v. Board of Directors of City Trusts of Philadelphia*, 353 U.S. 230, 1 L. Ed. 2d 792, 77 S. Ct. 806 (1957) (per curiam) (holding that a state agency created under state law was a state actor). Indeed, no one claims that the State of Tennessee played any role in the creation of the TSSAA as a private corporation in 1925. The TSSAA was designed to fulfill an objective -- the organization of interscholastic athletic tournaments -- that the government had not contemplated, much less pursued. And although the board of control currently is composed largely of state school officials, and although public schools currently account for the majority of the TSSAA's membership, this is not required and, in TSSAA's constitution.

In addition, the State of Tennessee has not "exercised coercive power or . . . provided such significant encouragement [to the TSSAA], either overt or covert," *Blum*, 457 U.S. at 1004, that the TSSAA's regulatory activities must in law be deemed to be those of the State. The State has not promulgated any regulations of interscholastic sports, and nothing in the record suggests that the State has encouraged or coerced the TSSAA in enforcing its recruiting rule. To be sure, public schools do provide a small portion of the TSSAA's funding through their membership dues, but no one argues that these dues are somehow conditioned on the TSSAA's enactment and enforcement of recruiting rules. In fact, even if the TSSAA were dependent on state funding to the extent of 90%, as was the case in *Blum*, instead of less than 4%, mere financial dependence on the State does not convert the [***827] TSSAA's actions into acts of the State. See *Blum, supra*, at 1011, *Rendell-Baker, supra*, at 840; see also *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 173, 32 L. Ed. 2d 627, 92 S. Ct. 1965 (1972) ("The Court has never held, of course, that discrimination by an otherwise private entity would be violative of the Equal Protection Clause if the private entity receives any sort of benefit or service at all from the State . . ."). Furthermore, there is no evidence of "joint participation," *Lugar*, 457 U.S. at 941-942, between the State and the TSSAA in the TSSAA's enforcement of its recruiting rule. The TSSAA's board of control enforces its recruiting rule solely in accordance with the authority granted to it under the contract that each member signs.

- - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - -

n5 The majority emphasizes that public schools joining the TSSAA "give up sources of their own income to their collective association" by allowing the TSSAA "to charge for admission to their games." *Ante*, at 10-11. However, this would be equally true whenever a State contracted with a private entity: The State presumably could provide the same service for profit, if it so chose. In *Rendell-Baker v. Kohn*, 457 U.S. 830, 73 L. Ed. 2d 418, 102 S. Ct. 2764 (1982), for example, the State could have created its own school for students with special needs and charged for admission. Or in *Blum v. Yaretsky*, 457 U.S. 991, 73 L. Ed. 2d 534, 102 S. Ct. 2777 (1982), the State could have created its own nursing homes and charged individuals to stay there. The ability of a State to make money by performing a service it has chosen to buy from a private provider is simply an indication that the service provider is a state actor.

- - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - -

Finally, there is no "symbiotic relationship" between the State and the TSSAA. *Moose Lodge, supra*, at 175; cf. *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 6 L. Ed. 2d 45, 81 S. Ct. 856 (1961). Contrary to the majority's assertion, see *ante*, at 10-11, the TSSAA's financial relationship with the State is not different from that of many contractors performing services for the government. *Rendell-Baker, supra*, at 843. [**939] The TSSAA provides a service -- the organization of athletic tournaments -- in exchange for membership dues and gate fees, just as a vendor could contract with public schools to sell refreshments at school events. Certainly the public school could sell its own refreshments, yet the existence of that option does not transform the service performed by the contractor into a state action. Also, there is no suggestion in this case that, as was the case in *Burton*, the State profits from the TSSAA's decision to enforce its recruiting rule.

[*312] Because I do not believe that the TSSAA's action of enforcing its recruiting rule is fairly attributable to the State of Tennessee I would affirm.

II

Although the TSSAA's enforcement activities cannot be considered state action as a matter of common sense or under any of this Court's existing theories of state action, the majority presents a new theory. Under this theory, the majority holds that the combination of factors it identifies evidences "entwinement" of the State with the TSSAA, and that such entwinement converts private action into state action. Ante, at 11. The majority does not define "entwinement," and the meaning of the term is not altogether clear. But whatever this new "entwinement" theory may entail, it lacks any support in our state-action jurisprudence. Although the majority asserts that there are three examples of entwinement analysis in our cases, there is no case in which we have rested a finding of state action on entwinement alone.

Two of the cases on which the majority relies do not even use the word "entwinement." See Lebron, supra, at 374; City Trusts, supra, at 230. Lebron concerned the status of Amtrak, a corporation that Congress created and placed under Government control for the public purpose of achieving a governmental objective [***828] (namely to avert the threatened extinction of passenger train service in the United States). 513 U.S. at 383, 386. Without discussing any notion of entwinement, we simply held that, when "the Government creates a corporation by special law, for the furtherance of governmental objectives, and retains for itself permanent authority to appoint a majority of the directors of the corporation, the corporation is part of the Government for purposes of the First Amendment." Id. at 400. Similarly, in [*313] City Trusts, we did not consider entwinement when we addressed the question whether an agency established by state law was a state actor. See 353 U.S. at 230. In that case, the Pennsylvania legislature passed a law creating a board of directors to operate a racially segregated school for orphans. Ibid. Without mentioning "entwinement," we held that, because the board was a state agency, its actions were attributable to the State. Ibid.

The majority's third example, Evans v. Newton, 382 U.S. 296, 15 L. Ed. 2d 373, 86 S. Ct. 486 (1966) lends no more support to an "entwinement" theory than do Lebron and City Trusts. Although Evans at least uses the word "entwined," 382 U.S. at 299 ("Conduct that is formally 'private' may become so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state action"), we did not discuss entwinement as a distinct concept, let alone one sufficient to transform a private entity into a state actor when traditional theories of state action do not. On the contrary, our analysis rested on the recognition that we are subject of the dispute, a park, served a "public function," much like a fire department or a police department. Id. at 302. A park, we noted, is a "public facility" that "serves the community." Id. at 301-302. Even if the city severed all ties to the park and placed its operation in private hands, the park still would be "municipal in nature," analogous to other public facilities that have given rise to a finding of state action: the streets of a company town in Marsh v. Alabama, 326 U.S. 501, 90 L. Ed. 265, 66 S. Ct. 276 (1946), the elective process in Terry v. Adams, 345 U.S. 461, 97 L. Ed. 1152, 73 S. Ct. 809 (1953), and the transit system in Public Utilities Comm'n of D. C. v. Pollak, 343 U.S. 451, 96 L. Ed. 1068, 72 S. Ct. 813 (1952). 382 U.S. at 301-302. Because the park served public functions, the private trustees operating the park were considered to be state actors. n6

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n6 We have used the word "entwined" in another case, Gilmore v. Montgomery, 417 U.S. 556, 565, 41 L. Ed. 2d 304, 94 S. Ct. 2416 (1974), which the majority does not cite. In Gilmore, we held that a city could not grant exclusive use of public facilities to racially segregated groups. Id. at 566. The city, we determined, was "engaged in an elaborate subterfuge" to circumvent a court order desegregating the city's recreational facilities. Id. at 567. The grant of exclusive authority was little different from a formal agreement to run a segregated recreational system. Ibid. Thus, although we quoted the "entwined" language from Evans v. Newton, 382 U.S. 296, 15 L. Ed. 2d 373, 86 S. Ct. 486 (1966), we were not using the term in the same loose sense the majority uses it today. And there is certainly no suggestion that the TSSAA has structured its recruiting rule specifically to evade review of an activity that previously was deemed to be unconstitutional state action.

- - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - [*314]

These cases, therefore, cannot support the majority's "entwinement" [***829] theory. Only Evans speaks of entwinement at all, and it does not do so in the same broad sense as does the majority. n7 Moreover, these cases do not suggest that the TSSAA's activities can be considered state action, whether the label for the state-action theory is "entwinement" or anything else.

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n7 The majority's reference to National Collegiate Athletic Assn. v. Tarkanian, 488 U.S. 179, 102 L. Ed. 2d 469, 109 S. Ct. 454 (1988), as foreshadowing this case, ante, at 8, also does not support its conclusion. Indeed, the reference to Tarkanian is incongruous. It is difficult to imagine that application of the majority's entwinement test could change the result reached in that case, so that the National Collegiate Athletic Association's actions could be found to be state action given its large number of public institution members that virtually control the organization.

- - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - -

* * *

Because the majority never defines "entwinement," the scope of its holding is unclear. If we are fortunate, the majority's fact-specific analysis will have little bearing beyond this case. But if the majority's new entwinement test develops in future years, it could affect many organizations that foster activities, enforce rules, and sponsor extracurricular competition among high schools -- not just in athletics, but in such diverse areas as agriculture, mathematics, music, marching bands, forensics, and cheerleading. Indeed, this entwinement test may extend to other organizations that are composed of, or controlled by, public officials or public entities, such as firefighters, policemen, teachers, cities or counties. [*315] I am not prepared to say that any private organization that permits public entities and public officials to participate acts as the state in anything or everything it does, and our state-action jurisprudence has never reached that far. The state-action doctrine was developed to reach only those actions that are truly attributable to the State, not to subject private citizens to the control of federal courts hearing § 1983 actions.

I respectfully dissent.

Copyright © 2003 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.
Your use of this service is governed by Terms & Conditions . Please review them